# NO. 23-1887

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**ACUFLOOR, LLC,**
*Plaintiff-Appellant,*

v.

**EVENTILE, INC., FORPAC, LLC**
*Defendants-Appellees.*

## OPENING BRIEF OF PLAINTIFF-APPELLANT ACUFLOOR, LLC

**Appeal from the United States District Court for the Middle District of Florida, in No. 2:21-cv-00802-SPC-KCD, Judge Sheri Polster Chappell**

### HAYNES AND BOONE, LLP

| | | |
|---|---|---|
| John R. Emerson | Angela M. Oliver | Adam L. Erickson |
| Debra J. McComas | 800 17th Street, NW | 6000 Headquarters Dr. |
| Caroline W. Fox | Suite 500 | Suite 200 |
| 2801 N. Harwood St. | Washington, D.C. 20006 | Plano, Texas 75024 |
| Suite 2300 | Phone: (202) 654-4552 | Phone: (972) 739-8661 |
| Dallas, Texas 75201 | | |
| Phone: (214) 651-5328 | | |

**Attorneys for Plaintiff-Appellant, Acufloor, LLC**

### REPRESENTATIVE CLAIMS OF U.S. PATENT NO. 10,704,274

5. A tile leveling device comprising:

   a body defining an open window;

   a base orthogonally coupled to the body, the base extending to the front of the body and the base extending to the rear of the body;

   a base to body coupling including a frangible breakaway section, the base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the base;

   a first notch formed at the base extending from proximate the base to body coupling to the front of the body the first notch providing first **tile edge-to-mortar-to-subfloor contact**; and

   a second notch formed at the base extending from proximate the base to body coupling to the rear of the body the second notch providing first **tile edge-to-mortar-to-subfloor contact**; and

   **the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the leveling device within the bounds of the base.** Appx123-124 (emphasis added).


8. A tile leveling device comprising:

   a body defining an open window;

   a base orthogonally coupled to the body, the base extending to the front of the body and the base extending to the rear of the body;

   a base to body coupling including a frangible breakaway section, the base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the base;

   a first notch formed at the base extending from proximate the base to body coupling to the front of the body; and

   a second notch formed at the base extending from proximate the base to body coupling to the rear of the body; and

   **the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the leveling device within the bounds of the base.** Appx124 (emphasis added).

# REPRESENTATIVE CLAIM OF U.S. PATENT NO. 10,513,857

10. A tile leveling device comprising:

a body defining an open window;

an I-shaped base orthogonally coupled to the body, the I-shaped base having spaced first, second, third, and fourth bars extending transversely from the body, the spaced first and second bars extending to the front and outward of the body and the spaced third and fourth bars extending to the rear and outward of the body;

an I-shaped base to body coupling including a frangible breakaway section, the I-shaped base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the I-shaped base;

a first notch formed between the first and second bars;

a second notch formed between the third and fourth bars;

a first tile over the first bar, the first tile having a first surface opposite a second surface, the first tile having a first corner over the first notch, **the first corner having contact with mortar at the first notch with edge-to-subfloor contact of first corner-to-mortar-to-subfloor at the first notch**, wherein the first surface faces the first bar and the second surface is farther from the first bar than the first surface;

a second tile over the second bar, the second tile having a third surface opposite a fourth surface, the second tile having a second corner over the first notch, **the second corner having contact with mortar at the first notch with edge-to-subfloor contact of second corner-to-mortar-to-subfloor at the first notch**, wherein the third surface faces the second bar and the fourth surface is farther from the second bar than the third surface; and

the frangible breakaway section being located between the first and second surfaces of the first tile and the third and fourth surfaces of the second tile. Appx96 (emphasis added).

# CERTIFICATE OF INTEREST

| | |
|---:|:---|
| **Case Number** | 23-1887 |
| **Short Case Caption** | Acufloor, LLC v. EvenTile, Inc. |
| **Filing Party/Entity** | Acufloor, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: October 12, 2023          Signature: */s/ John R. Emerson*

                                           Name:  John R. Emerson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>X None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>X None/Not Applicable |
| Acufloor, LLC | | |
| | | |
| | | |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

__ None/Not Applicable                     ___ Additional pages attached

| Tiffany M. Cooke (Haynes and Boone, LLP) | Nicolette Nunez (Haynes and Boone, LLP) | Andrew Drott (Haynes and Boone, LLP) |
|---|---|---|
| John N. Muratides (Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, PA) | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

____ Yes (file separate notice; see below)   _X_ No   ___ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

_X_ None/Not Applicable                    ___ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

REPRESENTATIVE CLAIMS OF U.S. PATENT NO. 10,704,274 ..................... i

REPRESENTATIVE CLAIM OF U.S. PATENT NO. 10,513,857 ....................... ii

CERTIFICATE OF INTEREST ........................................................................ iii

TABLE OF AUTHORITIES ........................................................................... viii

STATEMENT OF RELATED CASES ............................................................... 1

JURISDICTIONAL STATEMENT .................................................................... 2

STATEMENT OF THE ISSUES ......................................................................... 3

STATEMENT OF THE CASE ............................................................................ 4

    I.     The '274 and '857 Patents claim novel tile-leveling devices. .............. 6

    II.    The Prosecution Histories of the '274 and '857 Patents do
          not include disclaimers relevant to the appealed claim
          constructions. ................................................................................... 12

          A.     Acufloor did not disclaim the ordinary meaning of
                "edge" or the Majority of an Area Term during the
                prosecution of the '274 Patent. ............................................. 12

          B.     Acufloor did not disclaim the ordinary meaning of
                "edge" during the prosecution of the '857 Patent. ................. 18

    III.   The Proceedings Below .................................................................... 20

          A.     Claim construction of the Majority of an Area Term .............. 21

          B.     Claim construction of "edge" ................................................. 23

          C.     The stipulated judgment ......................................................... 26

SUMMARY OF THE ARGUMENT ................................................................ 26

STANDARD OF REVIEW ............................................................................... 29

ARGUMENT ..................................................................................30

    I.    The district court erred in concluding that the Majority of
          an Area Term describes the majority of the area of the base
          as a whole rather than the majority of an area "of tile-to-
          mortar-to-subfloor contact." ............................................ 31

          A.    The district court's construction contradicts the
                 plain meaning of the claim language. ......................................32

          B.    The district court erred in holding that the
                 prosecution history dictates a construction that
                 contradicts the Majority of an Area Term's plain
                 language. ..............................................................................34

    II.    The district court erred in limiting "edge" to a single line. ............... 42

          A.    The intrinsic record and the purpose of the claimed
                 "edge-to-subfloor contact" confirm that the term
                 "edge" is not restricted to a single line. ...................................43

          B.    Acufloor did not clearly and unequivocally disclaim
                 any meaning of "edge" that is not restricted to a
                 single line. ............................................................................50

CONCLUSION ..............................................................................59

CERTIFICATE OF COMPLIANCE .................................................62

ADDENDUM .................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*01 Communique Laboratory, Inc. v. LogMeIn, Inc.,*
  687 F.3d 1292 (Fed. Cir. 2012) ........................................................ 37

*3M Innovative Properties Co. v. Avery Dennison Corp.,*
  350 F.3d 1365 (Fed. Cir. 2003) ........................................................ 38

*Advanced Steel Recovery, LLC v. X-Body Equip., Inc.,*
  808 F.3d 1313 (Fed. Cir. 2015) ........................................................ 45

*Altair Eng'g, Inc. v. LEDdynamics, Inc.,*
  413 F. App'x 251 (Fed. Cir. 2011) .................................................... 47

*Altiris, Inc. v. Symantec Corp.,*
  318 F.3d 1363 (Fed. Cir. 2003) ........................................................ 29

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,*
  340 F.3d 1298 (Fed. Cir. 2003) ........................................................ 47

*Avid Tech., Inc. v. Harmonic, Inc.,*
  812 F.3d 1040 (Fed. Cir. 2016) .................................................. 29, 59

*Bicon, Inc. v. Straumann Co.,*
  441 F.3d 945 (Fed. Cir. 2006) .......................................................... 33

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.,*
  508 F.3d 1366 (Fed. Cir. 2007) .................................................. 30, 58

*Genuine Enabling Tech. LLC v. Nintendo Co.,*
  29 F.4th 1365 (Fed. Cir. 2022) ........................................................ 41

*Grober v. Mako Prods., Inc.,*
  686 F.3d 1335 (Fed. Cir. 2012) ........................................................ 31

*Hockerson-Halberstadt, Inc. v. Avia Group International, Inc.,*
  222 F.3d 951 (Fed. Cir. 2000) .............................................. 45, 46, 47

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
  381 F.3d 1352 (Fed. Cir. 2004) ......................................... 30

*Inline Plastics Corp. v. EasyPak, LLC*,
  799 F.3d 1364 (Fed. Cir. 2015) ......................................... 36

*Kaufman v. Microsoft Corp.*,
  34 F.4th 1360 (Fed. Cir. 2022) .................................... 44, 45

*Motionless Keyboard Co. v. Microsoft Corp.*,
  486 F.3d 1376 (Fed. Cir. 2007) ......................................... 47

*Omega Eng'g, Inc, v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ......................................... 31

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................... 30, 45

*SEB S.A. v. Montgomery Ward & Co.*,
  594 F.3d 1360 (Fed. Cir. 2010), *aff'd sub nom. Glob.-Tech
  Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) ............... 59

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
  358 F.3d 870 (Fed. Cir. 2004) ......................................... 41

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015) ......................................... 29

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  789 F.3d 1335 (Fed. Cir. 2015) ......................................... 29

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ......................................... 30

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
  853 F.3d 1272 (Fed. Cir. 2017) ......................................... 33

*In re Wright*,
  569 F.2d 1124 (CCPA 1977) ......................................... 46

**Statutes**

28 U.S.C. § 1295 ................................................................................. 2

28 U.S.C. § 1331 ................................................................................. 2

28 U.S.C. § 1338 ................................................................................. 2

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding was previously before this Court or any other appellate court.

Counsel is not aware of any case that may directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338 and entered final judgment. Acufloor timely appealed. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

# STATEMENT OF THE ISSUES

1. The district court construed the term "the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base" to mean that "the notches in the base collectively span an area that is larger than the solid portions of the base." Did the district court err in holding that the "majority" in the claim term refers to the majority of the area within the bounds of the base rather than majority of the area *of tile-to-mortar-to-subfloor contact for the tile leveling device* within the bounds of the base, as the claim states?

2. The district court also construed the term "edge," when used in the phrases "edge-to-subfloor contact" and "edge-to-mortar-to-subfloor contact," to mean "the line at which a surface of a tile terminates"—a construction that excludes an example embodiment that the specification expressly states provides the recited "edge-to-subfloor contact." Did the district court err in adopting a construction of "edge" that contradicts the specification based on statements in the prosecution that do not clearly and unequivocally disclaim a broader interpretation?

## STATEMENT OF THE CASE

This appeal comes to the Court from a stipulated judgment of non-infringement entered after the district court issued its claim construction order. The patents at issue in this appeal, U.S. Patent Nos. 10,704,274 ("the '274 Patent") and 10,513,857 ("the '857 Patent"), claim novel devices for leveling and spacing tiles that include openings called "notches" in their bases for allowing the tiles above them to directly contact the mortar below. *See* Appx83–97; Appx111–124. The district court's narrow constructions of (1) tile "edge" in the '274 and '857 Patents and (2) "the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base" (the "Majority of an Area Term") in the '274 Patent foreclosed Acufloor's infringement positions with respect to both patents. Appx1975–1977.

The district court based its constructions of both terms solely on the prosecution histories. Appx6–11. With respect to the Majority of an Area Term, the district court held that the term requires the claimed notches to take up a majority of the area of the base as a whole—rather than the majority of the area of tile-to-mortar-to-subfloor contact within the bounds of the base—because Acufloor added the phrase to distinguish prior-art devices that had openings that did not

cover the majority of the base.  Appx8–11.  But the district court did not cite (and the intrinsic record does not contain) any statements by Acufloor expressly distinguishing the asserted art on that basis.  Appx9–11.  The district court also did not address that the devices disclosed by the cited prior art had openings other than "notches"—which the district court construed to be limited to openings that intersect an edge of the base—that provided the majority of the area of direct tile-to-mortar-to-subfloor contact within the bounds of their bases.  Appx9–11.

The district court also held that the "tile edge" must refer to a single line on the border of the tile—as opposed to a region—because Acufloor "repeatedly distinguished [its] invention from tile spacers in the prior art by showing that only [its] invention allowed for mortar contact all the way to the very edge of the tile." Appx7.  But the district court did not cite a single statement by Acufloor that an "edge" is a single line or that the claims require notches that provide mortar contact at the "very edge" of the tile.  Appx6–8.  It also did not address Acufloor's express statements during prosecution that its own devices that ***do not*** provide mortar contact along the most extreme border of the tile ***do*** provide the requisite "edge" contact.  Appx6–8.

## I.    The '274 and '857 Patents claim novel tile-leveling devices.

Installers of ceramic tiling often rely on tile-leveling devices to help them properly space tiles and to prevent a phenomenon called lippage, in which adjacent tiles have different surface heights.  Appx614.  The '274 and '857 Patents claim novel tile-leveling devices developed by Clinton and Joshua Bunch, the father-and-son team that founded Acufloor, a leading company that manufactures, markets, and distributes high-quality, innovative tools for the tile industry.  Appx40–44; Appx83–97; Appx111–124.

Figures 11A and 11B[1] below illustrate the inventive device:



---

[1] The '274 and '857 Patents are continuations of the same parent patent and share a common specification.  For simplicity, this brief cites only the specification of the '274 Patent unless otherwise noted.

Appx117. The device includes both a tile clip (also referred to as a "spacer"),

depicted in Figure 11A, and a wedge, depicted in Figure 11B. Appx122 (5:43–48).

As shown in Figure 11A, the clip comprises two parts: a base portion (122) that lies

on the ground and an upright, u-shaped body portion (114). Appx122 (5:45–50).

During use, the installer first spreads mortar over the subfloor. Appx615.

The installer then places a tile on the mortar and slides the base of the tile clip

under one side of the tile. Appx121 (4:26–32); Appx615. Next, the installer places

another tile over the other side of the base of the tile clip so that there are tiles over

both sides of the clip base, and the body of the clip extends upward between the

tiles. Appx121 (4:30–41); Appx615–617. The installer then inserts a wedge through

an open window in the clip, putting pressure on the upper surfaces of the tiles to

level them. Appx122 (5:1–11); Appx618–619. Figures 6–8 below illustrate this

process:



Appx115.

Once the tiles are set, the installer either removes the wedge, or more typically, leaves the wedge in place, and breaks the upright body portion of the tile clip off of the base using either his or her foot or a specialized tool, as shown in Figure 9 below:



Appx115; Appx122 (5:14–27); Appx619–620.

8

The '857 and '274 Patents disclose a novel shape for the clip in which "notches" in the base of the clip allow the mortar beneath the part of the tile over the notches to directly contact the subfloor. Appx122 (5:60–62, 6:15–19); Appx620–621. As shown in annotated Figure 11A below, notches are openings in the base that intersect an edge of the base:



Appx117; Appx628; *see also* Appx8 (construing "notch" as an "opening intersecting an edge of the base through which mortar can penetrate").

The direct tile-to-mortar-to-subfloor contact provided by the notches strengthens the adhesion between the tile and the subfloor, which prevents the tile from breaking. Appx621; Appx635–636. Notches provide a stronger connection with the mortar than other types of openings that do not intersect the edge of the base because they allow the tile to connect with a continuous body of mortar rather

than only a small area of mortar penetrating through a hole or other opening. Appx652–653.

This direct mortar contact is especially important at the corners and edges of tiles because those regions of the tile are most vulnerable to breaking. Appx621–622; Appx635–636. Accordingly, claims 1 and 5 of the '274 Patent recite a tile-leveling device with two notches that each provide "tile edge-to-mortar-to-subfloor contact." Appx123–124; Appx621–622; Appx644.

The claims of the '857 Patent relate to an embodiment in which the installer places the tile-leveling device at the corners of three or four tiles, as shown in Figures 4 and 5 below:



Appx86. As with the '274 Patent, each of the independent claims recites a tile-leveling device that has two notches. Appx95–96. The claims of the '857 patent additionally recite two tiles, each placed with one of their corners over one of the notches, such that each corner has "edge-to-subfloor contact of [] corner-to-mortar-to-subfloor at the [] notch." Appx95–96. Placing leveling devices at the

corners of tiles, as the claims of the '857 Patent recite, permits the installer to use fewer leveling devices. Appx634–637.

The specification does not include any express definition of "edge" or "corner" but states that the embodiment depicted in Figure 11A has notches that are spaced to provide corner-to-subfloor contact and edge-to-subfloor contact. Appx122 (6:18–19). As the specification explains, the tile clip includes spacing pads 152 that installers can use to place tiles a predetermined distance apart by placing the tiles directly against the spacing pads. Appx122 (5:10–14, 5:65–67); Appx640–641; Appx646–647. As shown in the annotated figure below, placing a tile directly up against the spacing pads on the device depicted in Figure 11A would result in the lines at which the surfaces of the tile terminate resting over the plastic portion of the base rather the notches:



Appx117; Appx646–647.

II.     **The Prosecution Histories of the '274 and '857 Patents do not include disclaimers relevant to the appealed claim constructions.**

A.     **Acufloor did not disclaim the ordinary meaning of "edge" or the Majority of an Area Term during the prosecution of the '274 Patent.**

The prosecution of the '274 Patent centered on the claimed notches and the specific type of mortar contact they provide.  Acufloor ultimately overcame an obviousness rejection by adding the Majority of the Area Term to each of the independent claims to distinguish the asserted prior art, which disclosed devices that had openings other than notches in their bases that provided most of the area of direct mortar contact within the bounds of the base.

1.     **June 14, 2019 Non-Final Rejection and Response**

The Examiner first made the relevant prior-art rejection in a non-final office action dated June 14, 2019.  The Examiner asserted that each of the then-pending claims were obvious over the combination of two prior-art patent publications directed to tile-leveling devices: U.S. Patent Publication No. 2008/0236094 to Doda ("Doda") and PCT Application No. WO2013/033761 to Psaila ("Psaila").  Appx1307.  The rejection specifically pointed to the openings 129 in Figure 8 of Doda and the small notches 28 of Figure 1 of Psaila, shown below:

12





**Doda, Figure 8**                    **Psaila, Figure 1**

Appx1308–1309; Appx835; Appx927.  While the Examiner acknowledged

that "Doda fails to disclose said opening is a notch," he argued that the small

notches 28 in the base of the Psaila device would have made it obvious to make

Doda's openings notches by "modify[ing] the base of Doda with the configuration

of Psaila by extending the opening 129 all the way to the front portion of 116…."

Appx1309.

In a response filed September 16, 2019, Acufloor amended each of the

independent claims to recite that the tiles rest over the notches and the notches

provide "edge-to-mortar-to-subfloor contact."  Appx1299–1305.  It then argued

that neither Doda nor Psaila discloses the type of tile edge-to-mortar-to-subfloor

contact that the notches of the claimed device provide.  Appx1306–1307;

Appx1311–1312.

Specifically, Acufloor argued that the openings of Doda "push out mortar such that the 'transverse member sections adhere to the subsurface or floor and the tiles get adhered to the transverse member' and do not penetrate the base portion and provide this type of tile edge-to-mortar-to-subfloor contact." Appx1312.  It further argued that "two side cut-outs 28" of Psaila "are not positioned to provide the claimed tile edge-to-mortar-to-subfloor contact" at all.  Appx1312.  Acufloor did not argue, however, that the openings 129 of Doda were also not positioned to provide the claimed tile edge-to-mortar-to-subfloor contact.  Appx1307–1315.

## 2.    October 25, 2019 Final Rejection

The Examiner issued a final rejection on October 25, 2019, again rejecting all pending claims as obvious over Doda and Psaila.  Appx795–801.  In response to Acufloor's arguments, the Examiner reiterated that while Doda failed to disclose notches "extending to the front and/or rear of the base," it would have been obvious "to modify the base of Doda with the configuration of Psalia [sic] by extending the opening 129 all the way to the front portion of 116" to create notches providing the claimed contact.  Appx799.  The Examiner illustrated the proposed modification as follows and asserted that the illustrated combination satisfied the claims as amended:



Appx799.  According to the Examiner, modifying Doda in this manner "is generally recognized as being within the level of ordinary skill in the art, absent any showing of unexpected results."  Appx799.

### 3.     February 2020 Examiner Interview

Following the October 25, 2019 final rejection, Acufloor requested an examiner interview.  Appx750.  In advance of the interview, Acufloor sent an agenda outlining the argument to be presented—that "[i]t is not possible that one of ordinary skill in the art before the filing date of the instant invention would have modified the base of Doda with the configuration of Psaila by extending the opening 129 all the way to the front portion of base 116 for allowing more adhesive to penetrate the opening and extend over a greater surface area of the tiles as taught by Psaila."  Appx1285.  Acufloor went on to explain that Psaila teaches away from extending any openings or notches because the Psaila device uses spacing tabs that

rest on the base of the device itself—as opposed to a separate, upright piece as in the claimed invention—to ensure the proper spacing of adjacent tiles.  Appx1294–1295.

The agenda also provided a link to a YouTube video that used a commercial embodiment of the claimed devices to explain the non-obviousness of the notches by highlighting their unexpected benefits over other types of openings.  Acufloor also attached screenshots of the video and excerpts from its transcript as an exhibit.  Appx1269–1275; Appx1072–1087.[2]  The video explained that the claimed devices aim to provide "*minimal* interruption of plastic" at the edges and corner, which are the most vulnerable portions of the tile.  Appx1080 (emphasis added).  It further explained that "[t]here is a tremendous advantage to notches" when they are inserted correctly—namely, in a manner that "encourages mortar to reach as close to the edge as possible."  Appx1084–1085.

The video also expressly stated that the commercial embodiments depicted in the screenshots below provide the claimed tile edge-to-mortar-to-subfloor

---

[2] The Examiner's Interview Summary attaches the black-and-white version of the screenshots from the file history (Appx1269–1275), and Appx1080–1086 includes a color copy of the same presentation produced from the prosecuting attorney's files.  The full-color version of the video is also still publicly available at the address provided in Acufloor's pre-interview agenda.  Appx1276.

contact, despite the fact the lines at the most extreme borders of the tiles lie over

the bases of the depicted devices, rather than over the notches:

 

Appx1080.

### 4.    March 25, 2020 Amendment and Allowance

Following the interview, Acufloor amended each of the independent claims

to include the Majority of an Area Term: "the combination of the first notch and

the second notch providing a majority of an area of tile-to-mortar-to-subfloor

contact for the tile leveling device within the bounds of the base." Appx1349–1354.

Acufloor also added a new claim (now claim 8) that included the new Majority of

an Area Term but did not require that the notches provide tile edge-to-mortar-to-

subfloor contact. Appx1355. It also amended claim 5 to remove the recitation of

first and second tiles having tile-edge-to-mortar-to-subfloor contact and to instead

recite that the first and second notches provide tile edge-to-mortar-to-subfloor

contact. Appx1352–1353.

In the remarks, Acufloor reiterated its arguments that neither Doda nor Psaila disclosed the claimed notches and that it would not have been obvious to modify the openings of Doda to make them notches as proposed. Appx1357–1371. The remarks did not mention any comparison between the area of the notches and the area of the base as a whole. Appx1356–1371. Nor did Acufloor assert—in the March 25, 2020 Amendment or at any point during the prosecution of the '274 Patent—that the openings 129 of Doda are too far apart to provide the tile edge-to-mortar-to-subfloor contact recited in claims 1 and 5. Appx1356–1371.

The Examiner allowed the claims as amended. *See* Appx123–124.

## B. Acufloor did not disclaim the ordinary meaning of "edge" during the prosecution of the '857 Patent.

The district court and the Appellees only cited one office-action response from the prosecution of the '857 Patent in connection with the disputed "edge" term—a March 2019 response to a non-final rejection dated September 20, 2018. Appx6–8; Appx977–982. In that office action, the Examiner rejected the claims as obvious over Doda in view of U.S. Patent Application Publication No. 2013/0247508 to Hoffman ("Hoffman"). Appx710. The Examiner again pointed to Doda's openings 129 but acknowledged that Doda does not disclose an "I-shaped base," as claimed. Appx712. He argued that Hoffman's I-shaped base

18

would have made it obvious to modify the base of Doda to extend the openings 129 all the way to the front portion of the base to make it I-shaped.  Appx712–713.

Acufloor's response amended the independent claims to recite that the notches provide "edge-to-subfloor contact" and argued that the proposed combination did not render the amended claims obvious for two reasons: (1) the grooves present in Hoffman's base "do not penetrate the base" and therefore cannot provide edge-to-subfloor contact and (2) even if the grooves penetrated the base, they would not satisfy the claims' requirements of notches located to the front and back of the devices because the grooves extend to the sides of the device rather than to the front and back.  Appx713–714.  The response further explained that the grooves' purpose is to receive adhesive material to bind the tile to the plate, not to provide mortar-to-subfloor contact.  Appx713–714.

