# 2023-1887

In The
United States Court Of Appeals
For The Federal Circuit

## ACUFLOOR, LLC,

*Plaintiff-Appellant*,

v.

## EVENTILE, INC., FORPAC, LLC,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORIGINATING CASE 2:21-CV-00802-SPC-KCD

## BRIEF OF APPELLEE FORPAC, LLC

W. John Eagan
Florida Bar No. 105,101
MALLOY & MALLOY, P.L.
2800 S.W. Third Avenue
Miami, Florida 33129
(305) 858-8000 – Telephone
(305) 858-0008 – Facsimile
johneagan@malloylaw.com

*Counsel for Defendant-Appellee Forpac, LLC*

GibsonMOORE APPELLATE SERVICES, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

## RULE 32(A)(3) EXEMPLARY PATENT CLAIMS

### U.S. PATENT NO. 10,704,274

5. A tile leveling device comprising:

a body defining an open window;

a base orthogonally coupled to the body, the base extending to the front of the body and the base extending to the rear of the body;

a base to body coupling including a frangible breakaway section, the base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the base;

a first notch formed at the base extending from proximate the base to body coupling to the front of the body the first notch providing first **tile edge-to-mortar-to-subfloor contact**; and

a second notch formed at the base extending from proximate the base to body coupling to the rear of the body the second notch providing first **tile edge-to-mortar-to-subfloor contact**; and

**the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the leveling device within the bounds of the base.** Appx123-124 (emphasis added).

### U.S. PATENT NO. 10,513,857

10. A tile leveling device comprising:

a body defining an open window;

an I-shaped base orthogonally coupled to the body, the I-shaped base having spaced first, second, third, and fourth bars extending transversely from the body, the spaced first and second bars extending to the front and outward of the body and the spaced third and fourth bars extending to the rear and outward of the body;

an I-shaped base to body coupling including a frangible breakaway section, the I-shaped base and body being integral prior to frangible separation, the frangible breakaway section, upon breaking, frangibly separating the body from the I-shaped base;

a first notch formed between the first and second bars;

a second notch formed between the third and fourth bars;

a first tile over the first bar, the first tile having a first surface opposite a second surface, the first tile having a first corner over the first notch, **the first corner having contact with mortar at the first notch with**

**edge-to-subfloor contact of first corner-to-mortar-to-subfloor at the first notch**, wherein the first surface faces the first bar and the second surface is farther from the first bar than the first surface;

a second tile over the second bar, the second tile having a third surface
opposite a fourth surface, the second tile having a second corner over the first notch, **the second corner having contact with mortar at the first notch with edge-to-subfloor contact of second corner-to-mortar-to-subfloor at the first notch**, wherein the third surface faces the second bar and the fourth surface is farther from the second bar than the third surface; and

the frangible breakaway section being located between the first and second surfaces of the first tile and the third and fourth surfaces of the second tile. Appx96(emphasis added).

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1887

**Short Case Caption** Acufloor, LLC v. EvenTile, Inc.

**Filing Party/Entity** Forpac, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/29/2023

Signature: /s/W. John Eagan

Name: W. John Eagan

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Forpac, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Oliver Alan Ruiz<br>Malloy & Malloy, P.L. | John Cyril Malloy, III<br>Malloy & Malloy, P.L. | Peter Matos<br>Malloy & Malloy, P.L. |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Table of Contents

**Page:**

Table of Authorities ............ iii

Statement of Related Cases ............ v

1. Statement of the Issues ............ 1

2. Statement of the Case ............ 2

   a. The Parties' Claim Constructions ............ 2

      i. Tile Edge ............ 3

      ii. Majority of an Area ............ 4

   b. The Written Description Provides Nearly No Guidance for Either Disputed Term ............ 5

   c. The Prosecution Histories Contain Clear Statements Relevant to the Scope of the Construed Terms ............ 6

      i. Tile Edge ............ 6

      ii. Majority of an Area ............ 10

   d. The District Court's Claim Construction Opinion ............ 12

3. Summary of the Argument ............ 13

4. Argument ............ 16

   a. "Tile Edge" Refers to the Line where the Surface of the Tile Terminates, not a Nebulous Region Near the End of the Tile ............ 17

      i. The District Court was Correct to Construe "Tile Edge" ............ 17

ii. Express Disavowal is not Required for a "Narrow" Construction ........ 23

iii. Acufloor's Arguments during Prosecution Rose to the Level of "Express Disavowal" ........ 26

iv. Acufloor's other Arguments are Unavailing ........ 32

b. "Majority of an Area" Refers to the Ratio of Notch to Plastic in the Base ........ 33

5. Conclusion ........ 37

6. Certificate of Filing and Service ........ 38

7. Certificate of Compliance ........ 39

## Table of Authorities

**Page(s):**

**Cases:**

*Aptalis Pharmatech, Inc. v. Apotex Inc.*,
718 F. App'x 965 (Fed. Cir. 2018) .......................................... 15, 17, 24

*AstraZeneca AB v. Mylan Pharm. Inc.*,
19 F.4th 1325 (Fed. Cir. 2021)....................................................*passim*

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)......................................................... 22

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
508 F.3d 1366 (Fed. Cir. 2007).........................................................30

*Fenner Invs., Ltd. v. Cellco P'ship*,
778 F.3d 1320 (Fed. Cir. 2015)......................................................... 24

*Grober v. Mako Prods., Inc.*,
686 F.3d 1335 (Fed. Cir. 2012) ..........................................................31

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*,
222 F.3d 951 (Fed. Cir. 2000)........................................................... 33

*Home Diagnostics, Inc. v.LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004) .........................................................30

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) .......................................................15, 34