In support of those arguments, Acufloor submitted the below annotated figure, which it characterized as illustrating "Hoffman's edge to groove contact":



Appx714; Appx1052.[3]

### III.    The Proceedings Below

Acufloor's Complaint alleged that EvenTile, a competitor of Acufloor, infringes the '274 and '857 Patents by manufacturing, marketing, offering for sale, and/or selling its wedge-and-clip leveling system.  Appx45–46.  It further alleged that FORPAC, another Acufloor competitor, infringes the '274 and '857 Patents by

---

[3] Acufloor originally submitted its response to the relevant office action on March 20, 2019.  Appx700–718.  That response incorrectly listed amended claim 10 as "original" despite amendments to that claim and inadvertently omitted Exhibits A and B referred to in the response.  Appx704–705; Appx718.  On March 21, 2019, Acufloor submitted a corrected claim listing that presented the same amendments but correctly listed claim 10 as "currently amended" and also attached previously omitted Exhibits A and B.  Appx1045–1059.

marketing, offering for sale, and/or selling a similar, FORPAC-branded wedge-and-clip system that FORPAC purchases from EvenTile. Appx46–47.

### A.     Claim construction of the Majority of an Area Term

During claim construction, Acufloor argued that the Majority of an Area Term in asserted claims 1, 5, and 8 of the '274 Patent should be construed to mean "the combination of the first notch and the second notch providing the majority of the tile-to-mortar-to-subfloor contact that exists within the bounds of the base." Appx521. FORPAC and EvenTile, on the other hand, argued that the term should be construed to mean that "[t]he notches in the base collectively span an area that is larger than the solid portions of the base." Appx521–522.[4]

The crux of the parties' dispute centered around what the claimed "majority" referred to. Acufloor argued that—consistent with the claim language—it referred to the majority of the area *of tile-to-mortar-to-subfloor contact* within the bounds of the base. Appx587–589. FORPAC and EvenTile, on the other hand, both maintained that the claimed "majority" instead referred to the majority of the area within the bounds of the base as a whole—effectively

---

[4] EvenTile initially proposed and submitted briefing in favor of a slightly different construction that also required the notches to cover the majority of the base but agreed to FORPAC's construction at the *Markman* Hearing. Appx521; Appx10–11.

excising the phrase "of tile-to-mortar-to-subfloor contact" from the claims. Appx1000–1002; Appx1393–1396.

The district court adopted FORPAC's construction. Appx10–11. The *Markman* order did not address Acufloor's argument that FORPAC's construction contradicted the plain language of the claims. Appx9–11. Instead, the court relied exclusively on its holding that Acufloor added the Majority of an Area Term to the claims of the '274 Patent during prosecution to distinguish the Doda device based on the size of its openings. Appx10. Specifically, the district court asserted that Acufloor argued in its March 25, 2020 Amendment that "the claimed design allowed 'more adhesive to penetrate the opening and extend over a greater surface area of the tiles' than the prior art." Appx10 (quoting Appx826). The court then relied on that interpretation of Acufloor's argument to conclude that the Majority of an Area Term "distinguishes Acufloor's device from the prior art because the Accufloor [sic] design allows a relatively large area of direct contact between subfloor, mortar, and tile." Appx10. The district court further opined that "[t]he applicants gave no indication they contemplated other openings when adding the 'majority of an area' phrase." Appx10.

The portion of the March 25, 2020 Amendment the district court quoted in the *Markman* order came from Acufloor's response to the Examiner's argument

that Psaila would have made it obvious to modify Doda's openings to make them

notches.  Appx817; Appx826.  The full text of the sentence the district court cited

reads:

> It is not possible that one of ordinary skill in the art before the filing date of the instant invention *would have modified the base of Doda with the configuration of Psaila by extending the opening 129 all the way to the front portion of base 116* for allowing more adhesive to penetrate the opening and extend over a greater surface area of the tiles as taught by Psaila.

Appx814 (emphasis added).

### B.    Claim construction of "edge"

Acufloor also argued that the term "tile edge" should be given its plain and

ordinary meaning, while FORPAC and EvenTile both asserted that the term "tile

edge" should be limited to a single line.  Appx521.  FORPAC specifically proposed

that "tile edge" be construed to mean "[t]he line at which a surface of a tile

terminates," while EvenTile proposed that "tile edge" be construed as "the line

that is the intersection of two plane faces of a tile."  Appx521.

In asking the district court to reject Appellees' narrow constructions,

Acufloor cited, among other things:

- Expert testimony explaining that Appellees' constructions contradicted both common usage of the term "edge" in the art of tile installation to refer to a region of the tile rather than a line and the purpose of the claimed "edge-to-mortar-to-subfloor contact,"

23

- An example embodiment of a device (depicted in Fig. 11A) that the specification expressly states provides the claimed tile edge-to-subfloor contact that would ***not*** provide direct mortar contact with the line at the extreme edge of the tile,

- Repeated statements by Acufloor during the prosecution of the Asserted Patents that Acufloor's own device, which also ***does not*** provide direct mortar contact at the extreme edge of the tile, ***does*** provide the claimed edge-to-mortar-to-subfloor contact, and

- EvenTile's own dictionary definitions indicating that the plain meaning of the word "edge" includes a region.

Appx584–587.

The district court nevertheless sided with Appellees and construed the term "edge," when used in the phrases "edge-to-subfloor contact" in asserted claims 1 and 10 of the '857 Patent and "edge-to-mortar-to-subfloor contact" in asserted claims 1 and 5 of the '274 Patent, to mean "the line at which a surface of a tile terminates." Appx7–8. The district court further explained that the term "edge-to-subfloor contact" in the claims of the '857 Patent clarifies that mortar reaches the extreme edge of the tile at the corner and over the notch" and that "edge-to-mortar-to-subfloor contact" in claims 1 and 5 of the '274 Patent similarly requires "mortar-to-tile contact up to the very edge of the tile, rather than an area near the very edge." Appx7.

In reaching that construction, the district court did not address any of Acufloor's arguments. Appx6–8. Instead, the district court relied solely on its

holding that Acufloor had allegedly "repeatedly distinguished [its] invention from tile spacers in the prior art" during prosecution "by showing that only [Acufloor's] invention allowed for mortar contact all the way to the very edge of the tile." Appx7.

> In support of that opinion, the district court cited three documents:
>
> (1) the screenshots from the video Acufloor submitted in connection with the February 2020 Examiner Interview that expressly stated that a commercial embodiment that does not permit mortar contact with the "very edge of the tile" does provide "tile edge-to-mortar-to-subfloor contact;
>
> (2) the claim amendment that Acufloor submitted after that interview in March of 2020 that moved the reference to tile edge-to-mortar-to-subfloor contact to a different part of claim 5; and
>
> (3) the March 2019 Amendment from the prosecution of the '857 Patent—specifically, the addition of "edge-to-subfloor contact" to the claims and the annotated figure of the Hoffman reference used to support Acufloor's argument that Hoffman's grooves did not provide "edge-to-subfloor contact" because they do not penetrate the base.

Appx7 (citing Appx1052; Appx1073–1087; Appx1352).

Despite asserting that these three documents evidenced Acufloor's intent to distinguish prior-art devices that did not permit mortar contact with the "very edge of the tile," the district court did not point to any statement by Acufloor in any of these documents or otherwise that clearly and unequivocally indicated that either "edge-to-subfloor contact" or "edge-to-mortar-to-subfloor contact" requires mortar contact at the "the line at which a surface of a tile terminates." Appx6–8.

## C.  The stipulated judgment

After the *Markman* order issued, the parties entered a stipulated final judgment of non-infringement.  Appx1973–1980.  The judgment provided that "'[u]nder the Court's ordered construction of 'edge,' the Accused Systems do not meet the limitations requiring 'tile edge-to-mortar-to subfloor contact' in asserted Claims 1 and 5 of the '274 Patent or 'edge-to-subfloor contact' in asserted Claims 1 and 10 of the '857 Patent because when the Accused Systems are in use, 'the line at which the surface of the tile terminates' lies over the base of the clip of the Accused Systems.'"  Appx1976.

It further provided that "[t]he Accused Systems do not meet the limitation of the claims of the '274 Patent reciting 'the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base' under the Court's construction 'because the notches in the Accused Systems do not span an area larger than the solid portions of the base.'"  Appx1977.

## SUMMARY OF THE ARGUMENT

The district court committed two errors during claim construction.  First, it erred in construing "the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile

26

leveling device within the bounds of the base" to require that the notches in the base collectively span an area that is larger than the solid portions of the base. The plain language of the claim makes clear that the claimed "majority" is the majority of the area of the tile-to-mortar-to-subfloor contact within the bounds of the base— not the majority of the area of the base.

The district court based its construction solely on its finding that Acufloor added the Majority of an Area Term to the claims during prosecution to distinguish the prior art because the claimed devices provide a larger area of uninterrupted subfloor-to-mortar-to-tile contact than the prior-art devices. But the only prosecution statement the district court cited addressed an entirely different point—whether it would have been obvious to modify Doda's openings to make them notches. Far from clearly and unequivocally dictating a construction that contradicts the term's ordinary meaning, the cited amendment actually confirms that the Majority of an Area Term distinguished the prior art by requiring that notches—as opposed to other openings like those in the Doda device—provide the majority of the area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base.

The district court also erred in restricting "edge" in the terms "edge-to-subfloor contact" and "edge-to-mortar-to-subfloor contact" to a single line. The

district court's construction contradicts the plain meaning of "edge" to those in the art, which encompasses and area or region, and contradicts the purpose of the claimed contact—to prevent breakage in the most vulnerable areas of the tile.  The district court's construction also excludes the preferred embodiment depicted in Figure 11A and commercial embodiments that Acufloor expressly characterized as providing the claimed contact during prosecution.

The district court did not address Figure 11A, Acufloor's statements about its commercial embodiments, or any of Acufloor's other intrinsic and extrinsic evidence confirming that the term "edge" in the claims refers to a region.  It instead based its erroneous construction exclusively on its holding that Acufloor "repeatedly distinguished [its] invention from tile spacers in the prior art by showing that only [Acufloor's] invention allowed for mortar contact all the way to the very edge of the tile."  But none of the statements the district court cited in support of that holding distinguished the prior art on that basis—let alone in a manner that clearly and unequivocally restricted the term "edge" to a single line.  Instead, the cited arguments addressed entirely different issues: (1) whether it would have been obvious to modify Doda's holes to make them notches and (2) whether Hoffman's grooves, which did not penetrate the base, could provide tile-to-mortar-to-subfloor contact of any kind.

The district court's erroneous constructions of the Majority of an Area Term and "edge" led to the parties' stipulated judgment of non-infringement. The judgment must therefore be vacated and the case remanded for an infringement determination under the proper constructions of those terms.

## STANDARD OF REVIEW

Where a patent holder concedes non-infringement based on claim constructions, this Court need only review the relevant constructions. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368 (Fed. Cir. 2003).

The Court reviews claim construction *de novo* and any underlying factual findings regarding the extrinsic evidence for clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 574 U.S. 318, 332–33 (2015). The meaning of a claim term "in light of its use in the claims, the disclosure in the specification, and the discussion of the term in the prosecution history is a question of law." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015). Similarly, the existence and scope of prosecution disclaimer or disavowal is a legal question, not a factual one. *Id.* at 1343. Thus, where, as here, the district court based its constructions solely "on an intrinsic evidence determination about the meaning of the prosecution history," this Court reviews those constructions *de novo*. *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1044–45 (Fed. Cir. 2016).

## ARGUMENT

This appeal arises from the district court's erroneous constructions of the Majority of an Area Term and "edge." Both constructions contradict the claims' plain meaning and the intrinsic evidence. Despite relying exclusively on the prosecution histories to support both constructions, the district court failed to cite any clear and unequivocal disclaimer dictating its adopted constructions—or, indeed, any evidence supporting those constructions at all.

Claim language must be given its ordinary and customary meaning in view of the intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). The patent specification is the "'single best guide to the meaning of a disputed term,'" *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), and "is, thus, the primary basis for construing the claims." *Phillips*, 415 F.3d at 1315 (citation and quotation omitted).

The full scope of a claim term may be limited only where the patentee clearly and expressly sets out a different definition in the specification or clearly and unmistakably disavows the full scope during prosecution. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004); *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007). "[W]hile the prosecution history can inform whether the inventor limited the claim scope in the course of

30

prosecution, it often produces ambiguities created by ongoing negotiations between the inventor and the PTO." *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012). Accordingly, for a statement during prosecution to qualify as a disavowal of claim scope, it must be both "so clear as to show reasonable clarity and deliberateness," and "so unmistakable as to be unambiguous evidence of disclaimer." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) (citations omitted).

I.      **The district court erred in concluding that the Majority of an Area Term describes the majority of the area of the base as a whole rather than the majority of an area "of tile-to-mortar-to-subfloor contact."**

The court erred in construing "the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base" to mean "the notches in the base collectively span an area that is larger than the solid portions of the base." Despite holding that the prosecution history dictated a construction of the term that contradicts its plain meaning, the district court failed to cite any clear and unequivocal disclaimer supporting that construction. The term should instead be construed consistent with its plain meaning and the intrinsic record to mean that the combination of the first notch and the second notch provide the majority of the tile-to-mortar-to-subfloor contact that exists within the bounds of the base.

**A.    The district court's construction contradicts the plain meaning of the claim language.**

The district court's construction fails to give meaning to the phrase "of the tile-to-mortar-to-subfloor contact" in the Majority of an Area Term and therefore contradicts the term's plain meaning.  The parties' dispute with respect to the Majority of an Area Term centers around what the claimed "majority" refers to.  Appx587–589; Appx1000–1002.  Acufloor argued that—consistent with the plain language of the claim—the "majority" in the Majority of an Area Term refers to a majority of the area ***of tile-to-mortar-to-subfloor contact*** that exists within the bounds of the base of the device.  Appx587–589.  In other words, under Acufloor's proposal, the recited first and second notches—as opposed to other openings in the base—must provide most of the tile-to-mortar-to-subfloor contact for the leveling device.  Appx587–589.

The district court rejected Acufloor's construction and adopted FORPAC's proposal, which provides that the claimed majority instead refers to the area within the bounds of the base as a whole.  Specifically, the district court's construction requires that "[t]he notches in the base collectively span an area that is larger than the solid portions of the base."  Appx1393–1396.

The district court's construction contradicts the most natural reading of the claim language, which recites that the notches provide "a majority of an area ***of***

***tile-to-mortar-to-subfloor contact*** for the tile leveling device…." The phrase "of

an area of tile-to-mortar-to-subfloor contact" immediately follows the word

"majority." Accordingly, the most natural reading is that the phrase "of an area of

tile-to-mortar-to-subfloor contact," modifies the claimed "majority." In other

words, the claimed majority is the majority of the "area of tile-to-mortar-to-

subfloor contact." The phrase "within the bounds of the base" then limits the

area to be evaluated to determine whether this limitation is satisfied. Thus, of the

area of tile-to-mortar-to-subfloor contact within the bounds of the base, the

majority must be provided by the first and second notches. *See* Appx650.

The district court's construction ignores the phrase "of tile-to-mortar-to-

subfloor contact for the tile-leveling device" altogether. If Acufloor had wanted to

claim a device in which the notches covered a majority of the base, there would

have been no need to mention tile-to-mortar-to-subfloor contact at all.

This Court interprets claims "with an eye toward giving effect to all terms in

the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006); *see

also Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.,* 853 F.3d 1272, 1288 n.10 (Fed. Cir.

2017) ("It is highly disfavored to construe terms in a way that renders them void,

meaningless, or superfluous"). The district court's construction fails to do that by

rendering the phrase "of tile-to-mortar-to-subfloor contact for the tile-leveling device" superfluous.

      **B.**    **The district court erred in holding that the prosecution history dictates a construction that contradicts the Majority of an Area Term's plain language.**

              **1.**    **The sole prosecution statement the district court cited does not support its conclusion.**

The district court did not address Acufloor's arguments that FORPAC's construction contradicts the plain meaning of the claims. Instead, it based its construction solely on its holding that Acufloor added the Majority of an Area Term to the claims of the '274 Patent during prosecution to distinguish the Doda device because the claimed devices "allowed for a larger area of uninterrupted subfloor-to-mortar-to-tile contact" than that device. Appx10.

But the only prosecution statement the district court cited does not support its conclusion. The quoted statement came from the March 25, 2020[5] Amendment in which Acufloor added the Majority of an Area Term to the independent claims of the '274 Patent. *See* Appx10 (quoting Appx826). That amendment responded to the Examiner's October 25, 2019 rejection of the pending claims over his

---

[5]Although the *Markman* order states that the amendment was dated August 13, 2018, that was the filing date of the application that led to the '274 Patent, not the date of the amendment. Appx805; Appx829.

proposed combination of Doda and Psaila. Appx815. In that office action, the

Examiner reiterated his argument from the previous office action that although

"Doda fails to disclose said opening [129] is a notch," "[i]t would have been

obvious to one of ordinary skill in the art before the filing date of the instant

invention to modify the base of Doda with the configuration of Psaila by extending

the opening 129 all the way to the front portion of 116 for allowing more adhesive

132 to penetrate the opening and extend over the a greater surface area of the tiles

as taught by Psaila." Appx817. The Examiner also illustrated the proposed

combination as follows:



Appx799; Appx835; Appx927.

In response, Acufloor argued that "it is not possible that one of ordinary skill

in the art before the filing date of the instant invention would have modified the

base of Doda with the configuration of Psaila by extending the opening 129 all the

way to the front portion of base 116 for allowing more adhesive to penetrate the

opening and extend over a greater surface area of the tiles as taught by Psaila."

Appx826.  The *Markman* order quoted only a portion of that sentence—in which Acufloor was essentially quoting the Examiner—to support its conclusion that Acufloor added the Majority of an Area Term to distinguish the cited art because "the claimed design allowed 'more adhesive to penetrate the opening and extend over a greater surface area of the tiles' than the prior art."  Appx10.

But that is not what Acufloor argued.  In fact, the portion of the March 25, 2020 Amendment the district court quoted did not specifically relate to the Majority of an Area Term at all, let alone unambiguously indicate that the term requires the first and second notches to cover more area than the solid portions of the base.  *See* Appx823–826.  Instead, the quoted argument—which Acufloor had also made in the February 2020 Examiner Interview before adding the Majority of an Area Term (Appx1285, Appx1295)—explained that it would not have been obvious to extend the openings 129 of Doda to make them notches as the examiner proposed because Psaila taught away from doing so.  *See* Appx814–816, Appx826. Acufloor's arguments about the obviousness of different limitations—the presence of first and second notches that provide edge-to-mortar-to-subfloor contact— cannot result in a clear and unequivocal disclaimer about the Majority of an Area Term.  *See Inline Plastics Corp. v. EasyPak, LLC,* 799 F.3d 1364, 1369 (Fed. Cir.

2015); *01 Communique Laboratory, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1298–99 (Fed. Cir. 2012).

Further, even if the statement did relate to the Majority of an Area Term, nothing in the quoted statement suggests that the term—or the claims generally— require the notches to cover more area than the plastic portions of the base. Instead, it simply expresses Acufloor's contention that Psaila would not have made it obvious to modify Doda's openings in the specific way the Examiner had suggested. Appx817; Appx824–826.

The district court did not cite any other statements from Acufloor in support of its claim construction. *See* Appx10. Thus, despite adopting a construction of the Majority of an Area Term that contradicts its plain meaning based entirely on its reading of the prosecution history, the district court failed to cite any clear and unequivocal disclaimer dictating that construction.

And no such disclaimer exists. The only other prosecution statements Appellees relied on to support their construction of the Majority of an Area Term were statements by the Examiner in his summary of the February 2020 Examiner Interview. There, the Examiner stated that Acufloor's YouTube video "shows the size of the notch is critical to the success of the invention, hence Examiner suggested Applicant focus on the size of each notch in relation to the size of the

base." Appx1267. The Examiner further suggested that "amending the claim language to better define the size of the notch would further distinguish from the prior art of record." Appx1267. According to EvenTile, these statements by the Examiner indicate that Acufloor "clearly added" the Majority of an Area Term "to define 'notch' size in relation to the size of the base." Appx1394–1395.

But Acufloor was under no obligation to follow the Examiner's suggestion to "focus on the size of each notch in relation to the size of the base." And the language of the Majority of an Area Term itself shows that Acufloor decided to instead distinguish its claims based on the notches' size in relation to that of other openings.

"Prosecution history cannot be used to limit the scope of a claim unless the *applicant* took a position before the PTO." *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373 (Fed. Cir. 2003) (emphasis added, alterations omitted). Thus, the Examiner's suggestions about amendments that Acufloor could have made but did not cannot result in a clear and unequivocal disclaimer that limits the claims. *See id.*

Accordingly, neither the district court nor appellees identified any clear and unequivocal disclaimer justifying the district court's departure from the Majority of an Area Term's plain meaning.

**2.      The prosecution history is consistent with the Majority of an Area Term's plain meaning.**

In fact, the prosecution history is entirely consistent with the claims' plain meaning.  Acufloor added the Majority of an Area Term to distinguish prior art disclosing devices that had openings other than notches that provided the majority of the area of tile-to-mortar-to-subfloor contact within the bounds of the bases of those devices.  Specifically, as shown below, the Doda device had only the openings 129, which, as the Examiner himself admitted, are not notches:



Appx817; Appx927.  And although the Psaila device had two small notches (28), it also had four holes (26) that provided far more tile-to-mortar-to-subfloor contact than the notches:



Appx835.  Thus, the Majority of an Area Term distinguished the claimed devices because, unlike the Doda and Psaila devices, the claimed devices include first and second notches that provide the majority of the tile edge-to-mortar-to-subfloor contact within the bounds of the base.

The district court discounted the fact that Doda and Psaila had openings other than notches that provided most of their tile-to-mortar-to-subfloor contact because Acufloor allegedly "gave no indication that they contemplated other openings when adding the 'majority of an area' phrase." Appx10.  But as an initial matter, the district court is incorrect that Acufloor "gave no indication that [it] contemplated openings other than notches" in the remarks accompanying the amendment.  In fact, the only portion of the March 25, 2020 Amendment that the district court cited expressed that it would not have been obvious to modify Doda's openings to make them notches as proposed.  *See* Appx817; Appx826.

The video Acufloor presented in the Examiner Interview preceding the amendment also explained that "[t]here is a tremendous advantage to notches" and demonstrated their superiority over Doda and Psaila's holes, which have plastic in front of them that pushes mortar out of the way when an installer slides those devices under tiles. Appx1084. And even though Acufloor never expressly explained that the Majority of an Area Term requires the first and second notches to provide more mortar contact than any other openings, the claim language itself makes that clear.

In any event, disclaimer in the absence of some indication otherwise is not the correct standard. *See SuperGuide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 881 (Fed. Cir. 2004). Instead, disclaimer requires a statement "'so clear as to show reasonable clarity and deliberateness,' and 'so unmistakable as to be unambiguous evidence of disclaimer.'" *Genuine Enabling Tech. LLC v. Nintendo Co.,* 29 F.4th 1365, 1374 (Fed. Cir. 2022) (citations omitted). Where "the record does not rise to the level of establishing a 'clear and unmistakable' disavowal," a construction based on prosecution disclaimer is improper. *See id.* at 1375.

No such clear and unmistakable disavowal exists here. Accordingly, the Majority of an Area Term should be construed consistent with its ordinary meaning to require that the combination of the first notch and the second notch

41

provide the majority of the tile-to-mortar-to-subfloor contact that exists within the bounds of the base.

## II.    The district court erred in limiting "edge" to a single line.

The district court also erred in concluding that the term "edge," when used in the phrases "edge-to-subfloor contact" and "edge-to-mortar-to-subfloor contact," must be limited to a single line.  As with the Majority of an Area Term, the district court relied solely on the prosecution history to support its construction.  *See* Appx6–8.  But despite its holding that Acufloor "relied on mortar-to-tile contact up to the very edge of the tile, rather than an area near the very edge, to distinguish their invention from the prior art," it failed to cite any clear and unequivocal disclaimer to that effect.  Appx7.

The district court also overlooked intrinsic and extrinsic evidence contradicting its construction, including (1) the specification's sole example of a device providing tile edge-to-subfloor contact, (2) the patentee's statements that devices the district court's construction also excludes provide the claimed contact, and (3) expert testimony explaining that limiting an "edge" to a line contradicts the purpose of the claimed edge contact and confirming that a person of skill in the art would instead understand "edge" as used in the claims to refer to the area or region where two surfaces of a tile meet.  *See* Appx584–587.  Because Acufloor did

42

not clearly and unequivocally restrict the term "edge" that to a single line during prosecution, the term should be given that ordinary and customary meaning.

### A.    The intrinsic record and the purpose of the claimed "edge-to-subfloor contact" confirm that the term "edge" is not restricted to a single line.

The specification, the plain meaning and purpose of the claimed tile edge-to-mortar-to-subfloor contact, and the prosecution history all support giving the term "edge" its ordinary and customary meaning rather than narrowing it to a single line.

### 1.    The specification's sole example of notches providing "edge-to-subfloor contact" would not provide direct mortar contact at the "very" edge of the tile.

The specification only gives one example of a tile-leveling device that provides "edge-to-subfloor contact" via notches: the device depicted in Figure 11A. Appx122 (6:18–19). That device would not provide mortar contact with the tile's "very" edge tile because the "very" edge would lie over the center portion of the device's base rather than a notch. *See* Appx117. The specification explains that the legs of the upright portion of the depicted tile clip includes "spacing pad[s] 152," which "may be utilized to position the tiles a predetermined distance apart" by laying the tiles directly against the spacing pads. Appx122 (5:65–67). As shown in the annotated figure below, the spacing pads 152 of the tile clip in Figure 11A are

placed so that when an installer uses them correctly, the line at which the bottom surface of the tile terminates will rest on the dotted line on the center portion of the clip's base—not over a notch:



Appx117; *see also* Appx640–641; Appx646–647.  Thus, under the district court's construction, the depicted device would not provide edge-to-subfloor or edge-to-mortar-to-subfloor contact.  *See* Appx646–647.