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ......................................................... 23

*Int'l Visual Corp. v. Crown Metal Co.*,
991 F.2d 768 (Fed. Cir. 1993)........................................................... 32

*Northern Telecom, Ltd. v. Samsung. Electronics Co.*,
215 F.3d 1281, 55 USPQ2d 1065 (Fed. Cir. 2000) ............................ 27

*NTP, Inc. v. Resch. In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ....................................................14, 22

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005) ....................................................18, 25

*O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)................................................17, 18, 19

*Omega Eng'g, Inc, v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ............................................. 26, 27, 29

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .................................................... 16, 17

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011) ........................................................... 24

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) ..............................................................13

*Toro Co. v. White Consol. Indus., Inc.*,
199 F.3d 1295 (Fed. Cir. 1999) ........................................................... 18

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*,
546 U.S. 394, 126 S. Ct. 980, 163 L. Ed. 2d 974 (2006) .................... 18

## Statement of Related Cases

No appeal in or from the same proceeding was previously before this Court or any other appellate court. Counsel is not aware of any case that may directly affect or be directly affected by this Court's decision in the pending appeal.

## 1. Statement of the Issues

1. Was the District Court correct to construe the term "tile edge," rather than leave the jury to contend with the "plain and ordinary meaning" of the term, when: (i) the patentee necessitated the District Court's construction of the term as "the line at which a surface of a tile terminates" when, during prosecution, it repeatedly distinguished its invention from the prior art by demonstrating that only its invention permitted "tile edge-to-mortar-to-subfloor contact," and the prior art did not, because the prior art only permitted mortar to contact the nebulous region *near* the extreme end of the tile, not all the way to the extreme end of the tile; and (ii) the patentee's current proposal of the "plain and ordinary meaning" operates as a backdoor construction which, like the proverbial "nose of wax," twists the opposite direction from its prosecution position in an attempt to recapture that nebulous region near the extreme end of the tile in the construction of the term?

2. Was the District Court correct to construe the "Majority of an Area" term in accordance with the context imbued by the patentee during prosecution, when its allegedly "natural" reading is nothing more than a tautology, which would render it superfluous as a claim element?

## 2. Statement of the Case

### a. The Parties' Claim Constructions

Two claim terms are relevant to the instant appeal: the first is "tile edge," or more simply "edge," and the second is a longer phrase that the parties have referred to as the "Majority of an Area" term. The term "tile edge" (or simply "edge") appears in claims 1 and 10 of U.S. Patent No. 10,513,857 ("the '857 Patent") and claims 1 and 5 of U.S. Patent No. 10,704,274 ("the '274 Patent"), while the "Majority of an Area" term appears in claims 1, 5, and 8 of "the '274 Patent." In the Joint Claim Construction statement, the parties offered the following constructions:

| Term | Acufloor Proposal | Forpac Proposal |
|---|---|---|
| tile edge | Plain and Ordinary meaning | The line at which a surface of a tile terminates. |
| the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base | The combination of the first notch and the second notch providing the majority of the tile-to-mortar-to-subfloor contact that exists within the bounds of the base. | The notches in the base collectively span an area that is larger than the solid portions of the base. |

Appx521. Notably, Acufloor did not provide an alternative construction to the term "tile edge" and simply suggested that the plain and ordinary

meaning of the term would be sufficient. *See also,* Acufloor's Claim Construction Brief at Appx854.

#### i. Tile Edge

As used in the context of the claim limitations, "tile edge" and "edge" describe the extent to which mortar is permitted reach along the underside of the tile. *See, '857 Patent Claims 1 and 10* at Appx95-96 ("the first [tile] corner having contact with mortar ... with edge-to-subfloor contact...")*; see also '274 Patent Claims 1, 5* at Appx123 "the first tile ... having contact with mortar ... to provide first tile edge-to-mortar-to-subfloor contact...") The parties stipulated to constructions of these longer phrases in which the term is used in their Joint Claim Construction statement, and the stipulated constructions effectively require a vertical column of mortar spanning between the subfloor and the "edge" of the tile[1]. Appx528. Accordingly, in requesting that the District Court construe the term "tile edge" or "edge," Forpac effectively asked the District Court to resolve the question that is begged: how close to the extreme end of the tile must this vertical column of

---

[1] For example, the parties stipulated that the phrase "tile edge-to-mortar-to-subfloor contact," as used in Claims 1 and 5 of the '274 patent, means "the bottom surface of the edge of the tile is in direct contact with the mortar beneath that edge of the tile, and that mortar beneath the edge of the tile is in direct contact with the portion of the subfloor that is directly vertically below the bottom surface of the edge of the tile." Appx528.

mortar be located in order for it to contact the "edge" of the tile? Is it sufficient that the column touch the nebulous region that is *very close* to the extreme end, as is found in the prior art[2], or instead does "edge" require the column to touch the line where the bottom surface of the tile terminates, which the patentee argued was not found in the prior art[3]?

#### ii. Majority of an Area

Acufloor argued to the District Court that its proposed claim construction "comports with the most natural reading of the claims." Appx587. However, when it argued that the claimed "majority" is "tile-to-mortar-to-subfloor contact," Acufloor read into this term a functional limitation (i.e. contact) based upon interaction with unclaimed structure (i.e. mortar) which renders the limitation meaningless. Stated otherwise, if this claim term refers to an arrangement under which, only out of the areas that provide "tile-to-mortar-to-subfloor contact" within the bounds of the base (i.e. the notches), the notches provide the majority of that contact, such a reading renders the entire claim limitation superfluous. This is because the notches are the *only* claimed structure that permits contact within the

[2] *See infra*, Section 6(c)(i), pp.6-9.
[3] *Id.*

bounds of the base, so logically it must also be true that the notches provide the "majority" of that contact as well.