This Court has held that "'[a] claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support.'"  *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022).  The district court's construction does just that by construing "edge" to exclude the embodiment depicted in Figure 11A, which is the only embodiment the specification expressly characterizes as providing claimed edge-to-subfloor contact.  But neither the district court nor Appellees have cited any evidence sufficient to

meet the "high bar required to conclude that the patent excludes the only

embodiment described" as including this feature. *See id.*

The Court has also held that the specification "'is the single best guide to

the meaning of a disputed term'" and that, as part of the specification, "patent

drawings are highly relevant in construing the limitations of the claims." *Phillips v.

AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005); *Advanced Steel Recovery, LLC v.

X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015) (quoting *CVI/Beta

Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997)) (internal alterations

omitted). During claim construction, FORPAC attempted to discount the

relevance of Figure 11A by citing *Hockerson-Halberstadt, Inc. v. Avia Group

International, Inc.* for the proposition that "patent drawings do not define the

precise proportions of the elements and may not be relied on to show particular

sizes if the specification is completely silent on the issue." *See* Appx986 (citing 222

F.3d 951, 956 (Fed. Cir. 2000)).

The district court did not rely on *Hockerson-Halberstadt*, and it is

distinguishable for several reasons. First, the specification of the '274 and '857

Patents is not "completely silent" on the issue of whether Figure 11A is drawn in a

manner that would inform a POSITA of the meaning of "edge-to-subfloor

contact." It expressly states that the figure depicts an example of a leveling device 110 that has notches that can provide the claimed contact.  Appx122 (6:18-19).

Second, Acufloor is not relying on Figure 11A to define the "precise proportions" or "particular sizes" of the claimed devices like the patent holder in *Hockerson-Halberstadt*.  In *Hockerson-Halberstadt*, the patent holder attempted to overcome a prosecution disclaimer by arguing that the figures showed that the prosecution statement was a "mistake" because it contradicted the specific quantitative relationship between certain features of the claimed footwear shown in the figures.  222 F.3d at 956-57.  Citing *In re Wright*, 569 F.2d 1124, 1127 (CCPA 1977), this Court held that the patent holder could not use the "precise proportions" and "particular sizes" of elements in figures not drawn to scale to create "a mulligan that would erase from the prosecution history the inventor's disavowal of a particular aspect of a claim term's meaning." *Id.*

Unlike the patent holder in *Wright*, Acufloor is not using measurements of the figures to derive quantitative values for the measurements of the claimed device.  *See* 569 F.2d at 1127 ("Absent any written description in the specification of quantitative values, arguments based on measurement of a drawing are of little value.").  And unlike the patent holder in *Hockerson-Halberstadt*, Acufloor is not attempting to use conclusions drawn from the "quantitative relationship" between

different parts of the figure to "erase" a clear and unequivocal prosecution disclaimer. *See* 222 F.3d at 956-57.

Instead, Acufloor is simply relying on the figure to interpret a claimed feature that the specification expressly states the figure depicts. *See* Appx122 (6:18–19). This Court has repeatedly used patent figures for similar purposes. *See, e.g., Motionless Keyboard Co. v. Microsoft Corp.,* 486 F.3d 1376, 1380 (Fed. Cir. 2007) (using figures to construe a claim term requiring "keyboard within said concavity" to require that "all keys comprising the keyboard must be contained entirely within the concave area"); *Altair Eng'g, Inc. v. LEDdynamics, Inc.*, 413 F. App'x 251, 254-55 (Fed. Cir. 2011) (non-precedential) (using the apparent spacing of LEDs in a figure to construe "closely-spaced" to mean "not spaced-apart, such that adjacent LEDs are sufficiently close that another LED cannot fit in the space there between.").

The district court erred by failing to address Figure 11A and the accompanying description and construing "edge" to exclude the preferred embodiment depicted in that figure. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,* 340 F.3d 1298, 1308 (Fed. Cir. 2003) (rejecting a claim construction that excluded a preferred embodiment shown in one of the figures).

47

### 2. The prosecution history confirms that "edge" cannot be limited to a single line.

Consistent with the specification, during prosecution, Acufloor expressly argued that its own device provides tile edge-to-mortar-to-subfloor contact even though the center portion of the device is thick enough that the outer border of the tile clearly rests over the base on installation:



Appx1080. The district court's construction of "edge" would also exclude these devices because they do not provide direct mortar contact with "the line at which the surface of the tile terminates."

In the same presentation, Acufloor explained that "[c]orners and edges are the weakest points of any tile installation," and "[i]f a tile breaks anywhere, it breaks there…." Appx1080. Acufloor further explained that "[i]nserting plastic between the subfloor and the tile weakens the assembly, because mortar does not

adhere to plastic and often when the piece is inserted it completely removes mortar from the ability to touch the tile, especially at the edge." Appx1081. Therefore, Acufloor explained that the claimed notches aim to provide "minimal interruption of plastic" at these "vulnerable portion[s] of the tile installation." Appx1080.

Acufloor's description of the purpose of the claimed edge-to-mortar-to-subfloor contact confirms that the claims use the term "edge" to refer to "portions" or regions of the tile rather than single lines. As Acufloor's expert explained, restricting "edge" to a single line—as the district court did—is illogical in the context of the claims because a line has no area and cannot break. Appx644–645. It also would do little good to provide direct mortar support along a single line rather than an area of the tile. Appx644–645. In fact, the district court's construction renders the claims non-sensical because a line, having no area, cannot have "contact" with mortar. *See* Appx644.

For all of these reasons, a person of skill in the art would understand that the term "edge" in the claims must refer to an area or region rather than a line, particularly in light of Acufloor's illustration of edge-to-mortar-to-subfloor contact and its description of the purpose of that contact during prosecution. Appx644–648. The district court's construction contradicts that understanding and the prosecution history.

49

### 3. The district court's construction also contradicts the plain meaning of "edge."

The specification and prosecution history's uses of "edge" are consistent with the term's ordinary and customary meaning. Appellees' own cited dictionary definition confirms that "edge" can refer either to a line or a region or area. Appx1036–1037. Specifically, during claim construction, Appellees cited one of Merriam-Webster's twenty definitions of "edge," which defined "edge" as "the line where an object or area begins or ends." Appx977 (citing Appx1036–1037). But the same dictionary also defines "edge" as "the narrow *part* adjacent to a border." Appx1036.

Thus, the specification, the prosecution history, and the purpose of the claimed contact all confirm that the claims use "edge" to refer to a "part" of the tile, not a line.

### B. Acufloor did not clearly and unequivocally disclaim any meaning of "edge" that is not restricted to a single line.

The district court did not address any of Acufloor's intrinsic or extrinsic evidence contradicting its construction. Appx6–8. Instead, the court based its decision to restrict "edge' to a single line exclusively on its holding that Acufloor "repeatedly distinguished [its] invention from tile spacers in the prior art" during

prosecution "by showing that only [its] invention allowed for mortar contact all the way to the very edge of the tile." Appx7.

The district court cited only three documents in support of that opinion: 1) the agenda Acufloor submitted in advance of the February 2020 Examiner Interview during the prosecution of the '274 Patent; 2) the claim amendment Acufloor submitted following the same interview, and 3) Acufloor's March 2019 Amendment submitted during the prosecution of the '857 Patent. *See* Appx7 (citing Appx1072–1094; Appx1352; Appx1045–1059). None of these documents includes, nor did the district court cite, any clear and unmistakable disclaimer.

### 1. Acufloor did not clearly and unequivocally distinguish Doda and Psaila because they do not provide mortar contact at the "very edge" of the tile.

The district court incorrectly concluded that Acufloor responded to the Examiner's rejection of the claims of the '274 Patent over the combination of Doda and Psaila by arguing that the claimed devices, unlike those devices, "allowed for mortar contact all the way to the very edge of the tile." Appx7. But Acufloor made no such argument.

The district court cited the video Acufloor submitted in response to the Examiner's assertion that while Doda failed to disclose notches, Psaila's small notches 28 would have made it obvious to modify extend Doda's openings 129 all

the way to the front portion of its base to create notches that provide tile edge-to-mortar-to-subfloor contact, as shown below:



Appx7 (citing Appx1045–1068); Appx797–799; Appx835; Appx927.

Acufloor's response—including the video—centered around Acufloor's assertion that the proposed modification would not have been obvious. *See* Appx1284–1296; Appx1080–1086. Specifically, Acufloor argued that Psaila teaches away from extending its openings because of the spacer tabs resting on its base. Appx1293–1295. And the video focused on the unexpected benefits of notches over Doda and Psaila's holes. Appx1080–1086.

In particular, the video explained that "[t]here is a tremendous advantage to notches" when they are inserted correctly. Appx1084. As the video shows, the plastic in front of the holes of the Doda and Psaila devices pushes mortar out of the way as the installer slides the devices under the tile during installation, removing the mortar from under the edge region of the tile. *See* Appx1080–1086. Notches,

unlike other openings, also allow the edge region to directly contact a larger, uninterrupted body of mortar.  See Appx652–653.  As a result, as shown in the video and screenshots, the notches allow more mortar to directly contact both the subfloor below and the edge region of the tile above, creating a stronger bond. Appx1080–1086.

Contrary to the district court's holding, Acufloor did ***not*** assert either in the video or in the accompanying argument that only the claimed devices allow tile-edge-to-mortar-to-subfloor contact because only the claimed devices allow direct mortar-to-subfloor contact at the "very edge" of the tile—let alone in a manner clear and unequivocal enough to result in a disclaimer.  *See* Appx7; Appx1080–1086.  Not once did Acufloor argue that Doda's openings 129 or Psaila's circular holes (which the examiner did not rely on) were spaced too far apart to provide edge-to-mortar-to-subfloor contact.   Appx1080–1087; Appx1284–1296.  Nor did the video compare the spacing of the claimed notches to the spacing of those holes. Appx1080–1087; Appx1284–1296.

On the contrary, as the annotated screenshot below demonstrates, Acufloor could not plausibly have distinguished the claimed device from the Doda and Psaila devices on that basis.  Doda's and Psaila's holes are spaced almost exactly as far apart as the notches of the claimed device:



Appx1087 (showing the Doda device on the left, the Acufloor device in the middle, and the Psaila device on the right).

And as mentioned above, in the very same video, Acufloor stated that its own device provides tile edge-to-mortar-to-subfloor contact even though the center portion of the device is thick enough that the outer border of the tile visibly rests over the base on installation:



Appx1080. Thus, far from clearly and unmistakably disclaiming any interpretation of the term "tile edge-to-mortar-to-subfloor contact" that does not require the extreme edge of the tile to rest directly over mortar, the video directly contradicts the court's holding that the term should be so limited.

The district court also cited Acufloor's amendment following the examiner interview as an example of how Acufloor added limitations requiring tile edge-to-mortar-to-subfloor contact to the claims to distinguish them from prior-art devices that did not provide mortar contact at the very edge of the tile. Appx7. But Acufloor did not add that limitation in the cited amendment—it was already in all of the independent claims. Appx1350–1353. Acufloor simply moved the limitation to a different part of claim 5. *See* Appx1352–1353. The amendment instead overcame the prior-art rejection by adding the Majority of an Area Term to the claims, which, as discussed above, distinguished Doda and Psaila because those devices have openings other than notches that provide most of their tile-to-mortar-to-subfloor contact. *See* Appx1350–1355.[6]

---

[6] In fact, the same amendment added what is now claim 8 of the '274 Patent, which does not recite "edge-to-mortar-to-subfloor contact." Appx1355. The allowance of that claim makes clear that the recited "edge-to-mortar-to-subfloor contact" was not Acufloor's ultimate basis for overcoming the rejection.

> **2.    Acufloor did not clearly and unequivocally distinguish Hoffman because it does not provide mortar contact at the "very edge" of the tile.**

The only other part of the prosecution history the district court cited is Acufloor's March 2019 Amendment and Response to the Examiner's rejection of the claims of the '857 Patent over the combination of Doda and Hoffman. *See* Appx7. Specifically, the district court relied on an annotated figure from Hoffman, taken out of context, to conclude that Acufloor distinguished Hoffman because the claimed devices, unlike Hoffman, "allowed for mortar contact all the way to the very edge of the tile." Appx7 (citing Appx1052). But again, Acufloor never argued that Hoffman did not provide tile edge-to-mortar-to-subfloor contact because it did not allow mortar contact to the very edge of the tile, let alone in a way that clearly and unequivocally restricted the term "tile edge" to the single line along the tile's border.

In fact, the arguments supported by the annotated figure did not relate to the thickness of Hoffman's base at all.[7] Instead, Acufloor submitted the figure to

---

[7]As explained above, Acufloor originally submitted its response to the relevant office action on March 20, 2019, but inadvertently omitted the exhibits referred to in the response. Appx700–718. Acufloor submitted the exhibits in a separate filing on March 21, 2019. Appx1045–1059. The district court cited only the March 21 submission, but the arguments corresponding to the exhibit the district court relied on were included in the March 20 Amendment and Response. Appx7; Appx714.

support its arguments that Hoffman's "grooves 1618" exist to receive adhesive that binds the tile to the device and are not notches providing edge-to-subfloor contact because they (1) do not "penetrate the base portion" and (2) are located to the sides of, rather than to the front and back of, the leveling device. Appx714. Neither argument suggests that notches to the front and back of the device that do penetrate the base must reach the tile's extreme edge to provide edge-to-mortar-to-subfloor contact. And the response did not specifically address whether the the space between Hoffman's prongs 1610 could constitute a notch providing edge-to-mortar-to-subfloor contact; it only addressed whether the grooves "1618" satisfied that requirement. *See* Appx713–714.

The annotated figure, which the response specifically characterized as illustrating "Hoffman's edge-to-groove contact for the tiles," demonstrates that the grooves cannot provide edge-to-subfloor contact—or any tile-to-mortar-to-subfloor contact—because they do not penetrate the base, meaning that the edge of the tile would rest above grooves rather than the subfloor, as shown:



Appx714; Appx1052.

Appellees argued—and the district court apparently agreed—that Acufloor instead annotated the figure "to clarify that the 'edge' of the tile would rest on a small strip of plastic, instead of being exposed to the subfloor within the notch," and in doing so disclaimed any interpretation of "edge" that is not restricted to a line. Appx978. But even in isolation, the annotated figure does not clearly and unequivocally indicate that "edge-to-subfloor contact" requires the line at the border of the tile to lie over a notch. And properly viewing the figure in the context of the arguments it supported reveals that it was intended to convey an entirely different point—that the grooves cannot provide edge-to-mortar-to-subfloor contact because they do not provide mortar-to-subfloor contact at all. *See Elbex Video,* 508 F.3d at 1372 (holding that even if a statement could be read as a

disclaimer in isolation, its context precluded it from being "a clear and unmistakable surrender").

The standard for prosecution disclaimer is demanding. *Avid Tech.*, 812 F.3d at 1045. That is especially true where, as here, construing the claims in accordance with the alleged disclaimer would exclude a preferred embodiment and contradict the specification. *See SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1369 (Fed. Cir. 2010), *aff'd sub nom. Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011).

The district court has not met this standard. None of the arguments it cited distinguished the prior art based on its inability to provide mortar contact at the "very edge of the tile," much less in a way that clearly and unequivocally indicated that "edge" as used in the claims refers to a single line.

Accordingly, the term "edge" is entitled to the full scope of its ordinary and customary meaning in light of the intrinsic record, which includes an area or region where two surfaces of a tile meet.

## CONCLUSION

For the reasons above, Acufloor respectfully requests that the Court vacate the district court's judgment and remand for further proceedings under the correct constructions of the terms "the combination of the first notch and the second notch

providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile

leveling device within the bounds of the base" and "edge."

Dated: October 12, 2023                Respectfully Submitted,

                                       **HAYNES AND BOONE, LLP**

                                       */s/ John R. Emerson*
                                       John R. Emerson
                                       Debra J. McComas
                                       Caroline W. Fox
                                       2801 N. Harwood St., Suite 2300
                                       Dallas, Texas 75201
                                       Phone: (214) 651-5328
                                       *Russ.Emerson@haynesboone.com*
                                       *Debbie.McComas@haynesboone.com*
                                       *Caroline.Fox@haynesboone.com*

                                       Angela M. Oliver
                                       800 17th Street NW, Suite 500
                                       Washington, D.C. 20006
                                       Phone: (202) 654-4503
                                       *Angela.Oliver@haynesboone.com*

                                       Adam L. Erickson
                                       6000 Headquarters Dr., Suite 200
                                       Plano, Texas 75024
                                       Phone: (972) 739-8661
                                       *Adam.Erickson@haynesboone.com*

                                       **Attorneys for Plaintiff-Appellant,
                                       Acufloor, LLC**

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because:

■      this brief contains **11,102** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.      This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because:

■      this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Equity A font.

*/s/ John R. Emerson*
John R. Emerson

**ADDENDUM**

| Tab | Document | Appx Pages |
|---|---|---|
| 1 | Judgment | Appx1 – Appx2 |
| 2 | Claim Construction Order | Appx3 – Appx20 |
| 3 | U.S. Patent No. 10,501,947 | Appx70 – Appx81 |
| 4 | U.S. Patent No. 10,513,857 | Appx83 – Appx96 |
| 5 | U.S. Patent No. 10,704,271 | Appx98 – Appx109 |
| 6 | U.S. Patent No. 10,704,274 | Appx111 – Appx124 |
| 7 | U.S. Design Patent No. D832,680 | Appx126 – Appx128 |
| 8 | U.S. Design Patent No. D870,527 | Appx130 – Appx131 |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ACUFLOOR, LLC,

      Plaintiff,

v.                                  Case No.:  2:21-cv-802-SPC-KCD

EVENTILE, INC. and FORPAC, LLC,

      Defendants.

_____

## JUDGMENT IN A CIVIL CASE

**Decision by Court.**   This action came before the Court and a decision has been rendered.

      **IT IS ORDERED AND ADJUDGED** that pursuant to the Court's Order (Doc. 109), entered on April 11, 2023, it is hereby ORDERED:

      a.  Final Judgment of Non-Infringement of all Asserted Patents for Defendant EvenTile, Inc. and against Plaintiff Acufloor, LLC on all claims asserted by Acufloor against EvenTile;

      b.  Final Judgment of Non-Infringement of the '857 Patent and the '274 Patent for Defendant FORPAC, LLC and against Plaintiff Acufloor, LLC on all claims asserted by Acufloor against FORPAC.

      April 12, 2023

                         ELIZABETH M. WARREN,
                         CLERK

                         s/SH, Deputy Clerk

**Appx1**

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

    (a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

    (b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

    (c) **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

    (d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5:** The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

    (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546-49 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

    (a) **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

    (b) **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

    (c) **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

    (d) **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

    (e) **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ACUFLOOR, LLC,

      Plaintiff,

v.                              Case No.:  2:21-cv-802-SPC-KCD

EVENTILE, INC. and FORPAC,
LLC,

      Defendants.

_____/

## CLAIM CONSTRUCTION ORDER[1]

    This is a patent case.  Plaintiff Acufloor, LLC manufactures, markets, and sells ceramic tiles and tools to aid in tile installation.  That includes a leveling system that helps tile installers produce flat floors and walls.  The Acufloor System includes leveling spacers and wedges like these:



---

[1] Disclaimer: Papers hyperlinked to CM/ECF may be subject to PACER fees.  By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or their services or products, nor does it have any agreements with them.  The Court is not responsible for a hyperlink's functionality, and a failed hyperlink does not affect this Order.

Acufloor accuses Defendants Eventile, Inc. and Forpac, LLC of infringing patents it owns relating to the Acufloor System.

The parties disagree on the meanings of some parts of the patent claims. The disputed claims fall into three categories: terms describing the leveling spacer, terms describing the wedge, and design patent drawings. The Court has carefully considered the parties' briefs, exhibits, and oral arguments.

## Legal Standard

"The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1369 (Fed. Cir. 2022) (cleaned up). "A proper claim construction provides a legal standard for the jury to apply[.]" *Id.* at 1370. But "a sound claim construction need not always purge every shred of ambiguity." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977 (Fed. Cir. 2021) (citation omitted).

When construing claims, courts should give terms their "ordinary and customary meaning[,]" that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Courts primarily look to intrinsic evidence to determine what a person with skill in the art would have understood a term to mean. *Id.* at 1314. That includes the language of the claims, the remainder of the specification, and the prosecution history. *Id.*

2

**Appx4**

Extrinsic evidence like expert testimony and dictionary definitions is less reliable than intrinsic evidence, so courts should consider extrinsic evidence in the context of the intrinsic evidence. *Id.* at 1319. "If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021).

Courts should not narrow a claim term beyond its plain and ordinary meaning unless the intrinsic evidence supports the limitation. *Wasica Fin. GmbH v. Continental Auto. Sys., Inc.*, 853 F.3d 1272, 1281 (Fed. Cir. 2017). "If the intrinsic record supports several different definitions of a term, the term may be construed to encompass all such consistent meanings." *Id.*

## I.    Terms describing the leveling spacer

The parties dispute the proper interpretation of five words or phrases used to describe the leveling spacer in U.S. Patent No. 10,513,857 (the '857 Patent) and U.S. Patent 10,704,274 (the '274 Patent). The patents claim Acufloor's tile leveling devices and methods of using them. Claim 1 the '857 Patent exemplifies how four of the disputed terms—edge, corner, notch, and I-shaped base—are used in the patents, and how they relate to each other:

> A tile leveling device and tile combination comprising:
>    a leveling device comprising:
>     a body defining an open window,
>     an **I-shaped base** orthogonally coupled to the body, the **I-shaped base** having spaced first, second, third, and fourth

**Appx5**

bars extending transversely from the body, the spaced first and second bars extending to the front and outward of the body and the spaced third and fourth bars extending to the rear and outward of the body,

...

a first **notch** formed between the first and second bars, and

a second **notch** formed between the third and fourth bars;

a first tile over the first bar, the first tile having a first surface opposite a second surface, the first tile having a first **corner** over the first **notch**, the first **corner** having contact with mortar at the first **notch** with **edge**-to-subfloor contact of first **corner**-to-mortar-to-subfloor at the first **notch**, wherein the first surface faces the first bar and the second surface is farther from the first bar than the first surface;

...

(Doc. 1-2 at 14) (emphasis added).

   a. <u>Edge, corner, and notch</u>

  A single issue underlies the disputes about the meanings of edge, corner, and notch.  Defendants argue the device claimed in Acufloor's patents must allow tile-to-mortar contact up to the extreme edge of the tile, and they propose constructions designed to make that limitation clear.  So under Defendants' proposed constructions, the "corner" of a tile is a point, the "edge" of a tile is a line, and a "notch" must permit edge-to-mortar-to-subfloor contact.  Acufloor argues "corner" and "edge" are regions of a tile.  It urges the Court not to construe the terms but to allow the jury to apply the terms' plain and ordinary meanings.  Acufloor proposes a construction of "notch" that does not include edge-to-mortar-to-subfloor contact.

Before deciding the proper constructions of the disputed terms, the Court will address the larger underlying issue. During prosecution of the '857 and '274 Patents, the applicants repeatedly distinguished their invention from tile spacers in the prior art by showing that only their invention allowed for mortar contact all the way to the very edge of the tile. (*See*, *e.g.*, Doc. 93-6 and Doc. 93-4 at 9). The prior art allowed mortar to reach an area near the edge of the tile, but according to the inventors that was not "edge-to-mortar-to-subfloor contact." (Doc. 93-6 at 14-15). In addition to making this distinction during prosecution, the inventors amended Claims 1 and 10 of the '857 Patent by adding the phrase "with edge-to-subfloor contact at the first notch" and "with edge-to-subfloor contact at the second notch." (Doc. 93-4). The inventors made similar additions to Claim 5 of the '274 Patent. (Doc. 93-16).

The prosecution history vindicates Defendants on this point. The inventors relied on mortar-to-tile contact up to the very edge of the tile, rather than an area near the very edge, to distinguish their invention from the prior art. The inventors made this limitation explicit by adding the phrase "edge-to-subfloor contact" to its patent claims. For example, Claim 1 of the '857 Patent states, "the first corner having contact with mortar at the first notch with edge-to-subfloor contact of first corner-to-mortar-to-subfloor at the first notch[.]" (Doc. 1-2 at 14). Here, "edge-to-subfloor contact" clarifies that mortar reaches the extreme edge of the tile at the corner and over the notch. Similarly, Claim

5 of the '274 Patent clarifies that the notches provide "edge-to-mortar-to-subfloor contact[.]" (Doc. 1-4 at 14). Thus, the limitation is not inherent in the definitions of "corner" or "notch."

Having found that the patents use the term "edge" to state the limitation at issue, the Court must choose a construction that most clearly communicates the limitation to the jury. Eventile proposes, "the line that is the intersection of two plane faces of a tile," while Forpac proposes, "the line at which a surface of a tile terminates." Both proposals accurately describe the Court's understanding of the term as used in the patents. The Court finds Forpac's proposal simpler and easier to understand. The Court thus construes the term "edge," when used in the phrases "edge-to-subfloor contact" and "edge-to-mortar-to-subfloor contact," to mean "the line at which a surface of a tile terminates." The Court will not construe "corner," and it adopts Acufloor's proposed construction of "notch": "opening intersecting an edge of the base through which mortar can penetrate."

b. I-shaped base

The '857 Patent describes the bottom portion of the levelling spacer as an "I-shaped base having spaced first, second, third, and fourth bars extending transversely from the body[.]" Defendants propose similar, but not identical, constructions—both include a "thin, elongated central member" with shorter bars extending from the ends. They argue the Court should construe "I-shaped

base" because it is imprecise.  The Court disagrees.  The term, in the context of the claims, is precise enough to communicate that aspect of the invention to a jury.