Forpac, on the other hand, proposed a claim construction that more appropriately reflects the actual structure as well as the context added to this term by the prosecution history, namely, that it actually refers to the fact that the area of the notches are greater than the area of the solid portions of the base. Appx1000. Forpac asked the District Court to recognize that Acufloor's proposal renders this claim term superfluous because the notches are the only structure recited in the claims that permit "tile-to-mortar-subfloor" contact within the bounds of the base, so, again, stating that they provide the "majority" of that contact is meaningless (i.e. the majority of the area of the notches are notches).

**b. The Written Description Provides Nearly No Guidance for Either Disputed Term**

Notably, the term "tile edge" was not included in the original claims of the application that would mature into the '857 Patent, as it was only later added in the March 21, 2019 amendment in response to a non-final rejection. Appx1044-1059; Appx1053. With regard to the written descriptions, the term is only used one time in its proper context throughout the specifications of the asserted patents. The specification of the '857 Patent states that "in a

two-tile implementation, for example, each tile has edge-to-subfloor contact due to the notches." Column 6, lines 18-20. This statement does little to address the ambiguity of the term "tile edge," however. The specification of the '274 Patent contains a similar disclosure, but no additional illumination of the term.

The "Majority of an Area" term, on the other hand, is entirely missing from the specifications of the asserted patents. Therefore, its proper context can only be discerned from the prosecution history.

### c. The Prosecution Histories Contain Clear Statements Relevant to the Scope of the Construed Terms

#### i. Tile Edge

The patentee devoted a significant portion of its arguments to demonstrating why the prior art precludes "edge-to-subfloor contact." For example, and as can be seen in the excerpt below, from the March 21, 2019 Amendment in the '857 Patent prosecution history, the patentee annotated the prior art to demonstrate that the prior art precluded "edge-to-subfloor contact" because the "edge" of the tile would rest on a small strip of plastic, instead of being exposed to the subfloor within the prior art notch.




Appx1052. Adding context to this in a later submission (the August 20, 2019 amendment), Acufloor argued that the base thickness of the Hoffman prior art clip was about three quarters of an inch across, which would preclude edge-to-subfloor contact because spacing between tiles of three quarters of an inch is not used in flooring. *See* Appx1153-1154 and Appx1190 ("[t]herefore, Hoffman using Figure 16 cannot possibly provide edge-to-subfloor contact as the joint would have to be 3/4" – a size this is not used in flooring applications.") The implication of the patentee's statement is that one would need to separate adjacent tiles by three quarters of an inch in order to avoid having the edge of the tile rest on the plastic base of Hoffman.

In the very same submission, Acufloor demonstrated that its own base thickness is about one quarter of an inch, a joint size that is ostensibly used in flooring applications. Appx1192. The implication of that statement is that, for a joint spacing of one quarter inch, the edge of the tile does not lie on the center portions of Acufloor's base within the notch, and instead the edge is exposed directly to mortar, which is what provides the claimed edge-to-subfloor contact.

With regard to the prosecution history of the '274 Patent, Acufloor again gave ample characterization of "edge" and why the prior art did not permit "edge-to-subfloor" contact. The patentee continuously distinguished the invention over the prior art on the grounds that the prior art clips did not permit edge contact, as exemplified below in excerpts from a demonstrative aid submitted by the patentee to the USPTO. Appx1085-1086.






As can be seen, the patentee demonstrated that even where the prior art permitted mortar contact *very near* to the extreme end of the tile, that still did not qualify as "edge-to-mortar-to-subfloor" contact.




You can see that our system has the only edge to mortar to subfloor direct contact and therefore provides a superior installation.

Another excerpt from the same submission, Appx1086, allegedly shows a commercial embodiment of the invention which provides "edge-to-mortar-to-subfloor" contact, but as can be seen the distinction between the mortar placement of the "Bunch Device" (the patentee's device) and the prior art is miniscule, if it exists at all. Nowhere in the specification or the prosecution history does the patentee provide a measurement of exactly *how* much closer the invention permits mortar to flow. It instead chose to imply that ***near*** the edge does not qualify as "edge-to-mortar-to-subfloor" contact, because the prior art allegedly does not provide "edge" contact. The only reasonable inference that can be made is that the patentee intended mortar to contact the underside of the tile all the way to the extreme end – to the line where the surface of the tile terminates.

### ii. Majority of an Area

The “Majority of an Area” term is not included in the specifications of the asserted patents, and appeared for the first time in amendment to the ‘274 Patent claims. *See* Appx807. For context, the examiner had entered a refusal based on the prior art combination of Doda and Psaila, which is demonstrated below.

| **Figure 1 from Psaila Prior Art Reference<br>Appx857** | **Figure 8 from Doda Prior Art Reference<br>Appx927** |
|---|---|
|  | FIG. 8<br> |

**Examiner's Markup of the Doda + Psaila Combination from October 25, 2019 Final Rejection Appx799**




The Examiner clarified, both via the drawing above and in the October 25, 2019 Final Refusal, that the cited combination modifies "Doda with the configuration of Psaila *by extending the opening 129 all the way to the front portion of 116*…" Appx799 (emphasis original).

In response, the patentee amended the "Majority of an Area" term into the pending claims in the March 25, 2020 Request for Continued Examination. Appx807. The patentee then argued that the new claim language distinguished the invention from the prior art because the prior art

lacked sufficient area to provide the claimed functionality of tile edge-to-mortar-to-subfloor contact in the following excerpt from the patentee's remarks.