Defendants also argue that because the notches formed by the trunk and crossbars of the base must allow for adequate mortar-to-tile contact, the I-shape must have certain general dimensional qualities to fulfill its function.  But the patent separately requires contact between mortar and tile at the notches "with edge-to-subfloor contact[.]"  (Doc. 1-2 at 14).  The Court finds that claim language, as construed above, adequate to describe the required functionality of the notches.  It would be redundant and confusing to include a mortar-to-tile-contact limitation in the construction of "I-shaped base."

The term "I-shaped" is susceptible to variations.  But "absent a clear disavowal or alternative lexicography" by the patentees, they were "free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning."  *Wasica*, 853 F.3d at 1282 (quotation marks and citation omitted).  The Court declines to adopt a narrowing construction of "I-shaped base."

c.  The "majority of an area" phrase

The parties offer competing constructions of this phrase from Claims 1, 5 and 8 of the '274 Patent: "the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base" (the "majority of an area"

phrase).  (Doc. 1-4 at 14-15).  Acufloor argues the phrase describes the size of the notches in comparison to other openings, while Defendants assert it describes the size of the notches in relation to the solid portions of the base.

Acufloor points to the prosecution history to support its proposed construction.  But the document it cites favors Defendants.  In an August 13, 2018 response and request for continued examination, the applicants added the "majority of an area" phrase to their claims and used the phrase to distinguish their invention from the prior art.  The prior art device at issue had openings in its base that allowed mortar to spread over the transverse member of the base and adhere the tile to the transverse member.  The notches in the claimed device, on the other hand, allowed for a larger area of uninterrupted subfloor-to-mortar-to-tile contact.  In the words of the applicants, the claimed design allowed "more adhesive to penetrate the opening and extend over a greater surface area of the tiles" than the prior art.  (Doc. 86-10 at 25).  The applicants gave no indication they contemplated other openings when adding the "majority of an area" phrase.

The prosecution history thus confirms Defendants' interpretation of the "majority of an area" phrase.  The limitation distinguishes Acufloor's device from the prior art because the Accufloor design allows a relatively large area of direct contact between subfloor, mortar, and tile.  Defendants submitted different proposed constructions in their briefs, but at the hearing Eventile

**Appx10**

accepted Forpac's construction. The Court thus construes the "majority of an area phrase" to mean "the notches in the base collectively span an area that is larger than the solid portions of the base."

## II. Terms describing the wedge

The parties have four disputes over the claim language describing Acufloor's wedge device.

### a. "backstop member"

All four of Acufloor's utility patents use the phrase "backstop member." The '857 and '274 Patents claim "a wedge device comprising: a backstop member, and a wedge member extending from the backstop member…" (Doc. 1-2 at 14; Doc. 1-4 at 14). U.S. Patents 10,501,947 (the '947 Patent) and 10,704,271 (the 271 Patent) are a bit more descriptive. They claim as part of a wedge device "a backstop member; a body having an attachment end, a penetrating end, a top, and a bottom, the attachment end being coupled to the backstop member…" (Doc. 1-1 at 13; Doc. 1-3 at 13).

Acufloor argues the plain and ordinary meaning of "backstop member" applies, so the Court need not construe it. Eventile proposes this construction: "a structure distinct from the wedge member that extends laterally outward from the rear of the wedge member to provide additional surface area for pushing the wedge device." (Doc. 94 at 26). Forpac's proposal is almost identical to Eventile's.

**Appx11**

Defendants claim their proposed construction will clarify three properties of the backstop member. First, it states the backstop member is a distinct structure, not merely the rear face of the wedge. That element of the proposed construction is unnecessary. The term "backstop member" itself communicates that it is more than just a rear surface. That the claims identify the backstop member as an independent component of the wedge device makes it even more clear.

Second, Defendants' proposed construction expressly includes the limitation that the backstop member "extends laterally outward." Most of the embodiments disclosed in the patents include a backstop that increases the surface area of the rear of the wedge device, but not all of them do. Figures 11 and 15 of the '947 Patent show backstop members that appear flush with the back of the wedge. (Doc. 1-1 at 8-9). Claim 8 of the '947 Patent also favors Acufloor: "The wedge device as recited in claim 1, wherein the backstop member has a larger surface area than the attachment end." (*Id.* at 12). If the inventors considered a backstop member inherently oversized, Claim 8 would have been unnecessary. Defendants have not provided sufficient evidence to support this limitation.

Third, Defendants propose the Court include the function of the backstop member—"to provide additional surface area for pushing"—in the construction. But as established above, the backstop member does not

**Appx12**

necessarily increase the rear surface area of the wedge device. What is more, this explanation is unnecessary. Any juror with a basic understanding of the Acufloor system will understand that the user applies force to the backstop member.

The Court will not construe "backstop member."

      b.  <u>The wedge device preamble</u>

Claims 9 and 10 of the '947 Patent and Claim 1 of the '271 Patent begin with this preamble: "A wedge device for a tile leveling device including a clip member, the wedge device comprising…" (Doc. 1-1 at 12-13; Doc. 1-3 at 12). Eventile asks the Court to construe the preamble as a limitation that "requires a wedge device including a clip member." (Doc. 94 at 28). According to Acufloor, the preamble merely states an intended use for the wedge device and is not limiting.

To understand this issue, it is important to understand the terms "clip member" and "tile leveling device" as used in the patents. Both patents at issue here include the following diagram of an example of a clip member:

**Appx13**



*Fig.1A*

(Doc. 1-1 at 4; Doc. 1-3 at 4).  And the patents refer to the clip member and the wedge device together as a "tile leveling device."  (*See*, *e.g.*, Doc. 1-3 at 11).

Preambles are generally not limiting.  *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1292 (Fed. Cir. 2015).  That includes "preamble language that merely states the purpose or intended use on an invention."  *Id.* (cleaned up).  But there are exceptions.  A preamble generally is limiting "if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim."  *Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372 (Fed. Cir. 2014) (quotation marks and citation omitted).  And "when limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component

of the claimed invention." *Pacing Techs, LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (quotation marks and citation omitted).

The patents at issue bear hallmarks of a limiting preamble. The bodies of each claim include "the penetrating edge being configured to penetrate the clip member." (*See*, *e.g.*, Doc. 1-3 at 12). The "clip member" mentioned in the body of each claim derives an antecedent basis from the preamble. And the specifications emphasize the necessity of a clip member even when broadening the scope of the patents: "It should be appreciated that although a particular clip member is described and illustrated, the wedge device **10** presented herein may work with a variety of clip members and the clip member selected will depend on a number of manufacturing and design considerations." (Doc. 1-1 at 11; Doc. 1-3 at 11).

That said, the preamble is not limiting in the way Eventile argues. Under Eventile's proposed construction, the preamble "requires a wedge device including a clip member." But the clip member is not part of the wedge device. Rather, the wedge device and clip member are separate components of a tile leveling device. The '947 and '271 Patents claim a wedge device, not a tile leveling device. The limiting effect of the clip member lies in the design of the wedge—the wedge is designed to penetrate a clip member. The clip member is not a part of the wedge device, as Eventile's proposed construction implies. Because the body of each claim includes the limitation "the penetrating edge

**Appx15**

being configured to penetrate the clip member," the preamble phrase does not

provide any additional limitation.[2]

Because the limitation stated in the preamble of each claim is duplicative

of a limitation in the body, the Court will not construe the preamble. *See*

*Summit 6*, 802 F.3d at 1292.

c. The "line-of-sight opening" phrase

Claim 10 of the '947 Patent includes the following description of an

opening in the claimed wedge device: "a line-of-sight opening extending along

the longitudinal axis and intersecting the longitudinal length from one-third

(1/3) of the longitudinal length measured from the attachment end to one-third

(1/3) of the longitudinal length measured from the penetrating edge[.]" (Doc.

1-1 at 13). Eventile purportedly proposes a construction that merely simplifies

the limitation for the jury: "a line of sight opening that extends one-third (1/3)

the distance of the longitudinal length of the wedge device measured starting

from a point that is 1/3 the distance from the attachment end to a point that is

one-third (1/3) of the distance from the penetrating edge." (Doc. 94 at 29).

Eventile's proposed construction is not significantly easier to understand

than the claim language. But it is much more limiting. Both the claim

---

[2] This conclusion is consistent with the prosecution history cited by Eventile, wherein the examiner found: "The combination of all the elements of the claimed wedge device, in particular the wedge device including a clip member, *wherein a penetrating edge of the wedge being configured to penetrate the clip member* is not adequately taught or suggested in the cited prior art of record." (Doc. 94-13 at 7) (emphasis added).

limitation and the proposed construction describe a line-of-sight opening in relation to points 1/3 the length of the wedge measure from either end. Eventile's proposed construction requires the opening to *terminate* at the 1/3 points, while the claim teaches an opening that *intersects* those points. Eventile offers no justification for this additional limitation.

The Court will not construe the "line-of-sight opening" phrase.

d. <u>"inclined plane"</u>

The '947 and '271 Patents use the term "inclined plane" to describe the top surface of the wedge device. Acufloor and Eventile offer slightly different constructions. Acufloor proposes "sloped surface," and Eventile proposes "sloped flat surface." Acufloor worries that "flat" undercuts the patents' explicit claim of embodiments that include teeth along the top surface of the wedge. Eventile argues "sloped *flat* surface" will ensure the jury understands the claims.

The Court finds that inclusion of the term "flat" would more likely confuse than clarify. While "flat" does not necessarily mean "smooth," a juror could perhaps interpret it that way. That risk seems small, but the benefit of including "flat" is even smaller. Given the figures in the patents and the demonstrative evidence likely to be used at trial, a jury will understand that the top surface of the claimed wedge device is flat rather than concave or convex. The Court construes "inclined plane" as a "sloped surface."

15

**Appx17**

### III. Design patents

Acufloor accuses Eventile of infringing two design patents, U.S. Design Patent No. D832,680 (the '680 Design Patent) and U.S. Design Patent No. D870,527 (the '527 Design Patent). Eventile asks the Court to construe the design claims by adopting its proposed written descriptions of the figures. Acufloor rejects the need to construe the design claims, and while it contests the accuracy of Eventile's descriptions, it provides no alternative language.

The Federal Circuit has "proposed that the preferable course ordinarily will be for a district court not to attempt to construe a design patent claim" but "also emphasized that there are a number of claim scope issues on which a court's guidance would be useful to the fact finder." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010). Among them "is the distinction between the functional and ornamental aspects of a design." *Id.* That is so because a design patent protects the ornamental design of an article and not the functional elements. *Id.* at 1293-94.

Acufloor's design patents claim two designs for wedge devices used in its tile leveling system. The wedges are highly functional items, and the patents explicitly disclaim certain elements, which are illustrated in the patent with broken lines. It would be improper to allow Acufloor to extend the protection of its design patents to the functional and disclaimed elements of the wedge designs. *See id.* at 1294. However, the Court declines to adopt Eventile's list

16

**Appx18**

of design elements, might encourage the jury to engage in an improper element by element comparison rather than consider the overall design.  The Court will attempt to avoid that trap by referring the jury to the figures in the patents.

The Court construes the claim in Design Patent '680 as follows:  The ornamental design for a wedge-shaped device (Fig. 1) with a rectangular bottom surface (Fig. 4), right angles where the bottom surface meets the front and back surfaces (Fig. 2), a top surface sloped downward from back to front at the angle shown in Fig. 2, and smooth areas on the front and back ends of the top surface having the sizes and shapes shown in Figs. 1, 2, and 3.  The wedge has a vertical opening as shown in Fig. 4.  The existence of the opening is not part of the protected design, but the shape of the opening is.  The rectangular backstop at the rear of the wedge and the teeth along the top surface—both of which are depicted in the figures with broken lines—are not part of the protected design.

Likewise, the Court construes the claim in Design Patent '527 as follows: The ornamental design for a wedge-shaped device (Fig. 1) with a rectangular bottom surface (Fig. 4), right angles where the bottom surface meets the front and back surfaces (Fig. 2), a top surface with a smooth and level area at the back having the size and shape shown in Figs. 1-3 adjoining a larger area sloped downward from back to front at the angle shown in Fig. 2, and a smooth front end of the sloped top surface having the size and shape shown in Figs. 1-

**Appx19**

3.  The wedge has a vertical opening as shown in Figs. 3-4.  The existence of the opening is not part of the protected design, but the shape of the opening is. The shelf protruding from the bottom rear part of the wedge and the teeth along the top surface—both of which are depicted in the figures with broken lines—are not part of the protected design.

DONE and ORDERED in Fort Myers, Florida on November 21, 2022.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record

**Appx20**

US010501947B2

(12) **United States Patent**
Bunch et al.

(10) Patent No.: **US 10,501,947 B2**
(45) Date of Patent: **Dec. 10, 2019**

(54) **WEDGE DEVICE FOR LEVELING TILES AND CLIP SET FOR USE OF SAME**

(71) Applicants: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

(72) Inventors: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/051,079**

(22) Filed: **Jul. 31, 2018**

(65) **Prior Publication Data**

US 2019/0063084 A1    Feb. 28, 2019

**Related U.S. Application Data**

(60) Provisional application No. 62/551,946, filed on Aug. 30, 2017.

(51) **Int. Cl.**
*E04F 21/00* (2006.01)
*E04F 21/18* (2006.01)
*E04F 13/08* (2006.01)
*E04F 21/22* (2006.01)
*E04F 15/02* (2006.01)

(52) **U.S. Cl.**
CPC ...... *E04F 21/0092* (2013.01); *E04F 13/0892* (2013.01); *E04F 15/02022* (2013.01); *E04F 21/1877* (2013.01); *E04F 21/22* (2013.01)

(58) **Field of Classification Search**
CPC . E04F 21/0092; E04F 15/02022; E04F 21/22; E04F 13/0892; E04F 21/1877; E04F 21/1844
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,185,442 A | | 5/1965 | Hemphill |
| D268,804 S | | 5/1983 | Bacon |
| D269,495 S | | 6/1983 | Finn |
| D271,559 S | | 11/1983 | Reimann et al. |
| D286,008 S | | 10/1986 | Hillinger |
| 4,688,761 A | * | 8/1987 | Wilcox ............... B25B 27/0035 |
| | | | 254/104 |
| D336,224 S | | 6/1993 | Terry |
| 5,603,195 A | * | 2/1997 | Cosentino ........... E04F 13/0892 |
| | | | 52/127.3 |
| D421,374 S | | 3/2000 | Montgomery |
| 6,041,473 A | | 3/2000 | Johnson |
| D481,625 S | | 11/2003 | Ellsworth |
| D590,676 S | | 4/2009 | Pickard |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CA | 2892352 A1 | * | 11/2016 | ........ E04F 21/0092 |
| FR | 2625244 A1 | * | 6/1989 | ........ E04B 2/821 |

*Primary Examiner* — Jessie T Fonseca
(74) *Attorney, Agent, or Firm* — Scott T. Griggs; Griggs Bergen LLP

(57) **ABSTRACT**

A wedge device for leveling tiles and a clip set for use of the same are disclosed. In one embodiment of the wedge device, the wedge device includes a body having an attachment end, a penetrating edge, a top, and a bottom. The attachment end is coupled to a backstop member and the penetrating edge is configured to penetrate the clip member. The body includes an inclined plane tapering from the attachment end to the penetrating edge. A line-of-sight opening extends along a longitudinal axis of the body to provide visibility through the body from the top to the bottom.

**10 Claims, 6 Drawing Sheets**



**US 10,501,947 B2**

Page 2

(56)                **References Cited**

              U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,690,080 | B1 * | 4/2010 | Coffman, II ............ E05C 17/54 |
| | | | 16/82 |
| 8,429,878 | B1 * | 4/2013 | Hoffman ............ E04F 13/0889 |
| | | | 52/747.11 |
| D683,924 | S   * | 6/2013 | Wolfenbarger .............. D12/217 |
| D720,588 | S | 1/2015 | Pugh |
| D731,273 | S   * | 6/2015 | McPeak Ford ................ D8/402 |
| D760,566 | S | 7/2016 | Biec |
| 9,970,203 | B1 * | 5/2018 | Abidov .............. E04F 21/0092 |
| D821,838 | S   * | 7/2018 | Castellanos ...................... D8/47 |
| D829,532 | S   * | 10/2018 | Bunch ............................ D8/354 |
| D832,680 | S   * | 11/2018 | Bunch ............................ D8/354 |
| D850,966 | S   * | 6/2019 | Laurans ....................... D10/121 |
| 2008/0236094 | A1 * | 10/2008 | Doda .................. E04F 13/0892 |
| | | | 52/749.11 |
| 2013/0055675 | A1 * | 3/2013 | Sighinolfi .......... E04F 21/0092 |
| | | | 52/749.11 |
| 2014/0116001 | A1 * | 5/2014 | Ghelfi .............. E04F 21/0092 |
| | | | 52/749.11 |
| 2014/0298736 | A1 * | 10/2014 | Bunch .............. E04F 21/0092 |
| | | | 52/126.1 |
| 2014/0325935 | A1 * | 11/2014 | Hoffman ................ E04F 21/22 |
| | | | 52/747.11 |
| 2015/0308130 | A1 * | 10/2015 | Biec .............. E04F 21/0092 |
| | | | 52/749.11 |
| 2016/0090746 | A1 * | 3/2016 | Sighinolfi .............. E04F 21/18 |
| | | | 33/526 |
| 2016/0186449 | A1 * | 6/2016 | Lee .................. E04F 21/0092 |
| | | | 33/527 |
| 2016/0222679 | A1 * | 8/2016 | Bunch .................. E04F 21/1844 |
| 2016/0326754 | A1 * | 11/2016 | Bucsa ................ E04F 21/0092 |

* cited by examiner



*Fig.1A*

*Fig.1B*



**Fig.2A**

**Fig.2B**

**Fig.3A**     **Fig.3B**



*Fig.4*

*Fig.5*



Fig.6

Fig.7

Fig.8

Fig.9          Fig.10



*Fig.11*

*Fig.12*

*Fig.13*

*Fig.14*



*Fig.15*



*Fig.16*

US 10,501,947 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**WEDGE DEVICE FOR LEVELING TILES
AND CLIP SET FOR USE OF SAME**

PRIORITY STATEMENT & CROSS-REFERENCE
TO RELATED APPLICATIONS

This application claims the benefit of U.S. Patent Application No. 62/551,946, entitled "Wedge Device for Leveling Tiles and Clip Set for Use of Same" and filed on Aug. 30, 2017, in the names of Clinton D. Bunch and Joshua A. Bunch; which is hereby incorporated by reference for all purposes.

TECHNICAL FIELD OF THE INVENTION

This invention relates, in general, to tile installation and, in particular, to a wedge device for leveling tiles and a clip set for use of the same that properly levels tiles during the installation thereof.

BACKGROUND OF THE INVENTION

Tile has become a popular decorative and functional article for use in floors, walls, countertops, and the like. Both professional tile installers and do-it-yourselfers spend a great deal of time aligning and leveling tiles as they are being placed on a substrate's surface. Proper alignment and leveling of each tile is important for a number of reasons. Improper installation can cause the need for tiles to be replaced in order to prevent a spacing error from propagating across the substrate, aesthetic reasons, and in some instances, safety concerns. A need exists for a wedge for leveling tiles and clip set for use of the same that properly spaces tiles during the installation thereof.

SUMMARY OF THE INVENTION

It would be advantageous to achieve a device for leveling and aligning tiles and properly spacing tiles. It would also be desirable to enable a mechanical-based solution that furnishes an inexpensive tool that assists professional tile installers and do-it-yourselfers. To better address one or more of these concerns, in one aspect of the invention, a wedge device for leveling tiles and a clip set for use of the same are disclosed. In one embodiment of the wedge device, the wedge device includes a body having an attachment end, a penetrating edge, a top, and a bottom. The attachment end is coupled to a backstop member and the penetrating edge is configured to penetrate the clip member. The body includes an inclined plane tapering from the attachment end to the penetrating edge. A line-of-sight opening extends along a longitudinal axis of the body to provide visibility through the body from the top to the bottom. These and other aspects of the invention will be apparent from and elucidated with reference to the embodiments described hereinafter.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the features and advantages of the present invention, reference is now made to the detailed description of the invention along with the accompanying figures in which corresponding numerals in the different figures refer to corresponding parts and in which:

FIGS. **1**A and **1**B are front perspective views, when taken together, from one embodiment of a wedge device for a tile leveling device including a clip member, according to the teachings presented herein;

FIG. **2**A is a side view, in partial cross-section, of the tile leveling device with the wedge device presented in FIG. **1** during installation of tile;

FIG. **2**B is a side view, in partial cross-section, of the tile leveling device with the wedge device presented in FIG. **1** during installation of tile as the installation advances beyond FIG. **2**A;

FIG. **3**A is a top plan view of the tile leveling device with the wedge device presented in FIG. **2**A during installation of tile;

FIG. **3**B is a top plan view of the tile leveling device with the wedge device presented in FIG. **2**B during installation of tile;

FIG. **4** is a top perspective view of the tile leveling device with the wedge device presented in FIG. **2**B during installation of four tiles;

FIG. **5** is a top perspective view of the tile leveling device with the wedge device presented in FIG. **2**B during installation of three tile;

FIG. **6** is a right-side elevation view of the wedge device presented in FIG. **1**, where the wedge device has left-right symmetry;

FIG. **7** is a top plan view of the wedge device presented in FIG. **1**;

FIG. **8** is a bottom plan view of the wedge device presented in FIG. **1**;

FIG. **9** is a front elevation view of the wedge device presented in FIG. **1**;

FIG. **10** is a rear elevation view of the wedge device presented in FIG. **1**;

FIG. **11** is a front perspective view of another embodiment of a wedge device, according to the teachings presented herein;

FIG. **12** is a top plan view of the wedge device presented in FIG. **11**;

FIG. **13** is a front perspective view of another embodiment of a wedge device, according to the teachings presented herein;

FIG. **14** is a top plan view of the wedge device presented in FIG. **13**;

FIG. **15** is a front perspective view of another embodiment of a wedge device, according to the teachings presented herein; and

FIG. **16** is a top plan view of the wedge device presented in FIG. **14**.

DETAILED DESCRIPTION OF THE
INVENTION

While the making and using of various embodiments of the present invention are discussed in detail below, it should be appreciated that the present invention provides many applicable inventive concepts which can be embodied in a wide variety of specific contexts. The specific embodiments discussed herein are merely illustrative of specific ways to make and use the invention, and do not delimit the scope of the present invention.

Referring initially to FIG. **1**A and FIG. **1**B, therein is depicted one embodiment of a wedge device schematically illustrated and generally designated **10**. The wedge device **10** is utilized with a clip member **12** and the wedge device **10** and the clip member **12** are utilized, in combination, as part of a tile leveling device **14** to align and level two, three, or four tiles, for example. The wedge device **10** includes a body **16** having an attachment end **18**, a penetrating edge **20**, a top **22**, and a bottom **24**. The attachment end **18** is coupled to a backstop member **26** and the penetrating edge **20** is

US 10,501,947 B2

3

configured to penetrate the clip member **12**. The body **16** includes an inclined plane **28** tapering from the attachment end **18** to the penetrating edge **20**. A line-of-sight opening **30** extends longitudinally along the body **16**. Teeth **32** are positioned along the inclined plane **28** in order to latch onto the clip member **12** as will be described in further detail hereinbelow.

In one embodiment, the clip member **12** includes an inverted U-shaped body **40** defining an open window **42** between two stems **44**, **46** of the inverted U-shaped body **40**. An I-shaped base **48** is orthogonally coupled to the inverted U-shaped body **40** such that four spaced bars **50**, **52**, **54**, **56** extend transversely from the inverted U-shaped body **40**. Two breakaway sections **58**, **60** are defined along the respective two stems **44**, **46** of the inverted U-shaped body **40**. The open window **42** includes an upper edge **62**. It should be appreciated that although a particular clip member is described and illustrated, the wedge device **10** presented herein may work with a variety of clip members and the clip member selected will depend on a number of manufacturing and design considerations.

Referring now to FIG. **2A**, FIG. **2B**, FIG. **3A**, and FIG. **3B**, in one operational implementation, the tile leveling device **14** may be used to align two, three or four tiles. As shown in FIG. **2A** and FIG. **3A**, the clip member **12** is positioned on a subsurface, such as a floor F having tile mortar M in space S thereon, and four tiles $T_1$, $T_2$, $T_3$, $T_4$, are placed and positioned thereon. The wedge device **10** is aligned to be inserted into the clip member **12**. The backstop member **26** of the wedge device **10** provides a push area for fingers or a thumb and an enhanced sized that furnishes more leverage during use.