> It is not possible that one of ordinary skill in the art before the filing date of the instant invention would have modified the base of Doda with the configuration of Psaila by extending the opening 129 all the way to the front portion of the base 116 for allowing more adhesive to penetrate the opening and extend over a greater surface area of the tiles as taught by Psaila..... Psaila discloses and teaches keeping any opening 129 of Doda or cut-outs 28 of Psaila away from the inside of the base 116 so the integrity of the spacer tabs is maintained.

Appx814-815. A Notice of Allowance followed on April 3, 2020. Appx831-833.

**d. The District Court's Claim Construction Opinion**

After full briefing and oral argument, the District Court issued a Claim Construction Order on November 21, 2022 in which it construed the terms "tile edge" and "Majority of an Area." Appx3-20. With regard to the term "tile edge," the District Court's opinion cut right to the chase when it recognized that, [t]he inventors relied on mortar-to-tile contact up to the very edge of the tile, rather than an area near the very edge, to distinguish their invention from the prior art." Appx7. The District Court also found that Forpac's proposal most clearly communicates this limitation to a jury. Appx8.

With regard to the "Majority of an Area" term, the District Court found that "[t]he applicants gave no indication they contemplated other openings when adding the 'majority of an area' phrase." Appx10. Instead, the District Court determined that the phrase was added to the claims in order to demonstrate that the claimed device "allowed for a larger area of uninterrupted subfloor-to-mortar-to-tile contact" when compared to the prior art. *Id.*

### 3. Summary of the Argument

This appeal presents the Court with a textbook case of the "wax nose" concern.[4] In order to obtain the patent, the patentee imbued the claims with specific connotations that are not apparent on the surface of the claims, but now wishes to ignore those limitations in an attempt to obtain broader claim coverage than what was awarded.

With respect to the term "Tile Edge," the patentee distinguished its invention from the prior art by demonstrating that only its invention provides "tile edge-to-mortar-to-subfloor contact" even though the prior art permitted mortar to touch very near to the extreme end of the tile. The

[4] *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'")

implication, then, is that "close doesn't cut it" and mortar must touch the line where the surface of the tile terminates in order to truly achieve "edge-to-mortar-to-subfloor" contact.

Acufloor argues that its representations to the patent office do not rise to the level of a disclaimer. While Forpac disagrees because the patentee was clear and unequivocal in its arguments, the Court need not determine whether there was a disclaimer, because Acufloor did not provide an alternative construction. Therefore, the appropriate scope of review is simply whether the District Court was correct to issue a construction. This is due to the fact that in order to answer the question of whether the construction itself is correct, Acufloor would inherently need to propose an alternative construction, which it is not permitted to do at this stage. *See, e.g., NTP, Inc. v. Resch. In Motion, Ltd.*, 418 F.3d 1282, 1296 (Fed. Cir. 2005)

To the extent that this Court sees fit to entertain the question of whether the construction itself is correct, this case is analogous to others where the proper scope of the claim term was found to be narrower than the plain and ordinary meaning without first finding an express disclaimer or disavowal. *See, e.g., AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021)("[a]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role

of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented"); A*ptalis Pharmatech, Inc. v. Apotex Inc.*, 718 F. App'x 965, 971 (Fed. Cir. 2018)("[a]ccordingly, even in the absence of a clear and unmistakable disavowal, . . . the prosecution history can be evaluated to determine how a person of ordinary skill would understand a given claim term.") Finally, the patentee's prosecution statements do rise to the level of a disclaimer or disavowal.

With respect to the "Majority of an Area" term, the patentee distinguished its invention by arguing that the cited combination only permitted a smaller surface area of mortar to pass through the notch. In this case, a construction is necessary to provide the "Majority of an Area" term with both its prosecution subtext as well as a meaning that is not superfluous, otherwise, it would be meaningless in the context of the claim. *See, e.g., Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) ("[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous"). Acufloor argues that Forpac's claim construction renders of portion of the term superfluous, but Forpac's construction gives meaning to the term *in its entirety.*

## 4. Argument

A claim construction analysis requires more than mere identification of whether there has been an express disclaimer or disavowal of claim scope sufficient to overcome the plain and ordinary meaning of a term, as Acufloor contends. Instead, the appropriate scope of claim construction should include an evaluation of the evidence to determine the construction that most naturally aligns with the subject matter that the patentee actually intended to envelop with the claims. *Phillips*, 415 F.3d at 1316. The result is that express disavowal is not the only circumstance in which a court can determine that the proper construction of a claim departs from, or is narrower than, the "ordinary meaning." *See, e.g., AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021)("any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant .... Accordingly, even in the absence of a clear and unmistakable disavowal ... the prosecution history can be evaluated to determine how a person of ordinary skill would understand a given claim term")(internal quotations omitted). The prosecution history can "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would

otherwise be." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005); *see also Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718 F. App'x 965, 971 (Fed. Cir. 2018) (relying on the prosecution history to inform a claim construction analysis without finding a disavowal of claim scope).

### a. "Tile Edge" Refers to the Line where the Surface of the Tile Terminates, not a Nebulous Region Near the End of the Tile

#### i. The District Court was Correct to Construe "Tile Edge"

Before addressing the substance of the District Court's claim construction of "tile edge," it should be noted that Acufloor did not present an alternative construction of the term at the District Court, only that the "plain and ordinary meaning" was sufficient. Accordingly, the correct scope of review is whether it was appropriate for the District Court to construe the term, and this Court need not entertain arguments about whether the construction itself was correct. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). This does not mean that a court must construe every term, or that the "ordinary meaning" is never appropriate, but when the "ordinary meaning" does not resolve the parties' dispute, the court is required to issue a construction to determine the appropriate scope of the claim term in the

context of the patents-in-suit. *Id.* This principal is not limited to archaic, technical, or coined terms. This Court has routinely approved of constructions for commonly used terms with well-accepted plain definitions. *See, e.g., Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (construing "board" in light of intrinsic record); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1350 (Fed. Cir. 2004) (construing "golden brown" even though colors "are commonly used terms with well-accepted plain definitions that rarely need construction"), *rev'd on other grounds*, 546 U.S. 394, 126 S. Ct. 980, 163 L. Ed. 2d 974 (2006); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999) (construing "cover," "included," "attachment," and "removable").