As shown in FIG. **2B** and FIG. **3B**, as the wedge device **10** is inserted, the inclined plane **28** of the wedge device **10** penetrates the open window **42** contacting the upper edge **62** thereof and creating a latch. A finger or a thumb, for example, presses against the backstop member **26** of the wedge device **10** continually driving the wedge device **10** deeper into the clip member **12**. As the wedge device **10** advances, the resulting force is exerted against tiles $T_1$, $T_2$, $T_3$, $T_4$ pressing the tiles $T_1$, $T_2$, $T_3$, $T_4$ against the bars **50**, **52**, **54**, **56** wherein breakaway sections **58**, **60** are located beyond the undersurfaces of the tiles $T_1$, $T_2$, $T_3$, $T_4$ in a direction away from the bars **50**, **52**, **54**, **56**. The teeth **32** prevent the wedge device **10** from slipping out of the open window **42** of the clip member **12** during penetration thereof. The application of force from the use of the tile leveling device **14** causes the tiles $T_1$, $T_2$, $T_3$, $T_4$ to be level. Following the leveling, the breakaway sections **58**, **60** may be broken to remove the wedge device **10** and a portion of the clip member **12**. During use, the line-of-sight opening **30** that extends longitudinally along the body **16** of the wedge device **10** provides visibility and visual contact VC through the body **16** from the top **22** to the bottom **24** of the wedge device **10**. This permits a user of the wedge device **10** and the tile leveling device **14** to maintain visual contact VC with the tiles $T_1$, $T_2$, $T_3$, $T_4$ during the leveling operation, thereby improving efficiency and performance.

Referring now to FIG. **4** and FIG. **5**, the wedge device **10** and the tile leveling device **12** presented in FIG. **2B** during installation of four tiles ($T_1$, $T_2$, $T_3$, $T_4$ having an intersection I in FIG. **4**) and three tiles ($T_1$, $T_2$, $T_3$ having the intersection I in FIG. **5**). One of the main drawbacks of traditional wedge and clip systems is the clips cannot be placed in the intersections without interfering with one of the most important factors to tile installers; namely, visual contact with the intersections, such as intersection I in FIG. **4** and intersec-

4

tion I in FIG. **5**. Tile installers need to be able to see the tile intersections to make sure proper alignment is achieved and spacing is even. As shown in FIG. **4** and FIG. **5**, the use of the wedge device **10** having the line-of-sight opening **30** with the tile leveling device **12** creates a window providing the visual contact VC that allows the tile leveling device **12** to be placed at corners or with three or four tiles, for example. Further, as shown, the tile installer is able to maintain visual contact with the intersections I.

It is advantageous to an installer to be able to use only one tile leveling device **12** at the intersection I, instead of three or four clips, in order to save time and increase productivity. Additionally, with the use of only one tile leveling device **12** at the intersection I, costs are reduced. The window and visual contact afforded by the wedge device **10** saves time and money over existing wedge and clip systems by permitting a minimum number of components to be utilized and permitting continual visual contact at important intersections.

Referring now to FIG. **6** through FIG. **10**, as previously discussed, in one embodiment, the wedge device **10** includes the body **16** having the attachment end **18**, the penetrating edge **20**, the top **22**, and the bottom **24**. The attachment end **18** is coupled to the backstop member **26** and the penetration edge **20** is configured to penetrate the clip member **12** as described above. The body **16** includes the inclined plane **28** tapering from the attachment end **18** to the penetrating edge **20**. The body **16** may also include a longitudinal axis **70** from the attachment end **18** to the penetrating edge **20**. The longitudinal axis **70** may have a longitudinal length **72** as indicated by the one-eighth marks **74**. In one embodiment, the line-of-sight opening **30** extends along the longitudinal axis **70** and intersects the longitudinal length **72** from one-eighth ($\frac{1}{8}$) of the longitudinal length **72** measured from the attachment end **18** to one-eighth ($\frac{1}{8}$) of the longitudinal length **72** measured from the penetrating edge **20**. As previously discussed, the line-of-sight opening **30** provides visibility through the body **16** from the top **22** to the bottom **24**.

Referring now to FIG. **11** and FIG. **12**, in another embodiment, the wedge device **10** includes a body **86** having an attachment end **88**, a penetrating edge **90**, a top **92**, and a bottom **94**. The attachment end **88** is coupled to a backstop member **96**, which is slightly oversized with respect to the attachment end **88**, and the penetrating edge **90** is configured to penetrate the clip member **12**. The body **86** includes an inclined plane **98** tapering from the attachment end **88** to the penetrating edge **90**. The body **86** may also include a longitudinal axis **100** from the attachment end **88** to the penetrating edge **90**. The longitudinal axis **100** may have a longitudinal length **102**, which in this embodiment includes marks **104** indicating one-third increments. A line-of-sight opening **106** extends along the longitudinal axis **100** and intersects the longitudinal length **102** from one-third ($\frac{1}{3}$) of the longitudinal length **102** measured from the attachment end **88** to one-third ($\frac{1}{3}$) of the longitudinal length **102** measured from the penetrating edge **90**. As previously discussed, the line-of-sight opening **106** provides visibility through the body **86** from the top **92** to the bottom **94**. A partition member **108** traverses the line-of-sight opening **106** defining opening **110** and opening **112**. The openings **110** and **112** form a partition of line-of-sight opening **106**.

It should be appreciated that the extension of the line-of-sight opening **106** may vary from application to application. By way of example, as illustrated in FIGS. **9** and **10**, the line-of-sight opening **106** may extend along the longitudinal axis **100** and intersect the longitudinal length **102** from

US 10,501,947 B2

5

one-eighth of the longitudinal length **102** measured from the attachment end **88** to one-eighth (⅛) of the longitudinal length **102** measured from the penetrating edge **90**. By way of further example, the line-of-sight opening **106** may extend along the longitudinal axis **100** and intersect the longitudinal length **102** from one-sixth (⅙) or one-quarter (¼), for example, of the longitudinal length **102** measured from the attachment end **88** to a respective one-sixth (⅙) or one-quarter (¼), for example, of the longitudinal length **102** measured from the penetrating edge **90**.

Referring now to FIG. **13** and FIG. **14**, in another embodiment, the wedge device **10** includes a body **116** having an attachment end **118**, a penetrating edge **120**, a top **122**, and a bottom **124**. The attachment end **118** is coupled to a backstop member **126**, which is substantially flush with the attachment end **118**, and the penetrating edge **120** is configured to penetrate the clip member **12**. The body **116** includes an inclined plane **128** tapering from the attachment end **118** to the penetrating edge **120**. Wall members **130**, **132** secure the inclined plane **128**, which may include inclined plane member **134** and inclined plane member **136**, to the body **116**. The body **116** may also include a longitudinal axis **138** from the attachment end **118** to the penetrating edge **120**. The longitudinal axis **138** may include a longitudinal length **140** having a midpoint **142** and a mediolateral axis **144** bisecting the midpoint **142** creating a longitudinal length segment **146** and a longitudinal length segment **148**. A line-of-sight opening **150** extends along the longitudinal axis **138** and intersects the longitudinal length segment **146** and the longitudinal length segment **148**. As previously discussed, the line-of-sight opening **150** provides visibility through the body **116** from the top **122** to the bottom **124**.

Referring now to FIG. **15** and FIG. **16**, in another embodiment, the wedge device **10** includes a body **166** having an attachment end **168**, a penetrating edge **170**, a top **172**, and a bottom **174**. The attachment end **168** is coupled to a backstop member **176** and the penetrating edge **170** is configured to penetrate the clip member **12**. The backstop member **176** may include a flange **177** that extends therefrom to provide a contact surface for tool engagement. The body **166** includes an inclined plane **178** tapering from the attachment end **168** to the penetrating edge **170**. Wall members **180**, **182** secure the inclined plane **178**, which may include inclined plane member **184** and inclined plane member **186**, to the body **166**. The body **166** may also include a longitudinal axis **188** from the attachment end **168** to the penetrating edge **170**. The longitudinal axis **188** may include a longitudinal length **190** having a midpoint **192** and a mediolateral axis **194** bisecting the midpoint **192** creating a longitudinal length segment **196** and a longitudinal length segment **198**. A line-of-sight opening **200** extends along the longitudinal axis **188** and intersects the longitudinal length segment **196** and the longitudinal length segment **198**. As previously discussed, the line-of-sight opening **200** provides visibility through the body **166** from the top **172** to the bottom **174**. Crossbar members **202**, **204** traverse the line-of-sight opening **200** within the body **166**.

The order of execution or performance of the methods and techniques illustrated and described herein is not essential, unless otherwise specified. That is, elements of the methods and techniques may be performed in any order, unless otherwise specified, and that the methods may include more or less elements than those disclosed herein. For example, it is contemplated that executing or performing a particular element before, contemporaneously with, or after another element are all possible sequences of execution.

6

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is, therefore, intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

**1**. A wedge device for a tile leveling device including a clip member, the wedge device comprising:

a backstop member;

a body having an attachment end, a penetrating edge, a top, and a bottom, the attachment end being coupled to the backstop member, the penetrating edge being configured to penetrate the clip member, the penetrating edge being continuous the entire width of the body;

the body including an inclined plane tapering from the attachment end to the penetrating edge;

the body including a longitudinal axis from the attachment edge to the penetrating edge, the longitudinal axis having a longitudinal length; and

a line-of-sight opening extending along the longitudinal axis and intersecting the longitudinal length from one-eighth (⅛) of the longitudinal length measured from the attachment end to one-eighth (⅛) of the longitudinal length measured from the penetrating edge, the line-of-sight opening providing visibility through the body from the top to the bottom, the line-of-sight opening sized to provide a user of the wedge device visual contact with tiles during a leveling operation.

**2**. The wedge device as recited in claim **1**, further comprising teeth disposed along the inclined plane, the teeth latch onto an upper edge of an insertion space in the clip member.

**3**. The wedge device as recited in claim **1**, further comprising a partition member traversing the opening.

**4**. The wedge device as recited in claim **1**, further comprising a crossbar member traversing the opening.

**5**. The wedge device as recited in claim **1**, wherein the body including the inclined plane tapering from the attachment end to the penetrating edge further comprises a wall member coupled to the body.

**6**. The wedge device as recited in claim **1**, wherein the line-of-sight opening intersects the inclined plane.

**7**. The wedge device as recited in claim **1**, wherein the line-of-sight opening is subjacent to the inclined plane.

**8**. The wedge device as recited in claim **1**, wherein the backstop member has a larger surface area than the attachment end.

**9**. A wedge device for a tile leveling device including a clip member, the wedge device comprising:

a backstop member;

a body having an attachment end, a penetrating edge, a top, and a bottom, the attachment end being coupled to the backstop member, the penetrating edge being configured to penetrate the clip member, the penetrating edge being continuous the entire width of the body;

the body including an inclined plane tapering from the attachment end to the penetrating edge;

the body including a longitudinal axis from the attachment edge to the penetrating edge, the longitudinal axis having a longitudinal length;

the longitudinal length including a midpoint and a mediolateral axis bisecting the midpoint creating a first longitudinal length segment and a second longitudinal length segment; and

US 10,501,947 B2

7

a line-of-sight opening extending along the longitudinal axis and intersecting the first longitudinal length segment and the second longitudinal length segment, the line-of-sight opening providing visibility through the body from the top to the bottom, the line-of-sight opening sized to provide a user of the wedge device visual contact with tiles during a leveling operation.

**10**. A wedge device for a tile leveling device including a clip member, the wedge device comprising:

a backstop member;

a body having an attachment end, a penetrating edge, a top, and a bottom, the attachment end being coupled to the backstop member, the penetrating edge being configured to penetrate the clip member, the penetrating edge being continuous the entire width of the body;

the body including an inclined plane tapering from the attachment end to the penetrating edge;

the body including a longitudinal axis from the attachment edge to the penetrating edge, the longitudinal axis having a longitudinal length; and

a line-of-sight opening extending along the longitudinal axis and intersecting the longitudinal length from one-third (⅓) of the longitudinal length measured from the attachment end to one-third (⅓) of the longitudinal length measured from the penetrating edge, the line-of-sight opening providing visibility through the body from the top to the bottom, the line-of-sight opening sized to provide a user of the wedge device visual contact with tiles during a leveling operation.

\* \* \* \* \*

8

US010513857B2

(12) **United States Patent**
Bunch et al.

(10) Patent No.: **US 10,513,857 B2**
(45) Date of Patent: **Dec. 24, 2019**

(54) **DEVICE FOR LEVELING AND ALIGNING TILES AND METHOD FOR LEVELING AND ALIGNING TILES**

(71) Applicants:**Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

(72) Inventors: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/102,207**

(22) Filed: **Aug. 13, 2018**

(65) **Prior Publication Data**

US 2018/0355622 A1 Dec. 13, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/345,802, filed on Nov. 8, 2016, now Pat. No. 10,047,530, which is a continuation of application No. 15/044,907, filed on Feb. 16, 2016, now Pat. No. 9,487,959, which is a continuation-in-part of application No. 13/859,316, filed on Apr. 9, 2013, now Pat. No. 9,260,872.

(51) **Int. Cl.**
| | |
|---|---|
| *E04F 21/20* | (2006.01) |
| *E04F 21/22* | (2006.01) |
| *E04F 21/18* | (2006.01) |
| *E04F 21/00* | (2006.01) |
| *E04F 13/08* | (2006.01) |
| *E04F 15/02* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *E04F 21/20* (2013.01); *E04F 21/0092* (2013.01); *E04F 21/1844* (2013.01); *E04F 21/1877* (2013.01); *E04F 21/22* (2013.01); *E04F 13/0892* (2013.01); *E04F 15/02005* (2013.01)

(58) **Field of Classification Search**
CPC ... E04F 21/0092; E04F 21/22; E04F 21/1844; E04F 21/1877; E04F 13/0892; E04F 15/02005; E04F 21/20
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,397,125 | A | 8/1983 | Gussler |
| 7,603,825 | B2 | 10/2009 | Dohren |
| 7,621,100 | B2 | 11/2009 | Kufner et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

AU 2012101175 8/2012

OTHER PUBLICATIONS

Pearl Abrasive Co., Tuscan Leveling System, www.pearlabrasive.com.

(Continued)

*Primary Examiner* — Babajide A Demuren
(74) *Attorney, Agent, or Firm* — Scott T. Griggs; Griggs Bergen LLP

(57) **ABSTRACT**

A device for leveling and aligning tiles and method for leveling and aligning tiles are disclosed. In one embodiment, the leveling device includes a body and two spaced and parallel strip members extending transversely from the body. Each of the spaced and parallel strip members extend to the front and rear of the body. Two opposing lateral open windows are formed in the body. A breakaway section is defined along the body. A wedge device is provided for penetrating one or more of the two opposing lateral open windows and exerting a force on the tiles for leveling them relative to each other.

**17 Claims, 7 Drawing Sheets**



*Fig.4*

**US 10,513,857 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,861,487 | B2 | 1/2011 | Kufner et al. |
| 7,954,300 | B1 | 6/2011 | Kufner et al. |
| 7,992,354 | B2 | 8/2011 | Doda, Jr. |
| 8,181,420 | B2 | 5/2012 | Comas |
| 9,260,872 | B2 | 2/2016 | Bunch et al. |
| 9,487,959 | B2 | 11/2016 | Bunch et al. |
| 10,047,530 | B2 | 8/2018 | Bunch et al. |
| 2008/0236094 | A1 | 10/2008 | Doda |
| 2013/0055675 | A1 | 3/2013 | Sighinolfi |
| 2013/0118115 | A1 | 5/2013 | Hoffman et al. |
| 2014/0116001 | A1 | 5/2014 | Ghelfi |

OTHER PUBLICATIONS

Q.E.P. Co., Inc., Lash Tile Leveling Clips and Wedges, 99720/9972, www.qep.com.



Fig.1A

Fig.1B

Fig.2







**Fig.10**



*Fig.11A*

*Fig.11B*

*Fig.12*



*Fig.13*

*Fig.14*



*Fig.15*



*Fig.16*

US 10,513,857 B2

1

# DEVICE FOR LEVELING AND ALIGNING TILES AND METHOD FOR LEVELING AND ALIGNING TILES

## PRIORITY STATEMENT & CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of co-pending U.S. patent application Ser. No. 15/345,802 entitled "Device for Leveling and Aligning Tiles and Method for Leveling and Aligning Tiles," filed on Nov. 8, 2016, in the names of Clinton D. Bunch et al., issued on Aug. 14, 2018 as U.S. Pat. No. 10,047,530; which is a continuation of U.S. patent application Ser. No.15/044,907 entitled "Device for Leveling and Aligning Tiles and Method for Leveling and Aligning Tiles," filed on Feb. 16, 2016, in the names of Clinton D. Bunch et al., issued on Nov. 8, 2016 as U.S. Pat. No. 9,487,959; which is a continuation-in-part of U.S. patent application Ser. No. 13/859,316 entitled "Device for Leveling and Aligning Tile and Method for Leveling and Aligning Tiles," filed on Apr. 9, 2013, in the names of Clinton D. Bunch and Joshua A. Bunch and issued on Feb. 16, 2016 as U.S. Pat. No. 9,260,872; all of which are hereby incorporated by reference, in entirety, for all purposes.

## TECHNICAL FIELD OF THE INVENTION

This invention relates, in general, to tile installation and, in particular to a device for leveling and aligning tiles and properly spacing tiles during the installation thereof.

## BACKGROUND OF THE INVENTION

Tile has become a popular decorative and functional article for use in floors, walls, countertops, and the like. Both professional tile installers and do-it-yourselfers spend a great deal of time aligning and leveling tiles as they are being placed on a substrate's surface. Proper alignment and leveling of each tile is important for a number of reasons. Improper installation can cause the need for tiles to be replaced in order to prevent a spacing error from propagating across the substrate, aesthetic reasons, and in some instances, safety concerns. A need exists for a device for leveling and aligning tiles and properly spacing tiles.

## SUMMARY OF THE INVENTION

It would be advantageous to achieve a device for leveling and aligning tiles and properly spacing tiles. It would also be desirable to enable a mechanical-based solution that furnishes an inexpensive tool that assists professional tile installers and do-it-yourselfers. To better address one or more of these concerns, in one aspect of the invention, a tile leveling device and a wedge device for use with tiles are disclosed. In one embodiment, the leveling device includes a body and two spaced and parallel strip members extending transversely from the body. Each of the spaced and parallel strip members extend to the front and rear of the body. Two opposing lateral open windows are formed in the body. A breakaway section is defined along the body.

In one implementation, a wedge device includes a backstop member and a pair of members extending from the backstop member. Each of pair of members includes a tapered surface configured to penetrate the lateral open windows and exerting force against tiles, thereby pressing the tiles against the first and second strip members in order to level and align.

2

In another embodiment, the leveling device includes an inverted U-shaped body with an I-shaped base orthogonally coupled thereto. An open window is located within the U-shaped body between stems thereof. The I-shaped base has four bars extending transversely from the inverted U-shaped body and that extend upwards toward the inverted U-shaped body in an arcuate fashion to define respective four points of contact for two, three, and four tiles. Two breakaway sections are respectively defined along the spaced stems of the inverted U-shaped body at the I-shaped bar. In another implementation, a wedge device includes an oversized backstop member and a wedge member extending from the oversized backstop member. These and other aspects of the invention will be apparent from and elucidated with reference to the embodiments described hereinafter.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the features and advantages of the present invention, reference is now made to the detailed description of the invention along with the accompanying figures in which corresponding numerals in the different figures refer to corresponding parts and in which:

FIGS. 1A and 1B are front perspective views of one embodiment of a leveling device with a wedge device according to the teachings presented herein;

FIG. 2 is a side view, in partial cross-section, of the leveling device with the wedge device presented in FIGS. 1A and 1B;

FIGS. 3 through 5 are top plan views showing installations of two, three, and four tile using the leveling device and wedge device presented in FIGS. 1A, 1B, and 2;

FIGS. 6 through 8 are side cross-sectional views of one embodiment of the installation of tile on a floor using the leveling device and wedge device presented in FIGS. 1A, 1B, and 2;

FIG. 9 is a front cross-sectional view of the embodiment of the installation of tile on a floor or subsurface using the leveling device and wedge device presented in FIGS. 1A, 1B, and 2;

FIG. 10 is a front perspective view of another embodiment of a leveling device according to the teachings presented herein;

FIGS. 11A and 11B are front perspective views of one embodiment of a leveling device with a wedge device according to the teachings presented herein;

FIG. 12 is a side view, in partial cross-section, of the leveling device with the wedge device presented in FIGS. 11A and 11B;

FIG. 13 is a front perspective view of an alternate embodiment of a leveling device;

FIG. 14 is a side elevation view of the alternative embodiment of the leveling device depicted in FIG. 13.

FIG. 15 is a front perspective view of a further alternate embodiment of a leveling device; and

FIG. 16 is a bottom plan view of the leveling device depicted in FIG. 15.

## DETAILED DESCRIPTION OF THE INVENTION

While the making and using of various embodiments of the present invention are discussed in detail below, it should be appreciated that the present invention provides many applicable inventive concepts which can be embodied in a wide variety of specific contexts. The specific embodiments

US 10,513,857 B2

3

discussed herein are merely illustrative of specific ways to make and use the invention, and do not delimit the scope of the present invention.

Referring initially to FIGS. 1A, 1B, and 2, therein is depicted one embodiment of a tile leveling device that is schematically illustrated and generally designated 10. The tile leveling device 10 and a wedge device 12 are utilized, in combination, to align and level two, three, or four tiles, for example. The leveling device 10 includes a body 14 and spaced and parallel strip members 16, 18 extending transversely from the body 14. Each of the spaced and parallel strip members 16, 18 extend to the front F and rear R of the body 14. Lateral open windows 20, 22 having upper edges 21, 23 are formed in the body 14 and sized to accept a member having a tapered surface configured to penetrate the respective lateral open windows 20, 22 and exert force thereunder. A breakaway section 24 is defined along the body 14. The breakaway section 24 may be a frangible section of the body 14 of reduced thickness that would promote the breakaway, and thus, separation of the body 14. An upper bump 26 and a lower bump 28 extend horizontally across the body 14. The upper bump 26 being larger and more pronounced to provide lifting power. A spacing pad 30 is integral with the body 14 and may vary in thickness depending on the application. The spacing pad 30 contributes to furnishing a combination of vertical leveling and joint spacing within a single product. Moreover, the spacing pad 30, which may be more generally a spacer, is configured to position the tiles a predetermined distance apart depending on the application.

The spaced and parallel strip members 16, 18 provide four points of contact 32, 34, 36, 38 for lift of tiles, while still establishing space for maximum mortar penetration between the spaced and parallel strip members 16, 18. As shown, the spaced and parallel strip members 16, have an arcuate form wherein the spaced and parallel strip members 16, 18 curve upwards from the junction with the body 14 to the four points of contact 32, 34, 36, 38. That is, the spaced and parallel strip members 16, 18 define convex curvatures 40, 42 that are flexible and compressible for tile installation during a leveling and alignment of a tile. The convex curvatures 40, 42 also ensure that tiles of varying thicknesses may be leveled and aligned. In fact, in the corner embodiment, four tiles having four varying thicknesses may be leveled and aligned by way of the flexibility and compressibility of the convex curvatures 40, 42 of the strip members 16, 18.

The wedge device 12 includes a backstop member 50 and two extension members, depicted as wedge members 52, 54 extending from the backstop member 50. The backstop member 50 provides a push area for fingers or a thumb and an enhanced sized that furnishes more leverage during use. Each of the wedge members 52, 54 include respective tapered surfaces 56, 58 configured to penetrate the lateral open windows 20, 22 and exert force against the tiles by pressing the tiles against the strip members 16, 18. Teeth 60, 62 are located along the tapered surfaces 56, 58 in order to latch onto the respective upper edges 21, 23 of the opposing lateral open windows 20, 22. In operation, the teeth 60, 62 prevent the respective wedge members 52, 54 from slipping out of the lateral open windows 20, 22 during penetration thereof. As will be appreciated, the wedge device 12 may penetrate the leveling device from the front F or rear R.

Referring now to FIGS. 3 through 5, the tile leveling device may be utilized with two tiles 70, 72 (FIG. 3), three tiles (FIG. 4) 74, 76, 78, or four tiles 80, 82, 84, 86 (FIG. 5) for installation on a substrate, subsurface, or other surface,

4

which is indicated by the letter S. By way of example, in the two tile installation, the tile 70 is positioned over the front portions of the strip members 16, 18. The tile 70 has a lower surface 88 opposite an upper surface 90, wherein the lower surface 88 faces the strip members 16, 18 and the subsurface S. The upper surface 90 is farther from the strip members 16, 18 than the lower surface 88 and faces away from the strip members 16, 18. The second tile 72 is similarly situated over the rear portions of the strip members 16, 18 and includes a lower surface 92 and an upper surface 94.

Accordingly, a single leveling device 10 and wedge device 12 may be utilized to install, align, and level between two and four tiles. The use of the wedge device 12 having two extension members and the two lateral open windows 20, 22 provide for utilization at corner tiles; thereby offering improved efficiency. More particularly, using one leveling device for a corner improves efficiency and minimizes the number of leveling devices required to complete a job. Additionally, as previously discussed, the arcuate portions of the parallel strip members 16, 18 compress and flatten to accommodate different thicknesses of tiles to provide a level surface. In fact, the leveling device and wedge device presented herein may simultaneously accommodate between two and four different thicknesses of tiles.

Referring now to FIGS. 6 through 9, one example of installation is shown wherein the tile leveling device 10 is placed such that one end of the tile 72 sits on the rear portions of the parallel strip members 16, 18 and the tile 72 abuts the body 14 of the leveling device. Such an installation methodology may be used for any of the configurations shown in FIGS. 3 through 5, for example. By way of illustration, therefore, this example is for the two tile application of FIG. 3. The adjacent tile 70 sits on the other side of the body 14 and across the front portions of the parallel strip members 16, 18. The extension members, namely wedge members 52, 54 of the wedge device 12 are then inserted in the respective lateral open windows 20, 22. The backstop member 50 is then pushed, thereby driving the wedge members 52, 54 to penetrate the respective lateral open windows 20, 22.