In *O2 Micro*, the asserted claim was directed to a DC/AC converter that called for a "feedback control loop circuit" that would generate a control signal "only if" a feedback signal was above a predetermined threshold. *Id.* at 1356. The defendants in the case argued for specific constructions – either that it should mean "exclusively or solely in the event that" or "never except when," while *O2 Micro* argued that no construction was necessary because the term consisted of "two simple, plain English words." *Id. at 1357.* The district court ruled that the term did not need a construction, because it had

a "well-understood definition…" *Id.* In essence, the district court determined that the "plain and ordinary meaning" was sufficient.

On Appeal, the Federal Circuit determined that the term should have been construed because the "ordinary" meaning of the term did not resolve the parties' dispute.

> The parties presented a dispute to the district court regarding the scope of the asserted claims--What do the patents mean when they say that the feedback signal controls power "only if said feedback signal is above a predetermined threshold"? O2 Micro contends that this "only if" limitation only applies during "steady state operation," while Defendants-Appellants contend that the "only if" limitation applies at all times without exception. This dispute over the scope of the asserted claims is a question of law. In deciding that "'only if' needs no construction" because the term has a "well-understood definition," the district court failed to resolve the parties' dispute because the parties disputed not the meaning of the words themselves, but the scope that should be encompassed by this claim language.

*Id.* at 1361. In the case at hand, the District Court's findings determined the appropriate *scope* that should be encompassed by this claim language in light of the prosecution history, rather than set forth a specific definition of the *meaning* of the term.

Specifically, the term "tile edge" is used in the claims to establish a critical metric which the patentee relied on to distinguish the efficacy of its invention from the prior art, which is the concept it refers to as "Tile Edge-to-Mortar-to-Subfloor Contact." *See, e.g.,* Appx1081-1086, a visual aid

submitted by the patentee to the U.S. Patent and Trademark Office to demonstrate the concept. This concept describes the extent to which mortar must reach along the underside of the tile. As the patentee argued, "inserting a layer of plastic between the edge and the subfloor…. often creates a void of adhesive at the plastic to tile edge combination." Appx1081. It then characterized this as "weakening the installation … at the most vulnerable points" (the patentee was referring to tile edges and corners as the most vulnerable points). *Id.* The patentee then went on to demonstrate prior art tile clips in order to distinguish the invention's ability to provide "tile edge-to-mortar-to-subfloor contact" from the prior art clips' alleged inability to do so. Appx1085-1086. Importantly, it is plain to see that the prior art clips permit mortar contact *very close* to the extreme end of the tile. With respect to the Doda Device especially, it is extremely difficult to discern the difference in "edge" contact. Accordingly, the question of the proper scope of the claim term becomes, to what extent must mortar be permitted to contact the underside of the tile? The "plain and ordinary meaning" of this term does not resolve the question, given the apparently minute difference in mortar contact between the prior art and the claimed tile clip. Therefore, a construction was necessary to determine the appropriate scope

encompassed by this claim language, not merely to determine the meaning of the words.

At the District Court, Forpac argued that the term "edge" should be construed for at least two reasons. First, because the arguments made by the patentee during prosecution affected the scope of the term, and second, because the "ordinary meaning" of a tile edge does not necessarily indicate where the edge begins. If the District Court had not construed the term, then construction would have improperly fallen to the jury. This issue is best demonstrated in the exchange between counsel for Acufloor and the District Court during the Markman hearing.

> MR. EMERSON: So, Your Honor, is my mouse on the corner of the table? I would say that it's on the corner. A normal person would say yes, this is on the corner of the table; right? It's on the edge of the table here. It doesn't have to be overlapping in order to be on the edge or the corner. And, of course, again, that's because the point of the I-shaped base and of the notch is to allow the quickset or the mortar to contact -- you know, you've got mortar from the edge or the corner all the way down to the floor.
>
> THE COURT: So if you take your mouse and you set it back 3 inches from what you just said everybody would know would be the corner, do you still consider that area the corner?
>
> MR. EMERSON: Depends on the size of the rectangle. I would say that's the corner, sure. It's 3 inches. That's still the corner. If this were a one-by-one -- 1 foot by 1 foot tile, then you probably wouldn't consider that the corner.

Appx1821-1822. The exchange between counsel for Acufloor and the District Court encapsulates the issue with Acufloor's "I-know-it-when-I-see-it" concept of the plain and ordinary meaning of edge. In order to determine the question of infringement, the fact finder will need to ascertain the extent to which mortar is permitted to contact the underside of a tile. If that metric is "somewhere close to the extreme end of the tile," then we do not have clear guidelines placing future infringers on notice of what constitutes an infringement, especially considering that prior art clips also permitted mortar contact very close the extreme end of the tile.