In one embodiment, the wedge device 12 offers an advantage over individual wedges as the backstop member 50 provides a wider or broader surface to push. In particular, as shown in FIG. 8, a thumb or finger may be used to drive the wedge device 12 into the leveling device 10. The ease of push advantage translates into a more powerful lift because of the more even distribution of the lifting surface. Therefore, the leveling device 10 and wedge device 12 combination provide improved performance, both quantitatively and qualitatively. With respect to the former, the lateral open windows 20, 22 in combination with the wedge device 12 permit use at corners increasing efficiency and reducing the number of leveling and aligning operations, which leads to faster installation using fewer leveling devices. With respect to the latter, the improved contact surface provided by the backstop member 50 minimizes the stress and strain on the fingers and thumbs.

Additionally, the design of the wedge device 12 discourages the tiles from pivoting by providing two points of contact with each tile edge. By way of example, on a 12 inch by 12 inch tile, a traditional installation system would require two spacers for each side, for a total of eight spacers, in order to stabilize the edges and prevent pivoting. Using the teachings presented herein, four leveling devices 10 may be used and the optimal eight points of contact would be maintained.

US 10,513,857 B2

5

Continuing with the description of FIGS. 6 through 9, in one implementation, as these wedge-shaped extension members are continually pushed through the lateral open windows 20, 22 due to the increasing thickness of the wedge members 52, 54, the action causes the lower surfaces 88, 92 of each of the tiles 70, 72 to be compressed downward pressing the strip members 16, 18 beneath the tiles 70, 72 toward the subsurface S, on which is located mortar M for bonding the tiles 70, 72 to the subsurface S. As a result, the tiles 70, 72 are aligned and leveled. The spacing between the tiles is controlled by the thickness of the body and, in one embodiment, the presence of the spacing pad 30, which may more generally be a spacer. Once the tiles 70, 72 are set, the wedge device 12 may be removed and the body 14 is broken off by kicking or applying force to the side of the wedge device 12 such that the body 14 is severed at the breakaway section 24. As shown in FIG. 9, the application of force by a boot, breaks the body at a break at the breakaway section 24. In the illustrated implementation, the breakaway section 24 is positioned such that it is located between the surfaces 88, 90, 92, 94 of the tiles 70, 72. That is, the breakaway section 24 is located at a height within the thickness of the installed tiles. In this position, the breakaway section 24 is not exposed to any adhesive that may be used to adhere the tiles to the subsurface S, which may be a floor or wall, for example.

Referring now to FIG. 10, an alternative embodiment of the tile leveling device 10 includes the body 14 and the spaced and parallel strip members 16, 18 extending transversely from the body 14. In this embodiment, opposing lateral closed windows 100, 102 are formed in the body 14 with each of the opposing lateral closed windows 100, 102 sized to accept a wedge device having wedge members including a tapered surface configured to penetrate the respective lateral closed windows 100, 102 and exert force against multiple tiles pressing the tiles against the strip members 16, 18. Additionally, the breakaway section 24 is defined along the body 14. By way of further example, a further embodiment is possible, wherein the leveling device 10 would include a lateral open window and a lateral closed window.

Referring to FIGS. 11A, 11B, and 12, in one embodiment of a tile leveling device 110 and tile combination with a wedge device 112, the tile leveling device 110 includes an inverted U-shaped body 114 defining an open window 116 between two stems 118, 120 of the inverted U-shaped body 114. An I-shaped base 122 is orthogonally coupled to the inverted U-shaped body 114 such that four spaced bars 124, 126, 128, 130 extend transversely from the inverted U-shaped body 114. In particular, the spaced bars 124, 126 extend to the front F of the inverted U-shaped body 114 and the spaced bars 128, 130 extend to the rear R of the inverted U-shaped body 114. Each of the bars 124, 126, 128, 130 extends upward toward the inverted U-shaped body in an arcuate fashion to define respective four points of contact 132, 134, 136, 138 for two, three, and four tiles.

Two breakaway sections 140, 142 are defined along the respective two stems 118, 120 of the inverted U-shaped body 114. Additionally, as shown, a notch 144 is formed between the bars 124, 126 and a notch 146 is formed between the bars 128, 130. The open window 116 includes an upper edge 148. An open span 150 is proximally interposed between the breakaway sections 140, 142 and the open span 150 forms a portion of the open window 116. Spacing pads, such as spacing pad 152, may be utilized to position the tiles a predetermined distance apart, depending on the application.

6

The wedge device 112 includes an oversized backstop member 160. A wedge member 162 extends from the oversized backstop member 160 and includes a tapered surface 164 that is configured to penetrate the open window 116 and exert force against two, three, or four tiles pressing the tiles against the bars 124, 126, 128, 130. The breakaway sections 140, 142 are located where the ends of the stems 118, 120 of the inverted U-shaped body 114 contact the I-shaped base 122. Teeth 166 are positioned along the tapered surface 164 in order to latch onto the upper edge 148 of the open window 116.

In operation, the leveling device 110 may be used to align two, three or four tiles and operation is similar to leveling device 10 and wedge device 12, as previously presented. Similar to the leveling device presented in FIG. 5, in a four-tile embodiment, each tile has corner-to-subfloor contact due to the notches that provide space for mortar contact therein. Similarly, in a two-tile implementation, for example, each tile has edge-to-subfloor contact due to the notches. More particularly, the tapered surface 164 penetrates the open window 116 contacting the upper edge 148 thereof and exerting force against both tiles pressing the tiles against the bars 124, 126, 128, 130, wherein breakaway sections 140, 142 are located beyond the undersurfaces of the tiles in a direction away from the bars 124, 126, 128, 130. As previously discussed, the arcuate portions of the parallel strip members compress and flatten to accommodate different thicknesses of tiles to provide a level surface. In fact, the leveling device and wedge device presented herein may simultaneously accommodate between two and four different thicknesses of tiles.

Referring now to FIGS. 13 and 14, a tile leveling device 200 for use with a locking subassembly 202 are presented. As shown, the tile leveling device includes a shaft 204 and spaced and parallel strip members 206, 208 extend transversely from the shaft 204. The locking subassembly 202 is configured to traverse the shaft and exert force against the tiles by pressing the tiles against the parallel strip members, similar to the functionality described in previous embodiments. Each of the spaced and parallel strip members extend to the front and rear of the shaft 204. As shown, a frangible breakaway section is defined along the shaft 204. A spacing pad 207, which may be similar to spacing pad 30, may be integral with the shaft 204 and may vary in thickness depending on the application. The spaced and parallel strip members 206, 208 provide four points of contact 210, 212, 214, 216 for lift of tiles, while still establishing space for maximum mortar penetration between the spaced and parallel strip members 206, 208. Convex curvatures 218, 220 ensure that the tiles of varying thicknesses may be leveled and aligned, including the alignment of up to four tiles of varying thickness.

In operation, once the tiles are properly positioned, the locking subassembly 202 is secured in its place above the tiles and prevented from moving along the shaft 204 before being driven down to compress the tiles. The shaft 204 may include a locking surface 222, such as a "zip tie" to enable movement along the shaft 204 by the locking subassembly 202 in only one direction, i.e., toward the tiles.

Referring to FIGS. 15 and 16, in one further embodiment of the tile leveling device 110 and tile combination with the wedge device 112, the tile leveling device 110 includes the inverted U-shaped body 114 defining the open window 116 between two stems 118, 120 of the inverted U-shaped body 114. The I-shaped base 122 is orthogonally coupled to the inverted U-shaped body 114 such that four spaced bars 124, 126, 128, 130 extend transversely from the inverted

US 10,513,857 B2

7

U-shaped body **114**. In particular, the spaced bars **124**, **126** extend to the front F of the inverted U-shaped body **114** and the spaced bars **128**, **130** extend to the rear R of the inverted U-shaped body **114**. Each of the bars **124**, **126**, **128**, **130** extends upward toward the inverted U-shaped body in an arcuate fashion to define respective four points of contact **132**, **134**, **136**, **138** for two, three, and four tiles.

As shown, the I-shaped base is intersected by a crossbar **230**, which is located between the bars **124**, **126** and the bars **128**, **130**. The crossbar **230** may take any shape and form and may be considered a bi-directional projection, for example. As illustrated, the crossbar **230** includes a bar **232** extending to the front F of the inverted U-shaped body **114** and a bar **234** extends to the rear R of the inverted U-shaped body **114**. The bars **232**, **234** may have outwardly extending arcuate portions **236**, **238** at the respective ends that compress and flatten to accommodate the thickness. Moreover the bars **232**, **234** may be substantially equal to the length of the bars **124**, **126**, **128**, **130**. In another embodiment, the bars **232**, **234** may be greater than or less than the length of the bars **124**, **126**, **128**, **130**.

Two breakaway sections **140**, **142** are defined along the respective two stems **118**, **120** of the inverted U-shaped body **114**. Additionally, as shown, the notch **144** is formed between the bars **124**, **126** and the notch **146** is formed between the bars **128**, **130**. The open window **116** includes an upper edge **148**. The open span **150** is proximally interposed between the breakaway sections **140**, **142** and the open span **150** forms a portion of the open window **116**. As shown, the crossbar **230** intersects the notch **144** forming subnotches **240**, **242** between the bars **124**, **126** and the crossbar **230**. Similarly, subnotches **244**, **246** are formed between the bars **128**, **130** and the crossbar **230**. It should be appreciated that although the I-shaped base **122** with the crossbar **230** is depicted with a particular U-shaped body **114**, it should be appreciated that the I-shaped base **122** with the crossbar **230** may be utilized with any of the leveling devices **10** presented herein, including the leveling devices **10** of FIG. 1A, FIG. **10**, FIG. **13**, and FIG. **14**, for example.

The order of execution or performance of the methods and techniques illustrated and described herein is not essential, unless otherwise specified. That is, elements of the methods and techniques may be performed in any order, unless otherwise specified, and that the methods may include more or less elements than those disclosed herein. For example, it is contemplated that executing or performing a particular element before, contemporaneously with, or after another element are all possible sequences of execution.

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is, therefore, intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

**1**. A tile leveling device and tile combination comprising:
a leveling device comprising:
    a body defining an open window,
    an I-shaped base orthogonally coupled to the body, the I-shaped base having spaced first, second, third, and fourth bars extending transversely from the body, the spaced first and second bars extending to the front and outward of the body and the spaced third and fourth bars extending to the rear and outward of the body,

8

    an I-shaped base to body coupling including a frangible breakaway section, the I-shaped base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the I-shaped base,
    a first notch formed between the first and second bars, and
    a second notch formed between the third and fourth bars;
a first tile over the first bar, the first tile having a first surface opposite a second surface, the first tile having a first corner over the first notch, the first corner having contact with mortar at the first notch with edge-to-subfloor contact of first corner-to-mortar-to-subfloor at the first notch, wherein the first surface faces the first bar and the second surface is farther from the first bar than the first surface;
a second tile over the second bar, the second tile having a third surface opposite a fourth surface, the second tile having a second corner over the first notch, the second corner having contact with mortar at the first notch with edge-to-subfloor contact of second corner-to-mortar-to-subfloor at the first notch, wherein the third surface faces the second bar and the fourth surface is farther from the second bar than the third surface;
the frangible breakaway section being located between the first and second surfaces of the first tile and the third and fourth surfaces of the second tile; and
a wedge device comprising:
    a backstop member, and
    a wedge member extending from the backstop member, the wedge member having a tapered surface penetrating the open window and exerting force against both tiles pressing the tiles against the first and second bars.

**2**. The tile leveling device and tile combination as recited in claim **1**, wherein the I-shaped based having spaced first, second, third, and fourth bars extending transversely from the body further comprises first, second, third, and fourth bars that extend upwards toward the body in an arcuate fashion to define a respective four points of contact for two, three, and four tiles.

**3**. The tile leveling device and tile combination as recited in claim **1**, wherein the body further comprises a spacer extending transversely from the front and rear of the body, the spacer configured to position the first and second tiles a predetermined distance apart.

**4**. The tile leveling device and tile combination as recited in claim **1**, wherein the wedge member further comprises teeth along the tapered surface, the teeth latch onto an upper edge of the open window.

**5**. The tile leveling device and tile combination as recited in claim **1**, wherein the I-shaped base further comprises an intersection with a crossbar located between the first and third bars and the second and fourth bars.

**6**. The tile leveling device and tile combination as recited in claim **5**, wherein the crossbar further comprises a fifth bar extending to the front of the body and a sixth bar extending to the rear of the body.

**7**. The tile leveling device and tile combination as recited in claim **5**, wherein the crossbar intersects the first notch forming first and second subnotches between the first and second bars and the crossbar, and wherein the crossbar intersects the second notch forming third and fourth subnotches between the third and fourth bars and the crossbar.

**8**. The tile leveling device and tile combination as recited in claim **1**, wherein the first, second, third, and fourth bars

US 10,513,857 B2

9

each further comprise respective outwardly extending arcuate portions at the respective ends that compress and flatten.

9. The tile leveling device and tile combination as recited in claim 1, further comprising an open span proximally interposed between the first and second breakaway sections, the open span forming a portion of the open window.

10. A tile leveling device comprising:

a body defining an open window;

an I-shaped base orthogonally coupled to the body, the I-shaped base having spaced first, second, third, and fourth bars extending transversely from the body, the spaced first and second bars extending to the front and outward of the body and the spaced third and fourth bars extending to the rear and outward of the body;

an I-shaped base to body coupling including a frangible breakaway section, the I-shaped base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the I-shaped base;

a first notch formed between the first and second bars;

a second notch formed between the third and fourth bars;

a first tile over the first bar, the first tile having a first surface opposite a second surface, the first tile having a first corner over the first notch, the first corner having contact with mortar at the first notch with edge-to-subfloor contact of first corner-to-mortar-to-subfloor at the first notch, wherein the first surface faces the first bar and the second surface is farther from the first bar than the first surface;

a second tile over the second bar, the second tile having a third surface opposite a fourth surface, the second tile having a second corner over the first notch, the second corner having contact with mortar at the first notch with edge-to-subfloor contact of second corner-to-mortar-to-subfloor at the first notch, wherein the third surface faces the second bar and the fourth surface is farther from the second bar than the third surface; and

10

the frangible breakaway section being located between the first and second surfaces of the first tile and the third and fourth surfaces of the second tile.

11. The tile leveling device and tile combination as recited in claim 10, wherein the I-shaped base having spaced first, second, third, and fourth bars extending transversely from the body further comprises first, second, third, and fourth bars that extend upwards toward the body in an arcuate fashion to define a respective four points of contact for two, three, and four tiles.

12. The tile leveling device and tile combination as recited in claim 10, wherein the body further comprises a spacer extending transversely from the front and rear of the body, the spacer configured to position the first and second tiles a predetermined distance apart.

13. The tile leveling device and tile combination as recited in claim 10, wherein the I-shaped base further comprises an intersection with a crossbar located between the first and third bars and the second and fourth bars.

14. The tile leveling device and tile combination as recited in claim 13, wherein the crossbar further comprises a fifth bar extending to the front of the body and a sixth bar extending to the rear of the body.

15. The tile leveling device and tile combination as recited in claim 13, wherein the crossbar intersects the first notch forming first and second subnotches between the first and second bars and the crossbar, and wherein the crossbar intersects the second notch forming third and fourth subnotches between the third and fourth bars and the crossbar.

16. The tile leveling device and tile combination as recited in claim 10, wherein the first, second, third, and fourth bars each further comprise respective outwardly extending arcuate portions at the respective ends that compress and flatten.

17. The tile leveling device and tile combination as recited in claim 10, further comprises an open span proximally interposed between the first and second breakaway sections, the open span forming a portion of the open window.

* * * * *

US010704271B2

(12) **United States Patent** (10) Patent No.: **US 10,704,271 B2**
Bunch et al. (45) Date of Patent: **\*Jul. 7, 2020**

(54) **WEDGE DEVICE FOR LEVELING TILES AND CLIP SET FOR USE OF SAME**

(71) Applicants:**Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

(72) Inventors: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/707,801**

(22) Filed: **Dec. 9, 2019**

(65) **Prior Publication Data**

US 2020/0123789 A1 Apr. 23, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/051,079, filed on Jul. 31, 2018, now Pat. No. 10,501,947.

(60) Provisional application No. 62/551,946, filed on Aug. 30, 2017.

(51) **Int. Cl.**
E04F 21/00 (2006.01)
E04F 21/18 (2006.01)
E04F 15/02 (2006.01)
E04F 13/08 (2006.01)
E04F 21/22 (2006.01)

(52) **U.S. Cl.**
CPC ...... *E04F 21/0092* (2013.01); *E04F 13/0892* (2013.01); *E04F 15/02022* (2013.01); *E04F 21/1877* (2013.01); *E04F 21/22* (2013.01)

(58) **Field of Classification Search**
CPC . E04F 21/0092; E04F 15/02022; E04F 21/22; E04F 13/0892; E04F 21/1877; E04F 21/1844
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,185,442 A 5/1965 Hemphill
D268,804 S 5/1983 Bacon
D269,495 S 6/1983 Finn
D271,559 S 11/1983 Reimann et al.
D286,008 S 10/1986 Hillinger
4,688,761 A 8/1987 Wilcox
D336,224 S 6/1993 Terry
5,603,195 A 2/1997 Cosentino
D421,374 S 3/2000 Montgomery
6,041,473 A 3/2000 Johnson
D481,625 S 11/2003 Ellsworth
D590,676 S 4/2009 Pickard

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2892352 11/2016
FR 2625244 6/1989

*Primary Examiner* — Jessie T Fonseca
(74) *Attorney, Agent, or Firm* — Scott T. Griggs; Griggs Bergen LLP

(57) **ABSTRACT**
A wedge device for leveling tiles and a clip set for use of the same are disclosed. In one embodiment of the wedge device, the wedge device includes a body having an attachment end, a penetrating edge, a top, and a bottom. The attachment end is coupled to a backstop member and the penetrating edge is configured to penetrate the clip member. The body includes an inclined plane tapering from the attachment end to the penetrating edge. A line-of-sight opening extends along a longitudinal axis of the body to provide visibility through the body from the top to the bottom.

**10 Claims, 6 Drawing Sheets**



**Appx98**

**US 10,704,271 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,690,080 | B1 | 4/2010 | Coffman |
| 8,429,878 | B1 | 4/2013 | Hoffman |
| D683,924 | S | 6/2013 | Woffenbarger |
| D720,588 | S | 1/2015 | Pugh |
| D731,273 | S | 6/2015 | McPeak Ford et al. |
| D760,566 | S | 7/2016 | Biec |
| 9,970,203 | B1 | 5/2018 | Abidov |
| D821,838 | S | 7/2018 | Castellanos |
| D829,532 | S | 10/2018 | Bunch et al. |
| D832,680 | S | 11/2018 | Bunch et al. |
| D850,966 | S | 6/2019 | Laurans |
| 10,501,947 | B2 | 12/2019 | Bunch et al. |
| 2008/0236094 | A1 | 10/2008 | Doda |
| 2013/0055675 | A1 | 3/2013 | Sighinolfi |
| 2014/0116001 | A1 | 5/2014 | Ghelfi |
| 2014/0298736 | A1 | 10/2014 | Bunch et al. |
| 2014/0325935 | A1 | 11/2014 | Hoffman |
| 2015/0308130 | A1 | 10/2015 | Biec |
| 2016/0090746 | A1 | 3/2016 | Sighinolfi |
| 2016/0186449 | A1 | 6/2016 | Lee |
| 2016/0222679 | A1 | 8/2016 | Bunch et al. |
| 2016/0326754 | A1 | 11/2016 | Bucsa |



*Fig.1A*

*Fig.1B*



*Fig.2A*

*Fig.2B*

*Fig.3A*     *Fig.3B*

*Fig.4*



*Fig.5*



*Fig.6*

*Fig.7*

*Fig.8*

*Fig.9*

*Fig.10*



*Fig.11*

*Fig.12*

*Fig.13*

*Fig.14*



*Fig.15*



*Fig.16*

US 10,704,271 B2

# WEDGE DEVICE FOR LEVELING TILES AND CLIP SET FOR USE OF SAME

## PRIORITY STATEMENT & CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/051,079 entitled "Wedge Device for Leveling Tiles and Clip Set for Use of Same" filed on Jul. 31, 2018 in the names of Clinton D. Bunch et al., now U.S. Pat. No. 10,501,947 issued on Dec. 10, 2019; which claims the benefit of U.S. patent application Ser. No. 62/551,946 entitled "Wedge Device for Leveling Tiles and Clip Set for Use of Same" and filed on Aug. 30, 2017, in the names of Clinton D. Bunch and Joshua A. Bunch; both of which are hereby incorporated, in their entirety, by reference for all purposes.

## TECHNICAL FIELD OF THE INVENTION

This invention relates, in general, to tile installation and, in particular, to a wedge device for leveling tiles and a clip set for use of the same that properly levels tiles during the installation thereof.

## BACKGROUND OF THE INVENTION

Tile has become a popular decorative and functional article for use in floors, walls, countertops, and the like. Both professional tile installers and do-it-yourselfers spend a great deal of time aligning and leveling tiles as they are being placed on a substrate's surface. Proper alignment and leveling of each tile is important for a number of reasons. Improper installation can cause the need for tiles to be replaced in order to prevent a spacing error from propagating across the substrate, aesthetic reasons, and in some instances, safety concerns. A need exists for a wedge for leveling tiles and clip set for use of the same that properly spaces tiles during the installation thereof.

## SUMMARY OF THE INVENTION

It would be advantageous to achieve a device for leveling and aligning tiles and properly spacing tiles. It would also be desirable to enable a mechanical-based solution that furnishes an inexpensive tool that assists professional tile installers and do-it-yourselfers. To better address one or more of these concerns, in one aspect of the invention, a wedge device for leveling tiles and a clip set for use of the same are disclosed. In one embodiment of the wedge device, the wedge device includes a body having an attachment end, a penetrating edge, a top, and a bottom. The attachment end is coupled to a backstop member and the penetrating edge is configured to penetrate the clip member. The body includes an inclined plane tapering from the attachment end to the penetrating edge. A line-of-sight opening extends along a longitudinal axis of the body to provide visibility through the body from the top to the bottom. These and other aspects of the invention will be apparent from and elucidated with reference to the embodiments described hereinafter.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the features and advantages of the present invention, reference is now made to the detailed description of the invention along with the accompanying figures in which corresponding numerals in the different figures refer to corresponding parts and in which:

FIGS. 1A and 1B are front perspective views, when taken together, form one embodiment of a wedge device for a tile leveling device including a clip member, according to the teachings presented herein;

FIG. 2A is a side view, in partial cross-section, of the tile leveling device with the wedge device presented in FIG. 1 during installation of tile;

FIG. 2B is a side view, in partial cross-section, of the tile leveling device with the wedge device presented in FIG. 1 during installation of tile as the installation advances beyond FIG. 2A;

FIG. 3A is a top plan view of the tile leveling device with the wedge device presented in FIG. 2A during installation of tile;

FIG. 3B is a top plan view of the tile leveling device with the wedge device presented in FIG. 2B during installation of tile;

FIG. 4 is a top perspective view of the tile leveling device with the wedge device presented in FIG. 2B during installation of four tiles;

FIG. 5 is a top perspective view of the tile leveling device with the wedge device presented in FIG. 2B during installation of three tile;

FIG. 6 is a right-side elevation view of the wedge device presented in FIG. 1, where the wedge device has left-right symmetry;

FIG. 7 is a top plan view of the wedge device presented in FIG. 1;

FIG. 8 is a bottom plan view of the wedge device presented in FIG. 1;

FIG. 9 is a front elevation view of the wedge device presented in FIG. 1;

FIG. 10 is a rear elevation view of the wedge device presented in FIG. 1;

FIG. 11 is a front perspective view of another embodiment of a wedge device, according to the teachings presented herein;

FIG. 12 is a top plan view of the wedge device presented in FIG. 11;

FIG. 13 is a front perspective view of another embodiment of a wedge device, according to the teachings presented herein;

FIG. 14 is a top plan view of the wedge device presented in FIG. 13;

FIG. 15 is a front perspective view of another embodiment of a wedge device, according to the teachings presented herein; and

FIG. 16 is a top plan view of the wedge device presented in FIG. 15.

## DETAILED DESCRIPTION OF THE INVENTION

While the making and using of various embodiments of the present invention are discussed in detail below, it should be appreciated that the present invention provides many applicable inventive concepts which can be embodied in a wide variety of specific contexts. The specific embodiments discussed herein are merely illustrative of specific ways to make and use the invention, and do not delimit the scope of the present invention.

Referring initially to FIG. 1A and FIG. 1B, therein is depicted one embodiment of a wedge device schematically illustrated and generally designated 10. The wedge device

US 10,704,271 B2

3

10 is utilized with a clip member 12 and the wedge device 10 and the clip member 12 are utilized, in combination, as part of a tile leveling device 14 to align and level two, three, or four tiles, for example. The wedge device 10 includes a body 16 having an attachment end 18, a penetrating edge 20, a top 22, and a bottom 24. The attachment end 18 is coupled to a backstop member 26 and the penetrating edge 20 is configured to penetrate the clip member 12. The body 16 includes an inclined plane 28 tapering from the attachment end 18 to the penetrating edge 20. A line-of-sight opening 30 extends longitudinally along the body 16. Teeth 32 are positioned along the inclined plane 28 in order to latch onto the clip member 12 as will be described in further detail hereinbelow.