In light of the foregoing, the District Court was correct to construe the term "tile edge" and the Court's appellate review can simply end here because Acufloor did not propose an alternative construction to the District Court. In order to entertain the question of whether the District Court's construction was "correct," Acufloor would inherently need to assert a construction, which it has forefeited by failing to propose an alternative construction to the District Court. "We have previously held that presenting proposed claim constructions which alter claim scope for the first time on appeal invokes the doctrine of waiver as to the new claim constructions." *NTP, Inc. v. Resch. In Motion, Ltd.*, 418 F.3d 1282, 1296 (Fed. Cir. 2005); s*ee also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1370 (Fed. Cir. 2002) ("[A] waiver may

occur if a party raises a new issue on appeal, as by, *e.g.*, presenting a new question of claim scope ...." (internal quotation marks omitted)); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) ("As it relates to claim construction, the doctrine [of waiver] has been applied to preclude a party from adopting a new claim construction position on appeal.") Accordingly, the Court need not entertain the question of whether the District Court committed an error in its construction, only that it was appropriate for the District Court to issue a construction.

#### ii. Express Disavowal is not Required for a "Narrow" Construction

Acufloor has argued that the District Court committed error by adopting a construction of "edge" when it allegedly did not "clearly and unequivocally disclaim" a broader interpretation. First, the patentee's statements during prosecution do actually rise to the level of a clear and unequivocal disclaimer, as discussed below. However, the Court need not go that far because Acufloor has missed an important intermediate step. A court is not required to determine that the patentee disclaimed subject matter in order to issue a construction that is "narrower" than the plain and ordinary meaning. *See, e.g., AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021). "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role

of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (quoting *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011)). "Accordingly, even in the absence of a clear and unmistakable disavowal, . . . the prosecution history can be evaluated to determine how a person of ordinary skill would understand a given claim term." *Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718 F. App'x 965, 971 (Fed. Cir. 2018).

In *AstraZeneca*, the asserted claim called for a pharmaceutical composition having 0.001% of a particular ingredient. *AstraZeneca AB* 19 F.4th at 1328. The district court construed the scope of 0.001% consistent with its "plain and ordinary meaning" and clarified that meant, "expressed with one significant digit" (inclusive of 0.0005% to 0.0014% to account for rounding). *Id.* On appeal, however, the Federal Circuit construed that term as a "precise number, with only minor variations, i.e., 0.00095% to 0.00104%." *Id.*

While the Federal Circuit noted that the broader range would ordinarily fall within the standard scientific convention, it disagreed with AstraZeneca's assertion that *only* lexicography or disclaimer could alter that scope because "this narrow view of our precedent would necessitate adopting

an acontextual construction of this disputed claim term." *Id.* at 1329-1330. The Federal Circuit appreciated that the specification and prosecution history can alter the ordinary meaning of a claim term. "Indeed, as we have explained, the ordinary meaning of a claim term is not the meaning of the term in the abstract. Instead, the ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* (internal quotations omitted). *See also, Nystrom v. TREX Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005)("[a] party is . . . not entitled to a claim construction divorced from the context of the written description and prosecution history.") Therefore, because both the specification and the prosecution history placed considerable emphasis on the stability of the claimed formulations, the intrinsic record supported a narrower percentage range to reflect the fact that the broader "ordinary meaning" has a negative impact on stability. *Id.* at 1330-1332.

In the case at hand, the District Court recognized that the patentee placed considerable emphasis on supporting the underside of the tile with mortar all the way to the edge of the tile. The prosecution history demonstrated that prior art clips, which permitted mortar contact *very close* to the extreme end of the tile, did not sufficiently support the "tile edge."

### iii. Acufloor's Arguments during Prosecution Rose to the Level of "Express Disavowal"

The opinions cited by Acufloor set forth a rigid and fairly strict burden to meet before a prosecution history disclaimer can limit claim scope of a term from its ordinary meaning, but none of them are availing to Acufloor because the statements it made during prosecution do, actually, rise to the level of a "clear and unequivocal" disavowal of claim scope. Acufloor mainly relies on *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) to demonstrate the bar which must be met before a disavowal of claim scope occurs. Notably, however, when comparing the prosecution statements in *Omega* to those made in the instant case, it becomes clear that Acufloor's statements meet this bar.

In *Omega*, the asserted patents related to a laser sighting system for infrared thermometers. *Id.* at 1318. The claims at issue dealt with the use of laser beams to visually outline the surface area encompassed by the field of view of the radiometer's lens, in order to take more accurate temperature measurements. *Id.* The construed terms included: "to outline the energy zone," "outline visibly," "to outline visibly the periphery," and equivalent phrases. *Id.* at 1319. The district court construed those terms as excluding a laser beam directed inside the energy zone. *Id.* On review, the Federal Circuit determined that while the district court had erred, it was not because there

was no disclaimer at issue, it was simply that the disclaimer was more circumscribed than what the district court articulated. *Id.* at 1323.

In particular, the patentee distinguished its invention from the prior art by arguing that its invention “outlined” the “energy zone” to avoid introducing energy into the region where a temperature reading is being taken. *Id.* at 1326. The patentee strengthened this disavowal by repeating the argument in different amendments. *Id.* at 1326-1327

> Consequently, during the prosecution of the application that issued as the '880 patents, Omega repeatedly insisted that its invention differed from the prior art by precluding appreciable heat from entering the energy zone and affecting the temperature of the energy zone. By insisting that its invention directs energy in a way that does not affect temperature measurement, the patentee has rejected the examiner's broad assessment of the claim scope and stated in a public record what his invention could not be. That statement is a deliberate surrender of claim scope, unmistakable in its effect because it is not suitable to multiple interpretations as in *Northern Telecom*, 215 F.3d at 1294, 55 USPQ2d at 1075. There is only one possible interpretation of this clear statement: The inventions covered by claims 1 and 3 have significantly reduced effect on temperature measurement. *Id.* at 1327.