In one embodiment, the clip member 12 includes an inverted U-shaped body 40 defining an open window 42 between two stems 44, 46 of the inverted U-shaped body 40. An I-shaped base 48 is orthogonally coupled to the inverted U-shaped body 40 such that four spaced bars 50, 52, 54, 56 extend transversely from the inverted U-shaped body 40. Two breakaway sections 58, 60 are defined along the respective two stems 44, 46 of the inverted U-shaped body 40. The open window 42 includes an upper edge 62. It should be appreciated that although a particular clip member is described and illustrated, the wedge device 10 presented herein may work with a variety of clip members and the clip member selected will depend on a number of manufacturing and design considerations.

Referring now to FIG. 2A, FIG. 2B, FIG. 3A, and FIG. 3B, in one operational implementation, the tile leveling device 14 may be used to align two, three or four tiles. As shown in FIG. 2A and FIG. 3A, the clip member 12 is positioned on a subsurface, such as a floor F having tile mortar M in space S thereon, and four tiles T₁, T₂, T₃, T₄, are placed and positioned thereon. The wedge device 10 is aligned to be inserted into the clip member 12. The backstop member 26 of the wedge device 10 provides a push area for fingers or a thumb and an enhanced sized that furnishes more leverage during use.

As shown in FIG. 2B and FIG. 3B, as the wedge device 10 is inserted, the inclined plane 28 of the wedge device 10 penetrates the open window 42 contacting the upper edge 62 thereof and creating a latch. A finger or a thumb, for example, presses against the backstop member 26 of the wedge device 10 continually driving the wedge device 10 deeper into the clip member 12. As the wedge device 10 advances, the resulting force is exerted against tiles T₁, T₂, T₃, T₄ pressing the tiles T₁, T₂, T₃, T₄ against the bars 50, 52, 54, 56 wherein breakaway sections 58, 60 are located beyond the undersurfaces of the tiles T₁, T₂, T₃, T₄ in a direction away from the bars 50, 52, 54, 56. The teeth 32 prevent the wedge device 10 from slipping out of the open window 42 of the clip member 12 during penetration thereof. The application of force from the use of the tile leveling device 14 causes the tiles T₁, T₂, T₃, T₄ to be level. Following the leveling, the breakaway sections 58, 60 may be broken to remove the wedge device 10 and a portion of the clip member 12. During use, the line-of-sight opening 30 that extends longitudinally along the body 16 of the wedge device 10 provides visibility and visual contact VC through the body 16 from the top 22 to the bottom 24 of the wedge device 10. This permits a user of the wedge device 10 and the tile leveling device 14 to maintain visual contact VC with the tiles T₁, T₂, T₃, T₄ during the leveling operation, thereby improving efficiency and performance.

Referring now to FIG. 4 and FIG. 5, the wedge device 10 and the tile leveling device 12 presented in FIG. 2B during

4

installation of four tiles (T₁, T₂, T₃, T₄ having an intersection I in FIG. 4) and three tiles (T₁, T₂, T₃ having the intersection I in FIG. 5). One of the main drawbacks of traditional wedge and clip systems is the clips cannot be placed in the intersections without interfering with one of the most important factors to tile installers; namely, visual contact with the intersections, such as intersection I in FIG. 4 and intersection I in FIG. 5. Tile installers need to be able to see the tile intersections to make sure proper alignment is achieved and spacing is even. As shown in FIG. 4 and FIG. 5, the use of the wedge device 10 having the line-of-sight opening 30 with the tile leveling device 12 creates a window providing the visual contact VC that allows the tile leveling device 12 to be placed at corners or with three or four tiles, for example. Further, as shown, the tile installer is able to maintain visual contact with the intersections I.

It is advantageous to an installer to be able to use only one tile leveling device 12 at the intersection I, instead of three or four clips, in order to save time and increase productivity. Additionally, with the use of only one tile leveling device 12 at the intersection I, costs are reduced. The window and visual contact afforded by the wedge device 10 saves time and money over existing wedge and clip systems by permitting a minimum number of components to be utilized and permitting continual visual contact at important intersections.

Referring now to FIG. 6 through FIG. 10, as previously discussed, in one embodiment, the wedge device 10 includes the body 16 having the attachment end 18, the penetrating edge 20, the top 22, and the bottom 24. The attachment end 18 is coupled to the backstop member 26 and the penetration edge 20 is configured to penetrate the clip member 12 as described above. The body 16 includes the inclined plane 28 tapering from the attachment end 18 to the penetrating edge 20. The body 16 may also include a longitudinal axis 70 from the attachment end 18 to the penetrating edge 20. The longitudinal axis 70 may have a longitudinal length 72 as indicated by the one-eighth marks 74. In one embodiment, the line-of-sight opening 30 extends along the longitudinal axis 70 and intersects the longitudinal length 72 from one-eighth (⅛) of the longitudinal length 72 measured from the attachment end 18 to one-eighth (⅛) of the longitudinal length 72 measured from the penetrating edge 20. As previously discussed, the line-of-sight opening 30 provides visibility through the body 16 from the top 22 to the bottom 24.

Referring now to FIG. 11 and FIG. 12, in another embodiment, the wedge device 10 includes a body 86 having an attachment end 88, a penetrating edge 90, a top 92, and a bottom 94. The attachment end 88 is coupled to a backstop member 96, which is slightly oversized with respect to the attachment end 88, and the penetrating edge 90 is configured to penetrate the clip member 12. The body 86 includes an inclined plane 98 tapering from the attachment end 88 to the penetrating edge 90. The body 86 may also include a longitudinal axis 100 from the attachment end 88 to the penetrating edge 90. The longitudinal axis 100 may have a longitudinal length 102, which in this embodiment includes marks 104 indicating one-third increments. A line-of-sight opening 106 extends along the longitudinal axis 100 and intersects the longitudinal length 102 from one-third (⅓) of the longitudinal length 102 measured from the attachment end 88 to one-third (⅓) of the longitudinal length 102 measured from the penetrating edge 90. As previously discussed, the line-of-sight opening 106 provides visibility through the body 86 from the top 92 to the bottom 94. A partition member 108 traverses the line-of-sight opening 106

US 10,704,271 B2

5

defining opening **110** and opening **112**. The openings **110** and **112** form a partition of line-of-sight opening **106**.

It should be appreciated that the extension of the line-of-sight opening **106** may vary from application to application. By way of example, as illustrated in FIGS. **9** and **10**, the line-of sight opening **106** may extend along the longitudinal axis **100** and intersect the longitudinal length **102** from one-eighth of the longitudinal length **102** measured from the attachment end **88** to one-eighth (⅛) of the longitudinal length **102** measured from the penetrating edge **90**. By way of further example, the line-of sight opening **106** may extend along the longitudinal axis **100** and intersect the longitudinal length **102** from one-sixth (⅙) or one-quarter (¼), for example, of the longitudinal length **102** measured from the attachment end **88** to a respective one-sixth (⅙) or one-quarter (¼), for example, of the longitudinal length **102** measured from the penetrating edge **90**.

Referring now to FIG. **13** and FIG. **14**, in another embodiment, the wedge device **10** includes a body **116** having an attachment end **118**, a penetrating edge **120**, a top **122**, and a bottom **124**. The attachment end **118** is coupled to a backstop member **126**, which is substantially flush with the attachment end **118**, and the penetrating edge **120** is configured to penetrate the clip member **12**. The body **116** includes an inclined plane **128** tapering from the attachment end **118** to the penetrating edge **120**. Wall members **130, 132** secure the inclined plane **128**, which may include inclined plane member **134** and inclined plane member **136**, to the body **116**. The body **116** may also include a longitudinal axis **138** from the attachment end **118** to the penetrating edge **120**. The longitudinal axis **138** may include a longitudinal length **140** having a midpoint **142** and a mediolateral axis **144** bisecting the midpoint **142** creating a longitudinal length segment **146** and a longitudinal length segment **148**. A line-of-sight opening **150** extends along the longitudinal axis **138** and intersects the longitudinal length segment **146** and the longitudinal length segment **148**. As previously discussed, the line-of-sight opening **150** provides visibility through the body **116** from the top **122** to the bottom **124**.

Referring now to FIG. **15** and FIG. **16**, in another embodiment, the wedge device **10** includes a body **166** having an attachment end **168**, a penetrating edge **170**, a top **172**, and a bottom **174**. The attachment end **168** is coupled to a backstop member **176** and the penetrating edge **170** is configured to penetrate the clip member **12**. The backstop member **176** may include a flange **177** that extends therefrom to provide a contact surface for tool engagement. The body **166** includes an inclined plane **178** tapering from the attachment end **168** to the penetrating edge **170**. Wall members **180, 182** secure the inclined plane **178**, which may include inclined plane member **184** and inclined plane member **186**, to the body **166**. The body **166** may also include a longitudinal axis **188** from the attachment end **168** to the penetrating edge **170**. The longitudinal axis **188** may include a longitudinal length **190** having a midpoint **192** and a mediolateral axis **194** bisecting the midpoint **192** creating a longitudinal length segment **196** and a longitudinal length segment **198**. A line-of-sight opening **200** extends along the longitudinal axis **188** and intersects the longitudinal length segment **196** and the longitudinal length segment **198**. As previously discussed, the line-of-sight opening **200** provides visibility through the body **166** from the top **172** to the bottom **174**. Crossbar members **202, 204** traverse the line-of-sight opening **200** within the body **166**.

The order of execution or performance of the methods and techniques illustrated and described herein is not essential, unless otherwise specified. That is, elements of the methods

6

and techniques may be performed in any order, unless otherwise specified, and that the methods may include more or less elements than those disclosed herein. For example, it is contemplated that executing or performing a particular element before, contemporaneously with, or after another element are all possible sequences of execution.

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is, therefore, intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

1. A wedge device for a tile leveling device including a clip member, the wedge device comprising:
   a backstop member;
   a body having an attachment end, a penetrating edge, a top, and a bottom, the attachment end being coupled to the backstop member, the penetrating edge being configured to penetrate the clip member, the penetrating edge being continuous the entire width of the body;
   the body including an inclined plane tapering from the attachment end to the penetrating edge;
   the body including a longitudinal axis from the attachment end to the penetrating edge, the longitudinal axis having a longitudinal length; and
   a line-of-sight opening extending along the longitudinal axis and intersecting the longitudinal length, the line-of-sight opening providing visibility through the body from the top to the bottom, the line-of-sight opening sized to provide a user of the wedge device visual contact with tiles during a leveling operation.

2. The wedge device as recited in claim **1**, further comprising teeth disposed along the inclined plane, the teeth latch onto an upper edge of an insertion space in the clip member.

3. The wedge device as recited in claim **1**, further comprising a partition member traversing the line-of-sight opening.

4. The wedge device as recited in claim **1**, further comprising a crossbar member traversing the line-of-sight opening.

5. The wedge device as recited in claim **1**, wherein the body including the inclined plane tapering from the attachment end to the penetrating edge further comprises a wall member coupled to the body.

6. The wedge device as recited in claim **1**, wherein the line-of-sight opening intersects the inclined plane.

7. The wedge device as recited in claim **1**, wherein the line-of-sight opening is subjacent to the inclined plane.

8. The wedge device as recited in claim **1**, wherein the backstop member has a larger surface area than the attachment end.

9. A wedge device for a tile leveling device including a clip member, the wedge device comprising:
   a backstop member;
   a body having an attachment end, a penetrating edge, a top, and a bottom, the attachment end being coupled to the backstop member, the penetrating edge being configured to penetrate the clip member, the penetrating edge being continuous the entire width of the body;
   the body including an inclined plane tapering from the attachment end to the penetrating edge;

US 10,704,271 B2

7                                                              8

the body including a longitudinal axis from the attach-
ment end to the penetrating edge, the longitudinal axis
having a longitudinal length; and

a line-of-sight opening extending along the longitudinal
axis and intersecting the longitudinal length, the line-
of-sight opening sized to provide a user of the wedge
device visual contact with tiles during a leveling opera-
tion.

**10**. A wedge device for a tile leveling device including a
clip member, the wedge device comprising:

a backstop member;

a body having an attachment end, a penetrating edge, a
top, and a bottom, the attachment end being coupled to
the backstop member, the penetrating edge being con-
figured to penetrate the clip member, the penetrating
edge being continuous the entire width of the body;

the body including an inclined plane tapering from the
attachment end to the penetrating edge;

the body including a longitudinal axis from the attach-
ment end to the penetrating edge, the longitudinal axis
having a longitudinal length; and

a line-of-sight opening extending along the longitudinal
axis and intersecting the longitudinal length between
the attachment edge and the penetrating edge, the
line-of-sight opening providing visibility through the
body from the top to the bottom, the line-of-sight
opening sized to provide a user of the wedge device
visual contact with tiles during a leveling operation.

\*   \*   \*   \*   \*

US010704274B2

US 010704274B2

(12) **United States Patent**
Bunch et al.

(10) Patent No.: **US 10,704,274 B2**
(45) Date of Patent: **Jul. 7, 2020**

(54) **DEVICE FOR LEVELING AND ALIGNING TILES AND METHOD FOR LEVELING AND ALIGNING TILES**

(71) Applicants: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

(72) Inventors: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/102,344**

(22) Filed: **Aug. 13, 2018**

(65) **Prior Publication Data**

US 2018/0347210 A1 Dec. 6, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/345,802, filed on Nov. 8, 2016, now Pat. No. 10,047,530, which is a
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *E04F 21/20* | (2006.01) |
| *E04F 21/22* | (2006.01) |
| *E04F 21/18* | (2006.01) |
| *E04F 21/00* | (2006.01) |
| *E04F 13/08* | (2006.01) |
| *E04F 15/02* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *E04F 21/20* (2013.01); *E04F 21/0092* (2013.01); *E04F 21/1844* (2013.01); *E04F 21/1877* (2013.01); *E04F 21/22* (2013.01); *E04F 13/0892* (2013.01); *E04F 15/02005* (2013.01)

(58) **Field of Classification Search**
CPC ... E04F 21/0092; E04F 21/22; E04F 21/1844; E04F 21/1877; E04F 13/0892; E04F 15/02005
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,397,125 A | 8/1983 | Gussler |
| 7,603,825 B2 | 10/2009 | Dohren |
(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 2012101175 | 8/2012 | |
| WO | WO201303376 A1 * | 3/2013 | .......... E04F 21/1877 |

OTHER PUBLICATIONS

Pearl Abrasive Co., Tuscan Leveling System, www.pearlabrasive.com.

(Continued)

*Primary Examiner* — Babajide A Demuren
(74) *Attorney, Agent, or Firm* — Scott T. Griggs; Griggs Bergen LLP

(57) **ABSTRACT**

A device for leveling and aligning tiles and method for leveling and aligning tiles are disclosed. In one embodiment, the leveling device includes a body and two spaced and parallel strip members extending transversely from the body. Each of the spaced and parallel strip members extend to the front and rear of the body. Two opposing lateral open windows are formed in the body. A breakaway section is defined along the body. A wedge device is provided for penetrating one or more of the two opposing lateral open windows and exerting a force on the tiles for leveling them relative to each other.

**8 Claims, 7 Drawing Sheets**



US 10,704,274 B2

Page 2

**Related U.S. Application Data**

continuation of application No. 15/044,907, filed on Feb. 16, 2016, now Pat. No. 9,487,959, which is a continuation-in-part of application No. 13/859,316, filed on Apr. 9, 2013, now Pat. No. 9,260,872.

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,621,100 | B2 | 11/2009 | Kutner et al. | |
| D630,077 | S * | 1/2011 | Kufner | D8/105 |
| 7,861,487 | B2 | 1/2011 | Kufner et al. | |
| 7,954,300 | B1 | 6/2011 | Kufner et al. | |
| 7,992,354 | B2 | 8/2011 | Doda, Jr. | |
| 8,079,199 | B1 * | 12/2011 | Kufner | E04F 13/0892 |
| | | | | 33/526 |
| 8,181,420 | B2 | 5/2012 | Comas | |
| 8,429,878 | B1 * | 4/2013 | Hoffman | E04F 13/0889 |
| | | | | 52/747.11 |
| 9,045,911 | B2 * | 6/2015 | Hoffman | E04F 21/0092 |
| D734,119 | S * | 7/2015 | Kufner | D8/105 |
| 9,260,872 | B2 | 2/2016 | Bunch et al. | |
| 9,464,448 | B2 * | 10/2016 | Hoffman | E04F 21/22 |
| 9,487,959 | B2 | 11/2016 | Bunch et al. | |
| 9,657,485 | B2 * | 5/2017 | Meyers | E04F 21/1877 |
| 10,047,530 | B2 | 8/2018 | Bunch et al. | |

| | | | | |
|---|---|---|---|---|
| 2008/0236094 | A1 | 10/2008 | Doda | |
| 2010/0263304 | A1 * | 10/2010 | Torrents I Comas | E04F 21/0092 |
| | | | | 52/126.5 |
| 2012/0144773 | A1 * | 6/2012 | Mauro | E04F 21/0092 |
| | | | | 52/747.11 |
| 2013/0055675 | A1 | 3/2013 | Sighinolfi | |
| 2013/0118115 | A1 | 5/2013 | Hoffman et al. | |
| 2013/0247508 | A1 * | 9/2013 | Hoffman | E04F 21/00 |
| | | | | 52/749.11 |
| 2013/0255182 | A1 * | 10/2013 | Kufner | E04F 21/22 |
| | | | | 52/749.11 |
| 2014/0033640 | A1 * | 2/2014 | Gorton | E04F 21/22 |
| | | | | 52/747.11 |
| 2014/0116001 | A1 | 5/2014 | Ghelfi | |
| 2014/0325936 | A1 * | 11/2014 | Psaila | E04F 21/1877 |
| | | | | 52/749.11 |
| 2015/0308130 | A1 * | 10/2015 | Biec | E04F 21/0092 |
| | | | | 52/749.11 |
| 2018/0100315 | A1 * | 4/2018 | Volponi | E04F 15/02022 |

OTHER PUBLICATIONS

D.E.P. Co., Inc., Lash Tile Leveling Clips and Wedges, 99720/9972, www.qep.com.

* cited by examiner



Fig.1A

Fig.1B

Fig.2







*Fig.10*



*Fig.11A*

*Fig.11B*

*Fig.12*



*Fig.13*

*Fig.14*



*Fig.15*



*Fig.16*

US 10,704,274 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# DEVICE FOR LEVELING AND ALIGNING TILES AND METHOD FOR LEVELING AND ALIGNING TILES

## PRIORITY STATEMENT & CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of co-pending U.S. patent application Ser. No. 15/345,802, entitled "Device for Leveling and Aligning Tiles and Method for Leveling and Aligning Tiles" filed on Nov. 8, 2016, in the names of Clinton D. Bunch et al., issued on Aug. 14, 2018 as U.S. Pat. No. 10,047,530; which is a continuation of U.S. patent application Ser. No. 15/044,907 entitled "Device for Leveling and Aligning Tiles and Method for Leveling and Aligning Tiles" filed on Feb. 16, 2016, in the names of Clinton D. Bunch and Joshua A. Bunch, issued on Nov. 8, 2016 as U.S. Pat. No. 9,487,959; which is a continuation-in-part of U.S. patent application Ser. No. 13/859,316 entitled "Device for Leveling and Aligning Tile and Method for Leveling and Aligning Tiles" filed on Apr. 9, 2013, in the names of Clinton D. Bunch and Joshua A. Bunch and issued on Feb. 16, 2016 as U.S. Pat. No. 9,260,872; all of which are hereby incorporated by reference, in entirety, for all purposes.

## TECHNICAL FIELD OF THE INVENTION

This invention relates, in general, to tile installation and, in particular to a device for leveling and aligning tiles and properly spacing tiles during the installation thereof.

## BACKGROUND OF THE INVENTION

Tile has become a popular decorative and functional article for use in floors, walls, countertops, and the like. Both professional tile installers and do-it-yourselfers spend a great deal of time aligning and leveling tiles as they are being placed on a substrate's surface. Proper alignment and leveling of each tile is important for a number of reasons. Improper installation can cause the need for tiles to be replaced in order to prevent a spacing error from propagating across the substrate, aesthetic reasons, and in some instances, safety concerns. A need exists for a device for leveling and aligning tiles and properly spacing tiles.

## SUMMARY OF THE INVENTION

It would be advantageous to achieve a device for leveling and aligning tiles and properly spacing tiles. It would also be desirable to enable a mechanical-based solution that furnishes an inexpensive tool that assists professional tile installers and do-it-yourselfers. To better address one or more of these concerns, in one aspect of the invention, a tile leveling device and a wedge device for use with tiles are disclosed. In one embodiment, the leveling device includes a body and two spaced and parallel strip members extending transversely from the body. Each of the spaced and parallel strip members extend to the front and rear of the body. Two opposing lateral open windows are formed in the body. A breakaway section is defined along the body.

In one implementation, a wedge device includes a back-stop member and a pair of members extending from the backstop member. Each of pair of members includes a tapered surface configured to penetrate the lateral open windows and exerting force against tiles, thereby pressing the tiles against the first and second strip members in order to level and align.

In another embodiment, the leveling device includes an inverted U-shaped body with an I-shaped base orthogonally coupled thereto. An open window is located within the U-shaped body between stems thereof. The I-shaped base has four bars extending transversely from the inverted U-shaped body and that extend upwards toward the inverted U-shaped body in an arcuate fashion to define respective four points of contact for two, three, and four tiles. Two breakaway sections are respectively defined along the spaced stems of the inverted U-shaped body at the I-shaped bar. In another implementation, a wedge device includes an oversized backstop member and a wedge member extending from the oversized backstop member. These and other aspects of the invention will be apparent from and elucidated with reference to the embodiments described hereinafter.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the features and advantages of the present invention, reference is now made to the detailed description of the invention along with the accompanying figures in which corresponding numerals in the different figures refer to corresponding parts and in which:

FIGS. **1A** and **1B** are front perspective views of one embodiment of a leveling device with a wedge device according to the teachings presented herein;

FIG. **2** is a side view, in partial cross-section, of the leveling device with the wedge device presented in FIGS. **1A** and **1B**;

FIGS. **3** through **5** are top plan views showing installations of two, three, and four tile using the leveling device and wedge device presented in FIGS. **1A**, **1B**, and **2**;

FIGS. **6** through **8** are side cross-sectional views of one embodiment of the installation of tile on a floor using the leveling device and wedge device presented in FIGS. **1A**, **1B**, and **2**;

FIG. **9** is a front cross-sectional view of the embodiment of the installation of tile on a floor or subsurface using the leveling device and wedge device presented in FIGS. **1A**, **1B**, and **2**;

FIG. **10** is a front perspective view of another embodiment of a leveling device according to the teachings presented herein;

FIGS. **11A** and **11B** are front perspective views of one embodiment of a leveling device with a wedge device according to the teachings presented herein;

FIG. **12** is a side view, in partial cross-section, of the leveling device with the wedge device presented in FIGS. **11A** and **11B**;

FIG. **13** is a front perspective view of an alternate embodiment of a leveling device;

FIG. **14** is a side elevation view of the alternative embodiment of the leveling device depicted in FIG. **13**.

FIG. **15** is a front perspective view of a further alternate embodiment of a leveling device; and

FIG. **16** is a bottom plan view of the leveling device depicted in FIG. **15**.

## DETAILED DESCRIPTION OF THE INVENTION

While the making and using of various embodiments of the present invention are discussed in detail below, it should be appreciated that the present invention provides many applicable inventive concepts which can be embodied in a wide variety of specific contexts. The specific embodiments

US 10,704,274 B2

3

discussed herein are merely illustrative of specific ways to make and use the invention, and do not delimit the scope of the present invention.

Referring initially to FIGS. 1A, 1B, and 2, therein is depicted one embodiment of a tile leveling device that is schematically illustrated and generally designated 10. The tile leveling device 10 and a wedge device 12 are utilized, in combination, to align and level two, three, or four tiles, for example. The leveling device 10 includes a body 14 and spaced and parallel strip members 16, 18 extending transversely from the body 14. Each of the spaced and parallel strip members 16, 18 extend to the front F and rear R of the body 14. Lateral open windows 20, 22 having upper edges 21, 23 are formed in the body 14 and sized to accept a member having a tapered surface configured to penetrate the respective lateral open windows 20, 22 and exert force thereunder. A breakaway section 24 is defined along the body 14. The breakaway section 24 may be a frangible section of the body 14 of reduced thickness that would promote the breakaway, and thus, separation of the body 14. An upper bump 26 and a lower bump 28 extend horizontally across the body 14. The upper bump 26 being larger and more pronounced to provide lifting power. A spacing pad 30 is integral with the body 14 and may vary in thickness depending on the application. The spacing pad 30 contributes to furnishing a combination of vertical leveling and joint spacing within a single product. Moreover, the spacing pad 30, which may be more generally a spacer, is configured to position the tiles a predetermined distance apart depending on the application.

The spaced and parallel strip members 16, 18 provide four points of contact 32, 34, 36, 38 for lift of tiles, while still establishing space for maximum mortar penetration between the spaced and parallel strip members 16, 18. As shown, the spaced and parallel strip members 16, 18 have an arcuate form wherein the spaced and parallel strip members 16, 18 curve upwards from the junction with the body 14 to the four points of contact 32, 34, 36, 38. That is, the spaced and parallel strip members 16, 18 define convex curvatures 40, 42 that are flexible and compressible for tile installation during a leveling and alignment of a tile. The convex curvatures 40, 42 also ensure that tiles of varying thicknesses may be leveled and aligned. In fact, in the corner embodiment, four tiles having four varying thicknesses may be leveled and aligned by way of the flexibility and compressibility of the convex curvatures 40, 42 of the strip members 16, 18.