In the case at hand the District Court found that Acufloor “relied on mortar-to-tile contact up to the very edge of the tile, rather than an area near the very edge, to distinguish their invention from the prior art.” Appx7. Not only did Acufloor make this distinction once, but the District Court found that Acufloor “repeatedly distinguished their invention from tile spacers in

the prior art by showing that only their invention allowed for mortar contact all the way to the very edge of the tile." Appx7. The District Court pointed to Acufloor's Demonstrative Aid (Appx1080) and the fact that Acufloor amended the independent claim to include "edge-to-subfloor contact." Appx1053.

The prosecution statements supporting this distinction are ample. With regard to the '857 Patent, Acufloor annotated a prior art drawing to demonstrate that if the "edge" of the tile were to rest on the center of a clip, there could be no "edge-to-subfloor contact."



Appx1052. For context, Acufloor showed that the "screw hole" openings were approximately one quarter inch in diameter, suggesting that even a much smaller fraction of an inch of interference would be sufficient to preclude "edge-to-subfloor" contact.

With regard to the '274 Patent, Acufloor again went to great lengths to demonstrate that close to the edge does not qualify as edge-to-subfloor contact when it submitted its Demonstrative Aid to the USPTO:




Accordingly, just like the patentee in *Omega*, Acufloor rejected the examiner's broad assessment of "edge-to-subfloor contact" in the prior art by demonstrating that the prior art clips were not capable of "edge-to-subfloor contact." By insisting that only its invention was capable of "edge-to-subfloor contact," even though the prior art clearly permitted mortar contact very near to the edge, Acufloor stated in a public record what the invention could not be. The invention does not cover clips which only permit

mortar to flow *near* the edge. That statement is a deliberate surrender of claim scope, which is not suitable to multiple interpretations. Because the patentee did not provide precise measurements of *how much closer to the edge* its invention permits mortar contact, the only possible interpretation of this statement is that the invention must permit mortar to flow all the way to the edge, i.e., the line where the surface of the tile terminates.

Acufloor's other precedent regarding disavowal is easily distinguished. In *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004) the district court's error was to treat a "preferred embodiment" from the specification as a disavowal of claim scope. There were no relevant statements in the prosecution history of the asserted patents on which the *Home Diagnostic's* court could have relied. In the case at hand, and as demonstrated above, the District Court's finding relied on Acufloor's prosecution statements, and not merely a preferred embodiment.

In *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007), the prosecution statement on which the district court relied was outweighed by the fact that it would render the device inoperable, directly conflicted with other statements in the same prosecution document, and did not find support in the specification. *Id.* at 1373. In the case at hand, the District Court's construction is directly in line with the patentee's

prosecution position, namely, that edges are the most vulnerable points of a tile. In order to function effectively, the clip must permit mortar support the edge of the tile in order to prevent cracks. Appx1080-1082.

In *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012), the district court determined that a disavowal had occurred with respect to a "payload platform" of a stabilized camera mount. *Id.* at 1338. The district court relied on the reexamination history to construe the term as a "horizontal plate, piece of surface upon which the device (*e.g.*, a camera) is directly mounted upon or affixed to." *Id.* at 1341. On review, the Federal Circuit found that the prosecution history statements did not focus on the characteristics of the "payload platform" itself, but rather referred to the placement of sensors in relation to the prior art's analogous platform. *Id.* Accordingly, the comments could not be used to limit the "payload platform" itself, and it was not proper to limit it to a "horizontal" surface. *Id.* Therefore, the Federal Circuit determined that the proper claim scope was "a three-dimensional structure upon which the payload (*e.g.*, a camera) is directly mounted upon or affixed to." *Id.* at 1344. In the case at hand, as has been demonstrated, Acufloor's prosecution statements speak directly to the concept of "edge."

### iv. Acufloor's other Arguments are Unavailing

Acufloor also argues that the District Court erred in failing to address Figure 11A of the asserted patents as well as the commercial embodiments, in which the body of the clip is thinner than the base, which would preclude "edge-to-subfloor contact" if edge is limited to a line at which the surface of the tile terminates. However, this is a red herring, because Acufloor produces a number of commercial embodiments with varying body thicknesses, in order to accommodate different grout line thickness in tile installations. *See*, Appx1666, an excerpt from Forpac's presentation during the Markman Hearing. The slide shown on Appx1666 depicts two of Acufloor's products, as produced by Acufloor. On the right, in yellow, is a commercial embodiment having a body thickness sufficient to push the edge of the tile off of the base, and rest completely over the mortar in the notch. The fact that Acufloor's other products fail to achieve the stated goal of its patent claims should not be given much weight because commercial embodiments are rarely helpful in claim construction. *See Int'l Visual Corp. v. Crown Metal Co.*, 991 F.2d 768, 771-72 (Fed. Cir. 1993) (reversing claim construction based on commercial embodiment because infringement is determined on the basis of the claims, not on the basis of a comparison with

the patentee's commercial embodiment of the claimed invention)(internal quotes omitted).

With regard to Figure 11A, it is merely described as "one embodiment," not a "preferred embodiment." *See,* Appx120 at column 2, lines 45-47. The asserted patents do not use the term "preferred embodiment." Regardless, "it is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue." *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000).

Finally, Acufloor argues that the construction is inconsistent with the plain meaning of edge. However, Acufloor admits that there are multiple definitions for the term "edge" and that the District Court's construction is actually consistent with one of them. *See,* Appx1036 ("the line where an object or area begins or ends.") The fact that there are multiple other definitions of edge is irrelevant, because the nature of this exercise is to determine whether the patentee surrendered those other definitions, which it has.