The wedge device 12 includes a backstop member 50 and two extension members, depicted as wedge members 52, 54 extending from the backstop member 50. The backstop member 50 provides a push area for fingers or a thumb and an enhanced stand that furnishes more leverage during use. Each of the wedge members 52, 54 include respective tapered surfaces 56, 58 configured to penetrate the lateral open windows 20, 22 and exert force against the tiles by pressing the tiles against the strip members 16, 18. Teeth 60, 62 are located along the tapered surfaces 56, 58 in order to latch onto the respective upper edges 21, 23 of the opposing lateral open windows 20, 22. In operation, the teeth 60, 62 prevent the respective wedge members 52, 54 from slipping out of the lateral open windows 20, 22 during penetration thereof. As will be appreciated, the wedge device 12 may penetrate the leveling device from the front F or rear R.

Referring now to FIGS. 3 through 5, the tile leveling device may be utilized with two tiles 70, 72 (FIG. 3), three tiles (FIG. 4) 74, 76, 78, or four tiles 80, 82, 84, 86 (FIG. 5) for installation on a substrate, subsurface, or other surface,

4

which is indicated by the letter S. By way of example, in the two tile installation, the tile 70 is positioned over the front portions of the strip members 16, 18. The tile 70 has a lower surface 88 opposite an upper surface 90, wherein the lower surface 88 faces the strip members 16, 18 and the subsurface S. The upper surface 90 is farther from the strip members 16, 18 than the lower surface 88 and faces away from the strip members 16, 18. The second tile 72 is similarly situated over the rear portions of the strip members 16, 18 and includes a lower surface 92 and an upper surface 94.

Accordingly, a single leveling device 10 and wedge device 12 may be utilized to install, align, and level between two and four tiles. The use of the wedge device 12 having two extension members and the two lateral open windows 20, 22 provide for utilization at corner tiles; thereby offering improved efficiency. More particularly, using one leveling device for a corner improves efficiency and minimizes the number of leveling devices required to complete a job. Additionally, as previously discussed, the arcuate portions of the parallel strip members 16, 18 compress and flatten to accommodate different thicknesses of tiles to provide a level surface. In fact, the leveling device and wedge device presented herein may simultaneously accommodate between two and four different thicknesses of tiles.

Referring now to FIGS. 6 through 9, one example of installation is shown wherein the tile leveling device 10 is placed such that one end of the tile 72 sits on the rear portions of the parallel strip members 16, 18 and the tile 72 abuts the body 14 of the leveling device. Such an installation methodology may be used for any of the configurations shown in FIGS. 3 through 5, for example. By way of illustration, therefore, this example is for the two tile application of FIG. 3. The adjacent tile 70 sits on the other side of the body 14 and across the front portions of the parallel strip members 16, 18. The extension members, namely wedge members 52, 54 of the wedge device 12 are then inserted in the respective lateral open windows 20, 22. The backstop member 50 is then pushed, thereby driving the wedge members 52, 54 to penetrate the respective lateral open windows 20, 22.

In one embodiment, the wedge device 12 offers an advantage over individual wedges as the backstop member 50 provides a wider or broader surface to push. In particular, as shown in FIG. 8, a thumb or finger may be used to drive the wedge device 12 into the leveling device 10. The ease of push advantage translates into a more powerful lift because of the more even distribution of the lifting surface. Therefore, the leveling device 10 and wedge device 12 combination provide improved performance, both quantitatively and qualitatively. With respect to the former, the lateral open windows 20, 22 in combination with the wedge device 12 permit use at corners increasing efficiency and reducing the number of leveling and aligning operations, which leads to faster installation using fewer leveling devices. With respect to the latter, the improved contact surface provided by the backstop member 50 minimizes the stress and strain on the fingers and thumbs.

Additionally, the design of the wedge device 12 discourages the tiles from pivoting by providing two points of contact with each tile edge. By way of example, on a 12 inch by 12 inch tile, a traditional installation system would require two spacers for each side, for a total of eight spacers, in order to stabilize the edges and prevent pivoting. Using the teachings presented herein, four leveling devices 10 may be used and the optimal eight points of contact would be maintained.

US 10,704,274 B2

5 6

Continuing with the description of FIGS. 6 through 9, in one implementation, as these wedge-shaped extension members are continually pushed through the lateral open windows 20, 22 due to the increasing thickness of the wedge members 52, 54, the action causes the lower surfaces 88, 92 of each of the tiles 70, 72 to be compressed downward pressing the strip members 16, 18 beneath the tiles 70, 72 toward the subsurface S, on which is located mortar M for bonding the tiles 70, 72 to the subsurface S. As a result, the tiles 70, 72 are aligned and leveled. The spacing between the tiles is controlled by the thickness of the body and, in one embodiment, the presence of the spacing pad 30, which may more generally be a spacer. Once the tiles 70, 72 are set, the wedge device 12 may be removed and the body 14 is broken off by kicking or applying force to the side of the wedge device 12 such that the body 14 is severed at the breakaway section 24. As shown in FIG. 9, the application of force by a boot, breaks the body at a break at the breakaway section 24. In the illustrated implementation, the breakaway section 24 is positioned such that it is located between the surfaces 88, 90, 92, 94 of the tiles 70, 72. That is, the breakaway section 24 is located at a height within the thickness of the installed tiles. In this position, the breakaway section 24 is not exposed to any adhesive that may be used to adhere the tiles to the subsurface S, which may be a floor or wall, for example.

Referring now to FIG. 10, an alternative embodiment of the tile leveling device 10 includes the body 14 and the spaced and parallel strip members 16, 18 extending transversely from the body 14. In this embodiment, opposing lateral closed windows 100, 102 are formed in the body 14 with each of the opposing lateral closed windows 100, 102 sized to accept a wedge device having wedge members including a tapered surface configured to penetrate the respective lateral closed windows 100, 102 and exert force against multiple tiles pressing the tiles against the strip members 16, 18. Additionally, the breakaway section 24 is defined along the body 14. By way of further example, a further embodiment is possible, wherein the leveling device 10 would include a lateral open window and a lateral closed window.

Referring to FIGS. 11A, 11B, and 12, in one embodiment of a tile leveling device 110 and tile combination with a wedge device 112, the tile leveling device 110 includes an inverted U-shaped body 114 defining an open window 116 between two stems 118, 120 of the inverted U-shaped body 114. An I-shaped base 122 is orthogonally coupled to the inverted U-shaped body 114 such that four spaced bars 124, 126, 128, 130 extend transversely from the inverted U-shaped body 114. In particular, the spaced bars 124, 126 extend to the front F of the inverted U-shaped body 114 and the spaced bars 128, 130 extend to the rear R of the inverted U-shaped body 114. Each of the bars 124, 126, 128, 130 extends upward toward the inverted U-shaped body in an arcuate fashion to define respective four points of contact 132, 134, 136, 138 for two, three, and four tiles.

Two breakaway sections 140, 142 are defined along the respective two stems 118, 120 of the inverted U-shaped body 114. Additionally, as shown, a notch 144 is formed between the bars 124, 126 and a notch 146 is formed between the bars 128, 130. The open window 116 includes an upper edge 148. An open span 150 is proximally interposed between the breakaway sections 140, 142 and the open span 150 forms a portion of the open window 116. Spacing pads, such as spacing pad 152, may be utilized to position the tiles a predetermined distance apart, depending on the application.

The wedge device 112 includes an oversized backstop member 160. A wedge member 162 extends from the oversized backstop member 160 and includes a tapered surface 164 that is configured to penetrate the open window 116 and exert force against two, three, or four tiles pressing the tiles against the bars 124, 126, 128, 130. The breakaway sections 140, 142 are located where the ends of the stems 118, 120 of the inverted U-shaped body 114 contact the I-shaped base 122. Teeth 166 are positioned along the tapered surface 164 in order to latch onto the upper edge 148 of the open window 116.

In operation, the leveling device 110 may be used to align two, three or four tiles and operation is similar to leveling device 10 and wedge device 12, as previously presented. Similar to the leveling device presented in FIG. 5, in a four-tile embodiment, each tile has corner-to-subfloor contact due to the notches that provide space for mortar contact therein. Similarly, in a two-tile implementation, for example, each tile has edge-to-subfloor contact due to the notches. More particularly, the tapered surface 164 penetrates the open window 116 contacting the upper edge 148 thereof and exerting force against both tiles pressing the tiles against the bars 124, 126, 128, 130, wherein breakaway sections 140, 142 are located beyond the undersurfaces of the tiles in a direction away from the bars 124, 126, 128, 130. As previously discussed, the arcuate portions of the parallel strip members compress and flatten to accommodate different thicknesses of tiles to provide a level surface. In fact, the leveling device and wedge device presented herein may simultaneously accommodate between two and four different thicknesses of tiles.

Referring now to FIGS. 13 and 14, a tile leveling device 200 for use with a locking subassembly 202 are presented. As shown, the tile leveling device includes a shaft 204 and spaced and parallel strip members 206, 208 extend transversely from the shaft 204. The locking subassembly 202 is configured to traverse the shaft and exert force against the tiles by pressing the tiles against the parallel strip members, similar to the functionality described in previous embodiments. Each of the spaced and parallel strip members extend to the front and rear of the shaft 204. As shown, a frangible breakaway section is defined along the shaft 204. A spacing pad 207, which may be similar to spacing pad 30, may be integral with the shaft 204 and may vary in thickness depending on the application. The spaced and parallel strip members 206, 208 provide four points of contact 210, 212, 214, 216 for lift of tiles, while still establishing space for maximum mortar penetration between the spaced and parallel strip members 206, 208. Convex curvatures 218, 220 ensure that the tiles of varying thicknesses may be leveled and aligned, including the alignment of up to four tiles of varying thickness.

In operation, once the tiles are properly positioned, the locking subassembly 202 is secured in its place above the tiles and prevented from moving along the shaft 204 before being driven down to compress the tiles. The shaft 204 may include a locking surface 222, such as a "zip tie" to enable movement along the shaft 204 by the locking subassembly 202 in only one direction, i.e., toward the tiles.

Referring to FIGS. 15 and 16, in one further embodiment of the tile leveling device 110 and tile combination with the wedge device 112, the tile leveling device 110 includes the inverted U-shaped body 114 defining the open window 116 between two stems 118, 120 of the inverted U-shaped body 114. The I-shaped base 122 is orthogonally coupled to the inverted U-shaped body 114 such that four spaced bars 124, 126, 128, 130 extend transversely from the inverted

US 10,704,274 B2

7

U-shaped body **114**. In particular, the spaced bars **124**, **126** extend to the front F of the inverted U-shaped body **114** and the spaced bars **128**, **130** extend to the rear R of the inverted U-shaped body **114**. Each of the bars **124**, **126**, **128**, **130** extends upward toward the inverted U-shaped body in an arcuate fashion to define respective four points of contact **132**, **134**, **136**, **138** for two, three, and four uses.

As shown, the I-shaped base is intersected by a crossbar **230**, which is located between the bars **124**, **126** and the bars **128**, **130**. The crossbar **230** may take any shape or form and may be considered a bi-directional projection, for example. As illustrated, the crossbar **230** includes a bar **232** extending to the front F of the inverted U-shaped body **114** and a bar **234** extends to the rear R of the inverted U-shaped body **114**. The bars **232**, **234** may have outwardly extending arcuate portions **236**, **238** at the respective ends that compress and flatten to accommodate the thickness. Moreover the bars **232**, **234** may be substantially equal to the length of the bars **124**, **126**, **128**, **130**. In another embodiment, the bars **232**, **234** may be greater than or less than the length of the bars **124**, **126**, **128**, **130**.

Two breakaway sections **140**, **142** are defined along the respective two stems **118**, **120** of the inverted U-shaped body **114**. Additionally, as shown, the notch **144** is formed between the bars **124**, **126** and the notch **146** is formed between the bars **128**, **130**. The open window **116** includes an upper edge **148**. The open span **150** is proximally interposed between the breakaway sections **140**, **142** and the open span **150** forms a portion of the open window **116**. As shown, the crossbar **230** intersects the notch **144** forming subnotches **240**, **242** between the bars **124**, **126** and the crossbar **230**. Similarly, subnotches **244**, **246** are formed between the bars **128**, **130** and the crossbar **230**. It should be appreciated that although the I-shaped base **122** with the crossbar **230** is depicted with a particular U-shaped body **114**, it should be appreciated that the I-shaped base **122** with the crossbar **230** may be utilized with any of the leveling devices **10** presented herein, including the leveling devices **10** of FIG. 1A, FIG. 10, FIG. 13, and FIG. 14, for example.

The order of execution or performance of the methods and techniques illustrated and described herein is not essential, unless otherwise specified. That is, elements of the methods and techniques may be performed in any order, unless otherwise specified, and that the methods may include more or less elements than those disclosed herein. For example, it is contemplated that executing or performing a particular element before, contemporaneously with, or after another element are all possible sequences of execution.

While this invention has been described with reference to illustrative embodiments, this description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is, therefore, intended that the appended claims encompass any such modifications or embodiments.

What is claimed is:

**1**. A tile leveling device and tile combination comprising:
a leveling device comprising:
  a body defining an open window,
  a base orthogonally coupled to the body, the base extending to the front of the body and the base extending to the rear of the body,
  a base to body coupling including a frangible breakaway section, the base and body being integral prior

8

to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the base,
a first notch formed at the base extending to the front of the body, and
a second notch formed at the base extending to the rear of the body;
a first tile over the base to the front of the body, the first tile having a first surface opposite a second surface, the first tile over the first notch having contact with mortar at the first notch to provide first tile edge-to-mortar-to-subfloor contact, wherein the first surface faces the base and the second surface is farther from the base than the first surface;
a second tile over the base at the rear of the body, the second tile over the second notch having a third surface opposite a fourth surface, the second tile having contact with mortar at the second notch to provide second tile edge-to-mortar-to-subfloor contact, wherein the third surface faces the base and the fourth surface is farther from the base than the third surface;
the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base; and
the frangible breakaway section being located between the first and second surfaces of the first tile and the third and fourth surfaces of the second tile; and
a wedge device comprising:
  a backstop member, and
  a wedge member extending from the backstop member, the wedge member having a tapered surface penetrating the open window and exerting force against the first and second tiles.

**2**. The tile leveling device and tile combination as recited in claim **1**, wherein the body further comprises a spacer extending transversely from the front and rear of the body, the spacer configured to position the first and second tiles a predetermined distance apart.

**3**. The tile leveling device and tile combination as recited in claim **1**, wherein the wedge member further comprises teeth along the tapered surface, the teeth latch onto an upper edge of the open window.

**4**. The tile leveling device and tile combination as recited in claim **1**, further comprises proximate to the frangible breakaway section, the open span forming a portion of the open window.

**5**. A tile leveling device comprising:
a body defining an open window;
a base orthogonally coupled to the body, the base extending to the front of the body and the base extending to the rear of the body;
a base to body coupling including a frangible breakaway section, the base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the base;
a first notch formed at the base extending from proximate the base to body coupling to the front of the body the first notch providing first tile edge-to-mortar-to-subfloor contact; and
a second notch formed at the base extending from proximate the base to body coupling to the rear of the body the second notch providing first tile edge-to-mortar-to-subfloor contact; and

US 10,704,274 B2

9            10

the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the leveling device within the bounds of the base.

**6**. The tile leveling device as recited in claim **5**, wherein the body further comprises a spacer extending transversely from the front and rear of the body, the spacer configured to position the first and second tiles a predetermined distance apart.

**7**. The tile leveling device as recited in claim **5**, further comprising an open span proximate to the frangible breakaway section, the open span forming a portion of the open window.

**8**. A tile leveling device comprising:

a body defining an open window;

a base orthogonally coupled to the body, the base extending to the front of the body and the base extending to the rear of the body;

a base to body coupling including a frangible breakaway section, the base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the base;

a first notch formed at the base extending from proximate the base to body coupling to the front of the body; and

a second notch formed at the base extending from proximate the base to body coupling to the rear of the body; and

the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the leveling device within the bounds of the base.

\*   \*   \*   \*   \*

US00D832680S

(12) **United States Design Patent** (10) Patent No.: **US D832,680 S**
Bunch et al. (45) Date of Patent: ** **Nov. 6, 2018**

(54) **WEDGE FOR TILE INSTALLATION DEVICE**

(71) Applicants:**Clinton D. Bunch**, Sunnyvale, TX
(US); **Joshua A. Bunch**, North
Richland Hills, TX (US)

(72) Inventors: **Clinton D. Bunch**, Sunnyvale, TX
(US); **Joshua A. Bunch**, North
Richland Hills, TX (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/595,790**

(22) Filed: **Mar. 2, 2017**

(51) LOC (11) Cl. ............................................. **08-05**
(52) **U.S. Cl.**
USPC ............................................. **D8/354**; D8/47
(58) **Field of Classification Search**
USPC ................... D8/47, 389, 354, 349, 374, 499
CPC ... E04F 21/22; E04F 21/1877; E04F 21/1844;
E04F 21/0092; E04F 21/20; E04F
15/02005; E04F 13/0892; E04F 15/02;
E04F 2015/02094; Y10T 403/553; Y10T
403/75
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 1,351,453 | A | * | 8/1920 | Wells, Jr. | E06B 3/44 16/DIG. 6 |
| 3,836,118 | A | * | 9/1974 | Meyer | B60J 1/005 254/104 |
| D238,745 | S | | 2/1976 | Bedard | D8/47 |
| D268,804 | S | | 5/1983 | Bacon | D8/14 |
| 4,397,125 | A | | 8/1983 | Gussler | |
| 4,830,320 | A | | 5/1989 | Bellows | A47B 91/12 248/188.2 |
| D339,735 | S | | 9/1993 | Brennan | D8/354 |
| 5,249,767 | A | * | 10/1993 | Mellen | F16M 7/00 248/188.2 |

| | | | | | |
|---|---|---|---|---|---|
| D441,587 | S | * | 5/2001 | Cameron | D6/601 |
| D452,404 | S | * | 12/2001 | Cameron | D6/601 |
| D493,408 | S | * | 7/2004 | Chrisco | D12/217 |

(Continued)

FOREIGN PATENT DOCUMENTS

AU 2012101175 8/2012

OTHER PUBLICATIONS

Pearl Abrasive Co., Tuscan Leveling System, www.pearlabrasive.com.

(Continued)

*Primary Examiner* — Sandra S Snapp
*Assistant Examiner* — Ieisha N Price
(74) *Attorney, Agent, or Firm* — Scott T. Griggs; Griggs Bergen LLP

(57) **CLAIM**

The ornamental design for a wedge for tile installation device, as shown and described.

**DESCRIPTION**

FIG. **1** is a front perspective view of a wedge for tile installation device;
FIG. **2** is a right side elevation view of the wedge for tile installation device shown in FIG. **1**, which includes left-right symmetry;
FIG. **3** is a top plan view of the wedge for tile installation device shown in FIG. **1**;
FIG. **4** is a bottom plan view of the wedge for tile installation device shown in FIG. **1**;
FIG. **5** is a front elevation view of the wedge for tile installation device as shown in FIG. **1**; and,
FIG. **6** is a rear elevation view of the wedge for tile installation device as shown in FIG. **1**.
The broken lines in the drawings illustrate portions of the wedge for tile installation device and form no part of the claimed design.

**1 Claim, 1 Drawing Sheet**



# US D832,680 S
Page 2

(56)    References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,793,041 B1 * | 9/2004 | Taylor | E06C 7/44 |
| | | | 182/121 |
| D523,734 S * | 6/2006 | Calaicone | D8/354 |
| D538,150 S * | 3/2007 | Burns | D8/402 |
| D567,471 S * | 4/2008 | Haimoff | D34/33 |
| 7,603,825 B2 | 10/2009 | Dohren | |
| 7,621,100 B2 | 11/2009 | Kufner et al. | |
| 7,784,751 B1 * | 8/2010 | Bellows | A47B 91/02 |
| | | | 248/188.2 |
| 7,861,487 B2 | 1/2011 | Kufner et al. | |
| 7,954,300 B1 | 6/2011 | Kufner et al. | |
| 7,992,354 B2 | 8/2011 | Doda, Jr. | |
| D655,559 S * | 3/2012 | Cheng | D6/601 |
| 8,181,420 B2 | 5/2012 | Comas | |
| D679,574 S * | 4/2013 | Dotsey | D8/354 |
| D683,924 S * | 6/2013 | Wolfenbarger | D12/217 |
| D731,273 S * | 6/2015 | McPeak Ford | D8/402 |
| 9,260,872 B2 | 2/2016 | Bunch et al. | |
| D760,566 S * | 7/2016 | Biec | D8/47 |

| | | | |
|---|---|---|---|
| 9,487,959 B2 | 11/2016 | Bunch et al. | |
| 2008/0236094 A1 | 10/2008 | Doda | |
| 2012/0297714 A1 * | 11/2012 | Tavy | E04F 21/0092 |
| | | | 52/309.1 |
| 2013/0055675 A1 | 3/2013 | Sighinolfi | |
| 2013/0118115 A1 | 5/2013 | Hoffman et al. | |
| 2014/0116001 A1 | 5/2014 | Ghelfi | |
| 2014/0298736 A1 * | 10/2014 | Bunch | E04F 21/0092 |
| | | | 52/126.1 |
| 2015/0308130 A1 * | 10/2015 | Biec | E04F 21/0092 |
| | | | 52/749.11 |
| 2016/0186449 A1 * | 6/2016 | Lee | E04F 21/0092 |
| | | | 33/527 |
| 2016/0222679 A1 * | 8/2016 | Bunch | E04F 21/1844 |
| 2017/0051519 A1 | 2/2017 | Bunch et al. | |

OTHER PUBLICATIONS

Q.E.P. Co., Inc., Lash Tile Leveling Clips and Wedges, 99720/9972, www.qep.com.

* cited by examiner



*Fig.1*

*Fig.2*

*Fig.3*

*Fig.4*

*Fig.5*　　　　　*Fig.6*

US00D870527S

## (12) United States Design Patent
Bunch et al.

(10) Patent No.: **US D870,527 S**
(45) Date of Patent: ** **Dec. 24, 2019**

(54) **WEDGE FOR TILE INSTALLATION DEVICE**

(71) Applicants: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

(72) Inventors: **Clinton D. Bunch**, Keller, TX (US);
**Joshua A. Bunch**, Keller, TX (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/658,508**

(22) Filed: **Jul. 31, 2018**

(51) LOC (12) Cl. .............................................. **08-05**

(52) **U.S. Cl.**
USPC .................................................... **D8/47**

(58) **Field of Classification Search**
USPC ........................................... D8/14, 47, 354
CPC . E04F 21/00; E04F 21/18; E04F 21/22; E04F
21/1877; E04F 21/844; E04F 13/0092;
E04F 13/0892
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,185,442 A | 5/1965 | Hemphill | |
| D268,804 S | 5/1983 | Bacon | |
| D269,495 S | 6/1983 | Finn | |
| D271,559 S | 11/1983 | Reimann et al. | |
| D286,008 S | 10/1986 | Hillinger | |
| 4,830,320 A * | 5/1989 | Bellows | A47B 91/12 |
| | | | 248/188.2 |
| D336,224 S | 6/1993 | Terry | |
| D421,374 S | 3/2000 | Montgomery | |
| 6,041,473 A | 3/2000 | Johnson | |
| D481,625 S | 11/2003 | Ellsworth | |
| 6,793,041 B1 * | 9/2004 | Taylor | E06C 7/44 |
| | | | 182/121 |
| D538,150 S * | 3/2007 | Burns | D8/402 |
| D590,676 S | 4/2009 | Pickard | |
| 8,887,475 B2 * | 11/2014 | Ghelfi | E04F 21/0092 |
| | | | 52/749.11 |

| | | | |
|---|---|---|---|
| D720,588 S | 1/2015 | Pugh | |
| D731,273 S | 6/2015 | McPeak Ford et al. | |
| D760,566 S | 7/2016 | Biec | |
| D828,732 S * | 9/2018 | Workman | D8/11 |
| D828,735 S * | 9/2018 | Bunch | D8/47 |
| D829,532 S * | 10/2018 | Bunch | D8/354 |
| D832,680 S * | 11/2018 | Bunch | D8/354 |
| D856,128 S * | 8/2019 | Kazutaka | D8/402 |
| 2008/0236094 A1* | 10/2008 | Doda | E04F 13/0892 |
| | | | 52/749.11 |
| 2014/0116001 A1* | 5/2014 | Ghelfi | E04F 21/0092 |
| | | | 52/749.11 |
| 2016/0222679 A1* | 8/2016 | Bunch | E04F 21/1844 |

* cited by examiner

*Primary Examiner* — Philip S Hyder
(74) *Attorney, Agent, or Firm* — Scott T. Griggs; Griggs
Bergen LLP

(57) **CLAIM**

The ornamental design for a wedge for tile installation
device, as shown and described.

**DESCRIPTION**

FIG. **1** is a front perspective view of a wedge for a tile
installation device;
FIG. **2** is a right side elevation view of the wedge for tile
installation device shown in FIG. **1**, which includes left-right
symmetry;
FIG. **3** is a top plan view of the wedge for tile installation
device shown in FIG. **1**;
FIG. **4** is a bottom plan view of the wedge for tile installation
device shown in FIG. **1**;
FIG. **5** is a front elevation view of the wedge for tile
installation device as shown in FIG. **1**; and,
FIG. **6** is a rear elevation view of the wedge for tile
installation device as shown in FIG. **1**.
The dashed and dotted lines in the drawings illustrate
portions of the wedge for tile installation device that form no
part of the claimed design.

**1 Claim, 1 Drawing Sheet**





*Fig.1*

*Fig.2*

*Fig.3*

*Fig.4*

*Fig.5*          *Fig.6*