#### b. "Majority of an Area" Refers to the Ratio of Notch to Plastic in the Base

To support its construction, the District Court relied on the amendment and arguments in which Acufloor added the "Majority of an

Area" limitation. Appx10. *See also,* Appx805, Appx807, and Appx821-825. Specifically, the District Court noted that Acufloor distinguished its device from the prior art because the claimed device allowed for a larger area of uninterrupted subfloor-to-mortar-to-tile contact. Appx10. Quoting Acufloor, the District Court acknowledged that the claimed design allows "more adhesive to penetrate the opening and extend over a greater surface area of the tiles" than the prior art. Appx10. Thus, the District Court chose Forpac's construction, namely, "the notches in the base collectively span an area that is larger than the solid portions of the base." Appx10.

Acufloor first argues that this construction ignores the phrase "of tile-to-mortar-to-subfloor contact for the tile leveling device" altogether, but this is not true. The District Court's construction gives meaning to the claim term *as a whole*. If left with the purportedly natural reading, the claim term is nothing but a tautology because the notches are the *only* places where tile-to-mortar-to-subfloor contact can occur, so definitionally, they must also provide the "majority" of that contact as well. "It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021)

Moreover, the purportedly "natural" reading fails to inform a jury of the meaning imbued by Acufloor when arguing that limitation during prosecution. The District Court's opinion recognizes that the thrust of the patentee's arguments regarding this limitation were not focused on whether the prior art's notches were smaller than its holes, but rather, that the "notches in the claimed device … allowed for a larger area of uninterrupted subfloor-to-mortar-to-tile contact." Appx10. Thus, the differentiating factor, according to Acufloor itself, was to allocate a majority of surface area of the base structure to the open notches which allowed "more adhesive to penetrate the opening and extend over a greater surface area of the tiles than the prior art." Appx10 (quoting the March 25, 2020 Request for Continued Examination, Appx826). Given that "any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant,"[5] the District Court's construction provides a jury with the much needed subtext that Acufloor imbued this term with during prosecution.

Put simply, the meaning of this claim term is delineated by geometry. The bounds of the base are formed of two distinct portions – i.e., the solid portions of the base and the empty area formed by the notches. And if the notches provide the majority of the tile-to-mortar-to-subfloor contact, then

[5] *AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021)

logic dictates that the area of the notches is greater than the area of the solid portions of the base. Acufloor's proposed construction is also unfounded in view of the prosecution history of the '274 Patent. Specifically, in an Amendment submitted on March 25, 2020, the Patentee expressly amended the claims to recite the above referenced limitation in an attempt to overcome the prior art. Particularly, the Patentee argued the following:

> It is not possible that one of ordinary skill in the art before the filing date of the instant invention would have modified the base of Doda with the configuration of Psaila by extending the opening 129 all the way to the front portion of the base 116 for allowing more adhesive to penetrate the opening and extend over a greater surface area of the tiles as taught by Psaila..... Psaila discloses and teaches keeping any opening 129 of Doda or cut-outs 28 of Psaila away from the inside of the base 116 so the integrity of the spacer tabs is maintained.

Appx814-815. As such, the patentee argued that the distinguishing feature of the invention compared to the prior art was not that the notches of the invention provide more tile-to-mortar-subfloor contact than the holes of the prior art, but rather, that the prior art bases required a majority of surface area to be devoted to solid plastic in order to retain structural integrity. "Psaila discloses and teaches keeping any opening 129 of Doda or cut-outs 28 of Psaila away from the inside of the base 116 so the integrity of the spacer tabs is maintained." Appx815. Thus, according to Accufloor, the differentiating factor of the patentee's invention, and the feature highlighted

by the "Majority of an Area" term, was that it allocated a majority of surface area of the base structure to the open notches while retaining structural integrity. In view thereof, Acufloor's proposed construction is inconsistent with the intrinsic evidence of the '247 Patent. Conversely, Forpac's proposed construction accurately reflects that which the patentee actually argued.

## 5. Conclusion

For the reasons set forth above, Forpac respectfully urges the Court to affirm the District Court's claim construction. While the District Court reserved jurisdiction to adjudicate an award of fees and costs incurred at the appellate level, out of an abundance of caution, Forpac also reserves the right to apply to this Court for an award of fees and costs.

Respectfully Submitted,

Dated: March 22, 2024

/s/ W. John Eagan
W. John Eagan
Florida Bar No. 105,101
MALLOY & MALLOY, P.L.
2800 S.W. Third Avenue
Miami, Florida 33129
(305) 858-8000 – Telephone
(305) 858-0008 – Facsimile
johneagan@malloylaw.com

*Counsel for Defendant-Appellee Forpac, LLC*

## 6. Certificate of Filing and Service

I hereby certify that, on March 22, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

Respectfully Submitted,

Dated: March 22, 2024

/s/ W. John Eagan
W. John Eagan
Florida Bar No. 105,101
MALLOY & MALLOY, P.L.
2800 S.W. Third Avenue
Miami, Florida 33129
(305) 858-8000 – Telephone
(305) 858-0008 – Facsimile
johneagan@malloylaw.com

*Counsel for Defendant-Appellee Forpac, LLC*

## 7. Certificate of Compliance

1. This brief complies with the type-volume limitation of Federal Circuit Rule 35(d) and Fed. R. App. P. 35(b)(2) because:

   this brief contains 7,665 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 35(c)(2).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in proportionally space typeface using Microsoft Word in 14-point Georgia.

Respectfully Submitted,

Dated: March 22, 2024

/s/ W. John Eagan

W. John Eagan
Florida Bar No. 105,101
MALLOY & MALLOY, P.L.
2800 S.W. Third Avenue
Miami, Florida 33129
(305) 858-8000 – Telephone
(305) 858-0008 – Facsimile
johneagan@malloylaw.com

*Counsel for Defendant-Appellee Forpac, LLC*